**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

MAR 1 6 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| WILLIAM FOSTER,<br>      Individually and on behalf of all<br>      others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>CHECK ALERT SYSTEMS, INC.<br><br>      Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. B-02-196 |

---

**CHECK ALERT SYSTEMS, INC.'S**
**BRIEF IN SUPPORT OF ITS RESPONSE TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

---

Respectfully submitted,

DAW & RAY, P.C.

By: _Tina Brumbelow_

Keith Wier; TBN: 21436100
Tina Brumbelow; TBN: 24031980
Coastal Banc Plaza
5718 Westheimer, Suite 1750
Houston, Texas 77057
713/266-3121
713/266-3188 (Fax)

*ATTORNEYS FOR DEFENDANTS*
*CHECK ALERT SYSTEMS, INC.*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    ARGUMENTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.    The Lease Sophisticated Consumer Standard . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.    The May 24, 2002 collection letter does not violate the FDCPA and/or
         TDCPA because it there is no threat of further legal action or
         commencement of criminal charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         1.    The May 24, 2002 collection letter does not threaten further legal
              action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         2.    The May 24, 2002 collection letter does not threaten the
              commencement of criminal charges . . . . . . . . . . . . . . . . . . . . . . . . . . 6

         3.    The failure to maintain a surety bond, as required by the Texas Finance Code,
              does not automatically establish liability against a debt collector, Plaintiff,
              and other putative class members, must prove actual damages. . . . . . . . . 8

III.    CLASS CERTIFICATION REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     A.    Plaintiff has failed to meet at  least one or more of the four requirements
         of Rule 23(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         1.    Plaintiff Does Not Satisfy the Numerosity Requirement . . . . . . . . . . . . 10

              a.    There is no identifiable class. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

              b.    Plaintiff fails to meet the numerosity requirement because
                   the class is too speculative and indefinite. . . . . . . . . . . . . . . . . . 12

         2.    Plaintiff Does Not Satisfy the Commonality Requirement . . . . . . . . . . 13

         3.    Plaintiff Does Not Satisfy the Typicality Requirement . . . . . . . . . . . . . 13

              a.    Typicality is not met because Plaintiff is judicially estopped
                   from asserting his claims against Check Alert and lacks
                   individual standing to raise a legal claim . . . . . . . . . . . . . . . . . . 13

b.      Plaintiff's injuries are atypical because he and the putative
        class members do not share the same injuries and/or same
        factual scenarios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4.      Plaintiff Does Not Satisfy the Adequacy Requirement . . . . . . . . . . . . . 16

        a.      Plaintiff lacks the necessary personal qualities required of
                class representatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        b.      Plaintiff lacks a sufficient interest in the outcome to ensure
                vigorous advocacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        c.      Plaintiff has antagonistic or conflicting claims with other
                class members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5.      Representatives Lack Information Regarding Potential Class
        Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.      Plaintiff has not met the requirements of Rule 23(b) . . . . . . . . . . . . . . . . . . . . . 20

        1.      Class certification under Rule 23 (b)(2) is inappropriate because the
                final relief sought by Plaintiff and the putative class member
                relates exclusively to money damages. . . . . . . . . . . . . . . . . . . . . . . . . 20

        2.      Plaintiff has not met the requirements of Rule 23(b)(3) because class
                action is not superior to other available methods to resolve this
                controversy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

INDEX OF EXHIBITS

## TABLE OF AUTHORITIES

### Statutes

1.      15 U.S.C. § 1692 *et seq.*

2.      Tex. Fin. Code Ch. 392

3.      Tex. Fin. Code §392.101

4.      Tex. Pen. Code 32.41

5.      Mich. Pen.Code Ann. §750.131

6.      Fed. R. Civ. P. 23 (a)

7.      Fed. R. Civ. P. 23(b)

8.      11 U.S.C. §1692, *et seq.*

9.      11 U.S.C.§ 541(a)

### Case Law

1.      *Allison v. Citgo*, 151 F.3d 402 (5th 1998)

2.      *Amchen Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)

3.      *Applewhite v. Reichhold Chems.*, 67 F.3d 571 (5th Cir. 1995)

4.      *Barlow v. Marion County Hosp. Dist.*, 88 F.R.D. 619 (M.D.Fla.1980)

5.      *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir.2001)

6.      *Bolin v. Sears, Roebuck & CO.*, 231 F.3d 970 (5th Cir.  2000)

7.      *Bingham v. Collection Bureau, Inc.*, 505 F. Supp. 864 (N. Dak. 1981)

8.      *Castano v. American Tobacco Co.*, 4 F.3d 734 (5th Cir. 1996)

9.      *Clomon v. Jackson*, 988 F.2d 1314 (2nd Cir.1993)

10.     *Cwiak v. Flint Ink Corp.*, 186 F.R.D. 494 (N.D.Ill.1999)

11.     *DeBremaecher v. Short*, 433 F.2d. 733 (5th Cir. 1970)

12.    *Duncan v. Tennessee*, 84 F.R.D. 21 (M.D. Tenn. 1979)

13.    *Elston v. Resolution Servs., Inc.*, 950 S.W.2d 180

14.    *Gamman v. GC Services Ltd. Partnership*, 162 F.R.D. 313 (N.D.Ill1995)

15.    *General Tel. Co. v. Falcon*, 457 U.S. 147 (1982)

16.    *German v. Federal Home Loan Mortgage*, 885 F.Supp. 537 (S.D.N.Y.1995)

17.     *Gomez v. Comerford*, 833 F.Supp. 702, 706 (N.D.Ill.1993)

18.    *Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1974)

19.    *Green v. Carlson,* 653 F.2d 1022 (5th Cir.), *cert. denied,* 454 U.S. 944, *reh'g denied,* 454 U.S. 1093 (1981);

20.    *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470(5th Cir. 1982) , *cert. denied*, 463 U.S. 1207; *In re American Medical Sys.*, 75 F.3d 1069 (6th Cir. 1996).

21.    *Hooks v. General Fin. Corp.*, 652 F.2d 651 (6th Cir. 1981) (per curiam)

22.    *In re American Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir.1996)

23.    *In re Yonikus*, 974 F.2d 901 (7th Cir.1992)

24.    *In re Allen*, 179 B.R. 818 (Bankr.E.D.Tex.1995)

25.    *In re Coastal Plains*, 179 F.3d 197 (5th Cir. 1999)

26.    *Johnson v. General Motors Corp.*, 59 F.2d 432 (5th Cir. 1979)

27.    *Joseph v. General Motors Corp.*, 109 F.R.D. 635 (D. Colo. 1986)

28.    *Kammerman v. Steinberg*, 113 F.R.D. 511(S.D.N.Y. 1986)

29.    *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405 (W.D.Okla.1990)

30.    *Kohn v. Mucia*, 776 F.Supp. 348 (N.D.Ill.1991)

31.    *Lewis v. Johnson*, 92 F.R.D. 758 (E.D.N.Y. 1981)

32.    *Lyles v. Rosenfeld Attorney Network*, 2000 WL 798824, at *7 (N.D.Miss. May 17, 2000)

33.    *Marcial v. Coronet Ins. Co.*, 880 F.2d 954 (7th Cir.1989)

34.    *Martin v. New York Dept. of Social Servs.,* 111 F.R.D. 64

35.    *Mullen v. Treasure Chest Casino*, LLC, 186 F.3d 620 (5th Cir. 1999)

36.    *Narwick v. Wexler*, 901 F.Supp. 1275 (N.D.Ill.1995)

37.    *Ortiz v. Fiberboard Corp.*, 527 U.S. 815 (1999)

38.    *Page v. Checkrite, Ltd*, CV82-L-317 (D. Neb. 1984)

39.    *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *cert. denied,* 458 U.S. 1107 (1982);

40.    *Piazza v. EBSCO Indus., Inc.*, 273 F.3d 1341 (11th Cir. 2001)

41.    *Reed v. Chartwell Financial Services*, Nos. 98 C 6965-66, 1999 WL 181986, *2 (N.D.Ill. Mar. 24, 1999)

42.    *Senter v. General Motors Corp.* 532 F.2d 511, 520 (6th Cir.), *cert. denied,* 429 U.S. 870 (1976)

43.    *Simer v. Rios,* 661 F. 2d. 655 (7th Cir. 1981)) *cert denied,* 456 U.S. 917 (1982)

44.    *Sizemore v. Arnold,* 647 N.E.2d 697 (Ind.Ct.App.1995)

45.    *Southmark,* 442 S.E.2d at 267

46.    *Spivak v. Petro-Lewis Corp.*, 123 F.R.D. 693 (D. Colo. 1987)

47.    *Stewart v. Hardie,* 978 S.W.2d 203 (Ft. Worth 1998)

48.    *Stewart v. Winger*, 669 F. 2d 328 (5th Cir. 1982)

49.    *United States v. National Financial Serv., Inc.*, 98 F.3d 131 (4th Cir.1996)

50.    *Wade v. Regional Credit Ass'n*, 87 F.3d 1098 (9th Cir.1996)

51.    *Weisman v. Darneille,* 78 F.R.D. 669 (E.D.N.Y.1978)

52.    *Wilcox Dev. Co. V. First Interestate Bank,* 97 F.R.D. 440 (D. Or. 1983)

53.    *Woolfolk v. Van Ru Credit Corp.*, 783 F. Supp. 724 ( D. Conn 1990)

<u>Other Authorities</u>

1.    7 A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1760, at 126 & n. 12 (1986)

2.    7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1766

TO THE HONORABLE COURT:

Defendant, CHECK ALERT SYSTEMS, INC. (hereinafter referred to as "Check Alert" or "Defendant"), files its Response to Plaintiff's Motion for Class Certification and Brief in Support of Its Response, and respectively asks the Court to deny Plaintiff's Motion for Class Certification, and Brief in Support, under Federal Rules of Civil Procedure 23 and in support thereof shows the Court as follows:

## I. INTRODUCTION

1.     Plaintiff filed this suit alleging violations of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") and the Texas Debt Collection Practice Act, Tex. Fin. Code Ch. 392 ("TDCPA"), including (1) threatening further legal action that Check Alert did not intend to take; (2) threatening commencing criminal charges it did not plan to initiate; (3) failing to maintain a surety bond as required by §392.101 of the Texas Finance Code. In response to Plaintiff's allegations, Defendant denies any FDCPA and TDCPA violation on its part.

2.     Defendant Check  Alert was hired Martin's Supermarket to collect the outstanding debt of Plaintiff for his dishonored check. *See Exh A, May 24, 2002 Collection Letter; see also Exh B, Copy of the Dishonored Check.* Accordingly, Defendant attempted to collect that debt though several correspondences including the collection letter dated May 24, 2002 (hereinafter referred to as "letter"). *See Exh B.* As a result of Defendant's collection efforts, Plaintiff asserts the May 24, 2002 violated the FDCPA and TDCPA. *See Exh A.* However, Defendant denies the letter: (1) violates the FDCPA and/or the TDCPA; and (2) threatens further legal action and the commencement of criminal charges as alleged by Plaintiff. In fact, as explained hereinafter, Courts have found the language utilized in the letter to be permissible and not in violation of the FDCPA.

-1-

3.      Plaintiff alleges Defendant violated the FDCPA and the TDCPA because Defendant allegedly utilized routine, abusive, deceptive, and unfair practices that are damaging to Plaintiff and many consumers.  More specifically, Plaintiff alleges Defendant violated the FDCPA and TDCPA by engaging in a variety of illegal practices in collecting debt, using letters similar to the one dated May 24, 2003, sent to William Foster.  Plaintiff alleges Defendant represented the  following in the letter:

a)      That if William Foster did not contact Check Alert to resolve the matter, it would take further legal action to collect a debt when it did not plan to do so and did not in fact do so; and

b)      That under State Law, Check Alert could commence criminal charges against the debtor, when it did not plan to do so and did not in fact do so.

Plaintiff further asserts Defendant violated the TDCPA because it did not maintain a surety bond as required by §392.101 of the Texas Finance Code.  Thus, Plaintiff now sues individually and as class representative on the behalf of two consumer classes.  *See Exh C, Plaintiff's Complaint.*  On January 13, 2004, Plaintiff requested the Court certify this cause as a class action.  *See Plaintiff's Motion for Class Certification.*

4.      On behalf of the two consumer classes, Plaintiff seeks declaratory judgment requesting the Court declare Check Alert regularly engages in practices that violate the FDCPA and TDCPA, actual damages, punitive damages, restitution and/or disgorgement of payments received by Check Alert, 1% of Check Alert's net worth, injunctive relief, and statutory damages for alleged violations of the Texas Finance Code, pre and post judgment interest and attorneys' fees.  *See Exh C and Plaintiff's Motion for Class Certification.*    Individually, and as a class member, William Foster seeks statutory, actual damages, punitive damages, declaratory judgment, injunctive relief, pre and post judgment interest and attorneys' fees.  *Id.*

-2-

## II.   ARGUMENTS AND AUTHORITIES

**A.      The Least Sophisticated Consumer Standard.**

5.      In choosing the "least sophisticated debtor" standard, the majority of  courts considering this issue have observed that this standard "comports with basic consumer-protection principles" enumerated by the U.S. Court of Appeals for the Second Circuit as follows: "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd.  This standard is consistent with the norms that courts have traditionally applied in consumer-protection law." *United States v. National Financial Serv., Inc.*, 98 F.3d 131,136 (4th Cir.1996)(quoting *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2nd Cir.1993). Thus, although this standard protects naive consumers, it also **"prevents liability for bizarre or idiosyncratic interpretations of collection notices** by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." *Id.* (citing *Clomon*, 988 F.2d at 1319).

6.      Thus, because the least sophisticated consumer is presumed to have read the letter with care, Plaintiff, a sophisticated consumer[1], is also presumed to have read the letter in its entirety, including the alleged threats and/or objectionable language.  As outlined herein above, Plaintiff asserts Check Alert engaged in two forms of abusive debt collection based upon the May 24, 2002 collection letter. However, even applying the least sophisticated consumer standard, the language of the May 24, 2002 letter does not violate the FDCPA or TDCPA as explained hereinafter.

---

[1]

Plaintiff has a approximately 4-5 ½ years of college education.  See Exh. D, *Deposition of William Foster*, page 10, lns 20-25.

**B.     The May 24, 2002 collection letter does not violate the FDCPA and/or TDCPA because it there is no threat of further legal action or commencement of criminal charges.**

7.     The May 24, 2002 letter contains the following information that is informational and notified the consumer that:

1)     Several unsuccessful attempts have been made to contact the consumer; and
2)     Check Alert wants to help the consumer before it recommends further collection effort on the dishonored check;
3)     The consumer can avoid further collection efforts by paying the amount in full.

8.     Plaintiff has alleged Defendants violated the FDCPA and TDCPA because the collection letter demonstrates abusive debt collection practices.  Specifically, based upon Plaintiff's deposition testimony and Complaint, Defendant believes Plaintiff complains of the following language:

1)     "We are attempting to help you before this dishonored check is recommended for further collection efforts"
2)     "We have advised you that under State Law, the intentional writing of bad checks can be grounds for criminal charges."
3)     "Avoid further action and protect your check writing privileges."
4)     "You can avoid further action being taken by remitting the above amount in full to Check Alert Systems, P.O. Box 818, Cadillac, MI."

9.     Defendant denies the language of the collection letter violated the FDCPA and TDCPA and offers the following case law in support of their position.

**1.     The May 24, 2002 collection letter does not threaten further legal action.**

10.     In the May 24, 2002 letter, there is no language suggesting that if Plaintiff did not contact Check Alert to resolve the debt, Check Alert would take "further legal action" to collect the debt.  Here, because Plaintiff does not reference what portion of the letter indicates further legal action will be taken to collect a debt when they did not intend to do so, Defendant believes Plaintiff is referring to the following sentences:"We are attempting to help you before this dishonored check is recommend for further collection efforts." and "Avoid further action and protect your check

-4-

writing privileges." However, based on federal jurisprudence, the use of these words, specifically "Avoid further action" are not held to be a violation of the FDCPA and a collector cannot be completely denied the use of the word "action" because others have used it with reference to a specific judicial process. *See Bingham v. Collection Bureau, Inc.*, 505 F. Supp. 864 (N. Dak. 1981). **Further, the term "action" cannot be interpreted to mean legal action by the least sophisticated consumer, or even to a sophisticated one, by mere use of the term.** *See Woolfolk v. Van Ru Credit Corp.*, 783 F. Supp. 724 (D. Conn 1990) (even where the collection form used the word "legal action", the term "action" could not be interpreted to mean lawsuit by unsophisticated consumer.) In this case, the passages quoted herein above do not contain any reference, either directly or indirectly, to a suit, lawsuit, legal action, or litigation.

11.    Further, the only "legal reference" in the letter, is the sentence, "We have advised you that under State Law, the intentional writing of bad checks can be grounds for criminal charges." However, there is no indication that further legal action and/or criminal charges would be filed against Plaintiff if they did not contact Defendant to resolve the debt. *See Exh A*. This sentence, as recognized by Plaintiff, is nothing more than an accurate statement of law advising Plaintiff that it is a violation of state law to intentionally write a bad check. *See Exh D, Deposition of Plaintiff William Foster*, pg 43, ls 13-18; pg 44, ls 8-24; *see also* pg 39, ls 1-25. Moreover, noting that it can be grounds for criminal charges to intentionally write bad checks under State Law does not violate the FDCPA. *See Page v. Checkrite, Ltd*, CV82-L-317 (D. Neb. 1984) (noting the bad check can be pursued under State Law is not a violation of the FDCPA).

12.    In fact, the collection letter in this case was informational, notifying the consumer that failure to pay could result in further collection activity and affect his check writing privileges in which the least sophisticated consumer would construe that notice a prudential reminder and not a

threat of legal action. *See Wade v. Regional Credit Ass'n*, 87 F.3d 1098 (9th Cir.1996) (collection letter construed as a prudential reminder). Defendant did not threaten or imply that Plaintiff would suffer further legal action or commence criminal charges. Instead, Defendant clearly informed the debtor that if he paid the debt in full, they will cease further collection activity.

13.     Therefore, even the least sophisticated consumer, who is able to read, and is presumed to have read the notices received with some caution, would be able to determine from cursory review of the correspondence that there is no threat of further legal action or the commencement of criminal charges. Moreover, even under the least sophisticated standard, the May 24, 2002 letter language that "We are attempting to help you before this dishonored check is recommended for further collection efforts" is sufficient to remedy **any** "bizarre or idiosyncratic interpretations" of the letter. *United States v. National Financial Serv., Inc.*, 98 F.3d 131, 136 (4th Cir. 1996). Simply put, there is no assertion in the letter that further legal action would be taken or that criminal charges would be commenced against Plaintiff or others similarly situated. Thus, Check Alert has complied with the requirements of the FDCPA and TCDPA and Plaintiff's claim that Check Alert threatened, without intent, to take further legal action is unfounded and unsupported.

**2.     The May 24, 2002 collection letter does not threaten the commencement of criminal charges.**

14.     Plaintiff asserts Defendant represented it could commence criminal charges against the debtor, Plaintiff. However, there is no language in the May 24, 2002 letter indicating Defendant was could, should, or would commence criminal charges against Plaintiff. In fact, as noted herein above in the previous section, there is no indication that criminal charges would be filed against Plaintiff if they did not contact Defendant to resolve the debt. Thus, Defendant's notation that it can be grounds for criminal charges to intentionally write bad checks under State Law does not violate the FDCPA. *See Page v. Checkrite, Ltd*, CV82-L-317 (D. Neb. 1984).

15.     Further, Plaintiff's assertion that the letter violated the FDCPA and TDCPA because Texas law does not allow such criminal charge and the threat was false is inaccurate and unsupported by Texas law. *See Plaintiff's Motion for Class Certification; see Exh E, Tex. Pen. Code §32.41.* Texas law clear allows for the criminal charge for the intentional writing of bad checks. *Id.* In fact, under the Texas Penal Code, criminal prosecution may be commenced against a person who issues of a bad check and the offense is punishable by fine and imprisonment. *Id; See also Tex. Pen. Code.* Therefore, Plaintiff's assertion that Texas law does not allow for such as a criminal charge is unfounded. *Id.* Thus, any threat, if at all, which Defendant denies, would not be false. *Id.*

16.     Moreover, the letter was sent by Check Alert, a Michigan entity, to Plaintiff, who was a Michigan resident at the time the check was issued and subsequently dishonored, regarding his dishonored check issued to Martin Supermarket, a Michigan entity. *See Exh D*, pg 11, ls 10-25. Under Michigan state law, criminal charges can be commenced against a person for the issuance of a bad check. *See Exh F,* Mich. Pen.Code Ann. §750.131. In fact, a person who intentionally drafts a "bad" check is a subject to criminal charges can be grounds for punishment by fine and imprisonment not criminal charges. *Id.* Therefore, even if Defendant threatened criminal charges, which it denies, these threats, if any, were not false.

17.     However, even assuming Defendant threatened to commence criminal charges, which it expressly denies, there is no evidence that Defendant did not plan to or intend to commence criminal charges on behalf of Martin Supermarket nor is there any evidence that Defendant was not authorized by Martin's Supermarket to deliver the dishonored check to the proper authorities for initiation of criminal charges on its behalf. Thus, Defendant did not violate the FDCPA and/or TDCPA.

-7-

**3.    The failure to maintain a surety bond, as required by the Texas Finance Code, does not automatically establish liability against a debt collector. Plaintiff, and other putative class members, must prove actual damages.**

18.    Here, Plaintiff asserts Check Alert violated the TDCPA by engaging in debt collection without filing the required surety bond. However, the mere fact a debt collector engaged in debt collection without the required surety bond does not automatically establish liability for which Plaintiff can recover a minimum penalty. *See Elston v. Resolution Servs., Inc.*, 950 S.W.2d 180. In fact, Plaintiff, and other putative class members, must prove actual damages to recover against a debt collector. *Id.* Thus, statutory damages for failure to maintain surety bond are effectively conditional upon a Plaintiff's recovery of an award of actual damages for the successful maintenance of the suit under the TDCPA.

### III.  CLASS CERTIFICATION REQUIREMENTS

19.    A district court must conduct a rigorous analysis of the rule 23 prerequisites, often probing behind the pleadings, before certifying a class. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Applewhite v. Reichhold Chems.*, 67 F.3d 571, 573 (5th Cir. 1995). The party seeking certification bears the burden of demonstrating that the Rule 23 requirements have been met. *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 486 (5th Cir. 1982), *cert. denied*, 463 U.S. 1207; *In re American Medical Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996). Therefore, a motion for class certification must assert the four (4) requirements of Rule 23 (a) are met and that the class meets at least one of the three categories of Rule 23(b). *Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Bolin v. Sears, Roebuck & CO.*, 231 F.3d 970, 975 (5th Cir. 2000). Here, Plaintiff asserts this class action is proper pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). However, class certification is improper because Plaintiff has failed to meet one or more of the requirements of Rule 23(a) and the putative class has failed to meet Rule 23 (b)(2) and (3) as explained hereinafter.

-8-

**A.    Plaintiff has failed to meet at least one or more of the four requirements of Rule 23(a).**

20.    One or more class members may sue as representatives, on behalf of the class, if the following requirements are met: (1) the class is so large that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); *Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 828 n.6 (1999); *Mullen v. Treasure Chest Casino*, LLC, 186 F.3d 620, 623 (5th Cir. 1999). The four requirements are common referred to as: (1) numerosity; (2) commonality; (3) typicality; and (4) fair and adequate representation. *See Id.*  Each of these prerequisites must be met before a class can be certified. *See In re American Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996).  Here, Plaintiff assert that he has met all four requirement of Rule 23(a) and asks the Court to certify two classes comprised of:

a.)    Class 1.  All consumer in the Untied Stated who have been the alleged victims of the alleged illegal acts of Defendant that allegedly violated the FDCPA, beginning October 11, 2001 (on year prior to the date of the Complaint was filed ) and continuing to the present; and

b.)    Class 2.  All consumer residing in Texas who have been the alleged victims of the alleged illegal acts of Defendant that allegedly violated the Texas Act, beginning October 11, 200 (two years prior to the date of the Complaint was filed) and continuing to the present.  Class 2 consumers who were the victims of Defendant's acts beginning one year prior to the date this Complaint was filed are also members of Class 1.

21.    With regard to Class 1 and 2, the potential members who were victims of the alleged illegal acts of Defendant that allegedly violated the FDCPA and TDCPA, clearly there is no support for class certification inasmuch as the class is not identifiable and there are no specific illegal acts referenced as being in violation of either Act.  To the extent Plaintiff relies upon the letter as the basis of his class certification, it does not violate the FDCPA and/or the TDCPA as noted herein

above. Thus, there are no questions of law or fact common to the class, and the claims of the Plaintiff are not typical of the claims of the persons Plaintiff seeks to certify as a class.

22.      Further, even if Plaintiff was to point to some violation of the FDCPA, Plaintiff fails to satisfy the requirements of class certification.

### 1.      **Plaintiff Does Not Satisfy the Numerosity Requirement**.

#### a.      **There is no identifiable class.**

23.      In determining whether a class meets the numerosity requirement the court must first determine whether a class is sufficiently defined so that potential members can be identified. *Joseph v. General Motors Corp.*, 109 F.R.D. 635, 638 (D. Colo. 1986).   As outlined herein above, Plaintiff seeks to certify two classes; however, in order to do so, there must be a class of claimants whose members can be identified in order to maintain a class action. *DeBremaecher v. Short*, 433 F.2d. 733, 734 (5th Cir. 1970); *Id.* at 638-639. Further, the class must be defined in objective terms that can presently be ascertained.   Plaintiff has failed to identify a "class" of claimants.

24.      Regarding the putative class members that were contacted by the Defendant, that class is not marked by any objective criteria by which the identity of its members can be presently ascertained.   Simply because an individual was contacted by Defendant does not mean there was even a potential violation of any of the statutes allegedly violated by Plaintiff.   Therefore, in order to determine whether a person fits within the class, this Court would have to inquire into each putative member's dealings with Defendant. *See Exh C.*   In fact, Plaintiff even admits that each putative member's dealings with Defendant will have to inquired into. *Id.*   In Plaintiff's Complaint, he even asserts there are questions and determinations that will need to be answered and  made regard to the putative class member: (1) whether Defendant even engaged in practices that violated the FDCPA and TDCPA; (2) the extent of the practices violated that FDCPA and TDCPA, is any; (3) whether Defendant did so internationally and knowingly; and (4) whether Defendant thereby

violated the law. *Id.*   **The necessity for such an inquiry renders the putative class to <u>indefinite</u>**

**for certification.** *See, e.g., Simer v. Rios*, 661 F. 2d. 655, 669 (7th Cir. 1981)) *cert denied*, 456 U.S.

917 (1982); *Wilcox Dev. Co. V. First Interastate Bank*, 97 F.R.D. 440,445 (D. Or. 1983); *see*

*generally* 7 A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1760, at 126 &

n. 12 (1986).

25.     Further, even if the members of the class could be identified, as alleged by Plaintiff,

some of their transactions have been closed and there is no benefit that could accrue from the

injunctive relief which is sought.   Moreover, Defendant has testified that the letter has not been used

by Check Alert since October 2002; therefore, debts are no longer being collected by Defendant

through the use of the letter that Plaintiff asserts violates the FDCPA an TDCPA.   *See Exh G,*

*Defendant's Response to Interrogatory #14.*     Thus, injunctive relief is not a viable remedy.

26.     Moreover, many of the putative member many have paid their debt prior to receipt

of the letter renders that present claims inapplicable.   Additionally, many, if not all, of the putative

members, may not have construed the letter as a threat of further legal action or to commence

criminal charges against them. Thus, each class members dealing with Defendant and his or her

impressions and interpretations, Defendant's intent regarding each of these individuals, Defendant's

action or inaction regarding each individual, and any injuries of the individual class members arising

therefrom will have to be inquired into.

27.     Therefore, since Plaintiff seeks to certify a class based on illegal acts of Defendant

without specificity as to the acts and Defendant's dealings and intentions with each of the

individuals, the class is not identifiable and its to indefinite for certification because it necessitates

individualized inquiries.

### b.    Plaintiff fails to meet the numerosity requirement because the class is too speculative and indefinite.

28.    Even assuming there is an identifiable class, Plaintiff still fails to meet the numerosity requirement. The element of numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed.R. Civ. P. 23(a)(1). While "[t]he exact number of class members need not be pleaded or proved, . . . impracticality of joinder must be positively shown, and cannot be speculative." *Cwiak v. Flint Ink Corp.*, 186 F.R.D. 494, 496 (N.D.Ill.1999) (citing *Gomez v. Comerford*, 833 F.Supp. 702, 706 (N.D.Ill.1993); *Kohn v. Mucia*, 776 F.Supp. 348, 352 (N.D.Ill.1991)). As bearer of the burden to show that joinder of all members is impracticable, a plaintiff who seeks class certification must show some evidence of or reasonably estimate the number of class members. *See German v. Federal Home Loan Mortgage*, 885 F.Supp. 537, 551 (S.D.N.Y.1995); *Barlow v. Marion County Hosp. Dist.*, 88 F.R.D. 619, 625 (M.D.Fla.1980); *see also Narwick v. Wexler*, 901 F.Supp. 1275, 1278 (N.D.Ill.1995) (stating that "a putative class representative must provide some evidence as to the size of the class; 'he or she cannot rely on conclusory allegations that joinder is impractical [sic] or on speculation as to the size of the class in order to provide numerosity'") (quoting *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir.1989)).

29.    Here, Plaintiff has provided no evidence that joinder of the class is impracticable. Plaintiff seeks to satisfy the numerosity requirement by relying on speculation as to the size of the class based upon the number of individuals that may have received the letter sent to Plaintiff. However, as explained herein, there is no evidence that the letter violated the FDCPA and TDCPA. Thus, mere supposition, like that offered by Plaintiffs here, that there may be a violation if any, and speculation as to the size of the class without knowledge of any specific violation is not enough to satisfy Rule 23(a)'s numerosity requirement. *See Cwiak*, 186 F.R.D. at 496. Therefore, Plaintiff has

-12-

failed to show joinder is impracticable.

**2.    Plaintiff Does Not Satisfy the Commonality Requirement.**

30.    Rule 23(a)(2) of the Federal Rules of Civil Procedure requires "question of law or fact common to the class." Here, there is no evidence that there is at least one issue common question of law or fact applicable to all class members because Plaintiff assets he is seeking class certification for illegal acts of Defendant without specification as to what illegal activity is common to the members of the class. Therefore, commonality is not met because Defendant could have engaged in a wide variety of illegal acts, which it expressly denies, that would not be common to all members of the putative class, requiring the application of different legal standards. Thus, Plaintiff has failed to meet the commonality requirement.

**3.    Plaintiff Does Not Satisfy the Typicality Requirement.**

31.    Rule 23(a)(3) of the Federal Rules of Civil Procedure requires the claims or defenses of the representative parties be typical of the claims or defenses of the class. Typicality also encompasses the question of the named Plaintiff's standing, "without individual standing to raise a legal claim, a named representative does not have the prerequisite typicality to raise the same claim on behalf of the class." *See Piazza v. EBSCO Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001). Therefore, the typicality requirement cannot be satisfied if the named plaintiffs' injuries are not representative of the injuries of the class members. *See Spivak v. Petro-Lewis Corp.*, 123 F.R.D. 693, 695 (D. Colo. 1987); *Duncan v. Tennessee*, 84 F.R.D. 21,31 (M.D. Tenn. 1979) (citing *Senter v. General Motors Corp.* 532 F.2d 511, 520 (6th Cir.), *cert. denied*, 429 U.S. 870 (1976)).

**a.    Typicality is not met because Plaintiff is judicially estopped from asserting his claims against Check Alert and lacks individual standing to raise a legal claim.**

32.    Plaintiff does not have standing to bring an individual or class action, as the potential class representative, against Check Alert because Plaintiff is judicially estopped from asserting his

claims against Check Alert because he failed to report his accrued claims against Check Alert, as an asset to the bankruptcy court. *See Stewart v. Hardie,* 978 S.W.2d 203 (Ft. Worth 1998*); see also, In re Coastal Plains, Inc.,* 179 F.3d 197 (1999). Under federal law, a person discharged in bankruptcy will be judicially estopped from bringing a claim that goes contrary to assertions he had to make in the bankruptcy. *Id.* In a bankruptcy action, debtors have an absolute duty to report whatever interests they hold in property, even if they believe the asset is worthless or unavailable to the bankruptcy estate. *Id.; see also In re Yonikus,* 974 F.2d 901, 904 (7th Cir.1992). Because of the broad scope of 11 U.S.C.§ 541(a), a potential personal injury claim, such as Plaintiff's, that arose prepetition is property of the estate that must be reported. *Id.; see* 11 U.S.C.A. § 541(a) (West 1993); *see In re Allen,* 179 B.R. 818, 820 (Bankr.E.D.Tex.1995). In fact, there is a continuing duty of disclosure in bankruptcy, where "[a]ny claim with potential must be disclosed, even if it is contingent, dependent or conditional." *In re Coastal Plains,* 179 F.3d 197, 208 (5th Cir. 1999) (citations omitted) (quotation marks omitted). "[T]he importance of this disclosure duty cannot be overemphasized." *Id.* When a cause of action accrues before the date the bankruptcy petition is filed, the claim is an interest that the debtor possesses when he or she files the bankruptcy petition. *See Sizemore v. Arnold,* 647 N.E.2d 697, 699 (Ind.Ct.App.1995). Thus, it must be disclosed or the debtor will be judicially estopped from asserting the claims if failed to disclosed. The purpose is to protect the integrity of the judicial system and keep parties from "playing fast and loose" with the courts. *In re Coastal Plains,* 179 F.3d 197, 210

33.     In this case, Plaintiff's FDCPA and TDCPA violations, if any, had accrued at the time of his bankruptcy. *See Exh A.* In fact, the May 24, 2002 collection letter that Plaintiff claims was the basis of his bankruptcy filing is the very same letter in which he seeks to serve as the class representative and to recover damages individually. *See Exh D, pg 36, ls 19-25; pg 37, ls 1; pg 38, ls 5-16; pg 47, ls 13-20; pg 48, ls 14-20.* Plaintiff filed his bankruptcy petition on June 6, 2002. *See*

-14-

*Exh G.* Accordingly, both Plaintiff and his bankruptcy attorney, who is also one of his attorneys in this lawsuit, had a duty to report the potential lawsuit as an asset of the bankruptcy estate. Moreover, the fact that he and/or his attorneys failed to disclose it acted as a de facto denial that a claim(s) existed against Check Alert. *Cf. Southmark,* 442 S.E.2d at 267 (holding under Chapter 11's strict disclosure requirements, failure to disclose legal malpractice claim was de facto denial). Thus, Plaintiff is contradicting this denial by filing this claim.

34.    However, federal and Texas jurisprudence do not allow Plaintiff to "playing fast and loose" with the courts. Plaintiff did not file his claims against until approximately three to four weeks after his bankruptcy was discharged. *See Exh I, Discharge for Bankruptcy.* By the timing of his filings, it appears as if Plaintiff, and/or his attorney(s), concealed and deliberately waited until his bankruptcy was over to file his claims against Check Alert. Here, Plaintiff had a legal duty to report the claims as an assets to the bankruptcy court under federal bankruptcy law, yet he failed to do so. Thus, Plaintiff is judicially estopped from prosecuting the action he failed to report as part of his bankruptcy estate. *See Southmark,* 442 S.E.2d at 267 (holding plaintiff judicially estopped from bringing legal malpractice claim when he did not list it as bankruptcy estate asset). Therefore, Plaintiff's claims are atypical of the putative class.

          **b.**      **Plaintiff's injuries are atypical because he and the putative class members do not share the same injuries and/or same factual scenarios.**

35.    Even assuming Plaintiff has standing, Plaintiff has produced no evidence that his injuries are typical of the class he seeks to represent. In fact, the likelihood that any claims of putative class members would share the same factual scenario, as explained herein, is remote and therefore renders Plaintiff's claims atypical. *See Lewis v. Johnson,* 92 F.R.D. 758, 760 (E.D.N.Y. 1981).

### 4.   Plaintiff Does Not Satisfy the Adequacy Requirement.

36.     Plaintiff must show that as representative of the proposed class he will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy of representation requirement has three elements: (1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the named representative must have sufficient interest in the outcome to ensure vigorous advocacy; and (3) the counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously. Fed. R. Civ. P. 23(a)(4); *Gonzales v. Cassidy*, 474 F.2d 67, 72 (5th Cir. 1974); *Gamman v. GC Services Ltd. Partnership*, 162 F.R.D. 313, 317 (N.D.Ill 1995). As explained herein below, Plaintiff has failed to meet the adequacy of representation requirement.

### a.   Plaintiff lacks the necessary personal qualities required of class representatives.

37.     In order to assess the adequacy of the named representatives, courts have looked to factors such as their honesty, conscientiousness, and other affirmative personal qualities. If the representative displays a lack of credibility regarding the allegations made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied. 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1766. The inquiry into the representatives' personal qualities is not an examination into their moral righteousness, but rather an inquiry directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit. *See, e.g., Darms v. McCulloch Oil Corp.*, 720 F.2d 490 (8th Cir.1983); *Green v. Carlson*, 653 F.2d 1022 (5th Cir.), *cert. denied*, 454 U.S. 944, *reh'g denied*, 454 U.S. 1093 (1981); *Panzirer v. Wolf*, 663 F.2d 365 (2d Cir.1981), *cert. denied*, 458 U.S. 1107 (1982); *Martin v. New York Dept. of Social Servs.*, 111 F.R.D. 64; *Weisman v. Darneille*, 78 F.R.D. 669 (E.D.N.Y.1978). Here, Plaintiff has failed to adhere to the standards of honesty,

-16-

integrity, and candor required by the class representative in that he failed to uphold his duties to the bankruptcy court regarding his legal claims against Check Alert. As outlined herein above, in the section regarding typicality. Plaintiff's conduct surrounding his lack of disclosure to the bankruptcy court is questionable and arises out of and/or touches the very prosecution of the lawsuit. Thus, class certification should be denied because the named Plaintiff does not adequately represent the class.

**b.    Plaintiff lacks a sufficient interest in outcome to ensure vigorous advocacy.**

38.    The adequacy requirement is one that mandates an inquiry into the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees. *Horton*, 690 F.2d at 484. In *Gonzales v. Cassidy, supra*, the Fifth Circuit interpreted Rule 23(a)'s adequacy requirement somewhat more loosely and insisted that "it must appear that the representative[s] will vigorously prosecute the interests of the class through qualified counsel." *Gonzales*, 474 F.2d at 72. Both understandings, even accepting the variance between them, require the class representatives to possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation. Although, class representatives need not be legal scholars and are entitled to rely on counsel, plaintiffs do need to know more than that they were "involved in a bad business deal." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir.2001)(citing *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 410 (W.D.Okla.1990)). Representatives should understand the action in which they are involved, and their "understanding should not be limited to derivative knowledge acquired solely from counsel." *Berger*, 257 F.3d at 483 n. 18. The competency of class counsel is not enough on its own; the representatives themselves must be familiar with the case. *Id.* An example of an adequate class representative is one with "commendable familiarity with the complaint and the concept of a class action." *Horton*, 690 F.2d at 484.

39.    As evidenced by Plaintiff's deposition, Plaintiff cannot satisfy the element of adequacy of representation because he lacks a sufficient interest in outcome to ensure vigorous advocacy. Plaintiff testified he has never read the FDCPA, TDCPA, Texas Finance Code, or the Texas Deceptive Trade Practice Act which Defendant has allegedly violated. *See Exh*. D, pg. 81-80. Plaintiff was unable to identify and articulate any violation of these statutes, further indicating he does not know how Defendant has violated these statutes and is relying solely on his lawyer in making these allegations. *Id.* He has not conducted any investigation of or research into the identify, residence, or any other information regarding the putative class members. *See Exh D, pg 75, ls 21-25*. In fact, Plaintiff does not know what damages are being sought by other class member, what damages other class members could receive if he is successful in this lawsuit, and admits doing nothing with respect to identifying other potential class members. *Id; see also, Exh D, pg 76, ls 1-5*.

40.    Based on Plaintiff's testimony, it is apparent that he not conducted any investigation of or research into his attorneys' ability to serve as class counsel. In fact, he has never met in person one of his three attorneys. *See Exh*.D, pg. 62, ls 4-9.

41.    As evidenced herein above, Plaintiff's understanding of this lawsuit is limited to knowledge acquired solely from his attorneys. Defendant acknowledges that when representing the least sophisticated consumer, or the unsophisticated consumer, it is necessary for Plaintiff's attorneys to take the reins of the lawsuit. However, when a named plaintiff requests a court to certify a class whose interest he must protect, Plaintiff, a sophisticated consumer, should have a basic familiarity with the facts of the case and the statute under which he brings suit. Based on the forgoing, the Plaintiff has not displayed a sufficient interest in the outcome of this lawsuit to ensure vigorous advocacy. As such, Plaintiff has failed to meet his burden of demonstrating that the Rule 23 requirements have been met.

### c.    Plaintiff has antagonistic or conflicting claims with other class members.

42.    Even if the Court finds Plaintiff has a sufficient interest in the outcome of this lawsuit to ensure vigorous advocacy, Plaintiff must not have interests adverse to the class. Fed. R. Civ. P. 23. *Id.* Here, his interests are adverse to the class as explained hereinafter and as discussed herein above with regard to the commonality and typicality requirements.

43.    Although the class claims to seek injunctive and declaratory relief, Plaintiff, like the putative class members, is also seeking actual damages on his individual claims. This incentive for Plaintiff, the proposed class representative, to maximize his individual recovery creates the possibility of a conflict of interest between the representatives and the class. *See Hooks v. General Fin. Corp.*, 652 F.2d 651 (6th Cir. 1981) (per curiam); *Kammerman v. Steinberg*, 113 F.R.D. 511, 516 (S.D.N.Y. 1986). Although such prospect may not disqualify a named plaintiff in every case, any calculation of the proposed benefit to the class compels the conclusion that the interests of the class are not Plaintiff's first priority. *See Stewart v. Winger*, 669 F. 2d 328 (5th Cir. 1982). Here, Plaintiff has testified that it is in his best interest to maximize his personal recovery. *See Exh D, pg 78, ls 17-19.* Thus, since Plaintiff is interested in maximizing his own personal recovery, his first priority is not the interest of the putative class.

### 5.    Representatives Lack of Information Regarding Potential Class Members.

44.    Plaintiff has failed to present evidence that he has knowledge of other potential class members' contact by or with Defendants. No other potential members have been identified. No evidence has been presented regarding Plaintiff's injuries or the injuries to other potential members of the class. Thus, Plaintiff lacks the necessary information regarding potential class members to support his theories regarding numerosity, typicality and commonality, as required by Fed. R. Civ. P. Rule 23(a).

**B.    Plaintiff has not met the requirements of Rule 23(b).**

45.    Under Rule 23, the different categories of class actions, with their different requirements, represent a balance struck in each case between the need and efficiency of a class action and the interests of class members to pursue their claims separately or not at all. *See Allison v. Citgo,* 151 F.3d 402, 412.  The different types of class actions are categorized according to the nature or effect of the relief being sought.  Here, Plaintiff seeks to certify the class under Rule 23(b)(2) and/or (3).

**1.    Class certification under Rule 23 (b)(2) is inappropriate because the finalrelief sought by Plaintiff and the putative class member relates exclusively to money damages.**

46.    Under Rule 23 (b)(2), the predominant relief sought for the class must be declaratory or   injunctive relief. *See Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 411.  Thus, if Plaintiff only sought injunctive or declaratory relief, this case could readily be certified as a class action under Rule 23 (b)(2). *Id.*  However, Plaintiff and the putative class members also seek monetary relief, for actual damages,  punitive damages, and restitution, in which Rule 23 (b)(2) does not extend class certification. *See Id.,* 151 F.3d 402.

47.    Rule 23(b)(2) does not extend class certification to cases in which the final relief if it relates exclusively or predominantly to money damages. *See* Fed. R. Civ. P. 23( advisory n committe notes); *See also Allison,* 151 F. 3d at 411.  The (b)(2) class is, by its very nature, assumed to be homogenous and cohesive group with **few conflicting interests** among its members because of the group nature of the harm alleged and the broad character of the relief sought.  Accordingly, the underlying premise of (b)(2) begins to break down when the class seeks to recover other forms of monetary relief based on individual injuries. *Allison,* 151 F.3d at  413.  Thus, as claims for individually based money damages begin to predominate, the presumption of cohesiveness decreases

while the need for enhanced procedural safeguards to protect the individuals rights of the class members increases, thereby making class certification under (b)(2) less appropriate. *Id*; *Johnson v. General Motors Corp.*, 59 F.2d 432, 437-38 (5th Cir. 1979). In fact, monetary remedies are more often related directly to the disparate merits of individual claims. *Id.* As a result, a class seeking monetary remedies will more likely consist of members with divergent interests. *Id.*

48.    Here, class certification is inappropriate because the claims are individual, money-based damages introducing new and substantial legal and factual issues, requiring additional hearings to resolve the disparate merits of each individual's claims, and entail the complex individualized determinations. *See generally, Id.* In fact, Plaintiff and other members of the putative class seek the recovery of actual damages, including but not limited to emotional distress and other forms of intangible injuries that will not be presumed from mere violations, if any, of constitutional or statutory rights. *Id*, at 417. Accordingly, specific individualized proof is necessary, the testimony for each individual class member is necessitated, and Plaintiff's testimony alone is not sufficient. *Id.*

49.    Further, actual damages may **only** be awarded if Plaintiff and other putative members of the class submit proof of actual injury, often in the form of psychological or medical evidence, or other corroborating testimony from a third party. *Id.* The very nature of these damages, compensating plaintiffs for emotional or intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances. *Id.* In fact, such damages, awarded on the basis of intangible injuries and interest, are uniquely dependant on the subjective and intangible differences of each member's individual circumstances. *Id.,* at 418. Accordingly, actual damages are an individual, not a class-wide remedy, and the amount of actual damages to which any individual class members might be entitled cannot be calculated by objective standards. *Id.,* at 417. Therefore, Rule 26(b)(2) class certification should be denied.

-21-

2.   **Plaintiff has not met the requirements of Rule 23(b)(3) because class action is not superior to other available methods to resolve this controversy.**

50.    Rule 23 (b)(3) permits certification of a class action otherwise meeting the requirements of Rule 23 (a) when:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other methods for a fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of the members of the class in individually controlling prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in management of a class action. *See* Fed. R. Civ. P. 23(b)(3).

In determining whether common issues predominate and whether the class action is a superior method to resolve the controversy requires an understanding on the relevant claims, defenses, facts, and substantive law presented in the case. *Allison,* 151 F.3d at 413 (*citing Castano v. American Tobacco Co.*, 4 F.3d 734, 744 (5th Cir. 1996)). Here, Plaintiff asserts predominance exists in this case because there is a common link that all class members were subjected to Defendant's practice of sending letters that allegedly violate the FDCPA and the TDCPA. Plaintiff further asserts that the only individual issues that will be the identification of the consumer and the determination of the amount collected from those individual consumers. *See Plaintiff's Motion for Class Certification.* However, as outlined herein, Plaintiff has admitted in his Complaint that these are not the only issue that need to resolved. *See Exhibit C.* Thus, additional class discovery with Defendant alone is not enough. In fact, Plaintiff will have to inquire as to each putative class members dealing with Defendant which will introduce new and substantial legal and factual issues, requiring additional hearings to resolve the disparate merits of each individual's claims, and entail the complex individualized determinations. Thus, the facts and law are not common amongst the plaintiffs.

51.    The recovery of actual damages in FDCPA and TDCPA cases, for alleged unspecified

illegal acts and for alleged violations with regard to the letter, requires individualized and independent proof of injury to, and the means by which the abusive collection efforts was inflicted upon each class members Plaintiff seeks actual damages on behalf of. *See generally,* 11 U.S.C. §1692, *et seq.; see also Elston*, 950S.W.2d 180. Therefore, Plaintiff and the putative class members' claims for actual damages must focus almost entirely on facts and issues specific to individuals rather than the class as a whole, such as: (1) what kind of abusive collection efforts was each plaintiff subjected to; (2) how did it affect each plaintiff emotionally and physically, at work or home; (3) what medical treatment did each plaintiff receive and at what expense; and so on and so on. *Id.* Under such circumstance, an action conducted nominally under class action would degenerate in practice to multiple lawsuits separately tried. Thus, the predominance of individual-specific issues relating to their claim for actual damages detracts from the superiority of the class action devise in resolving these claims. *See* Fed. R. Civ. 23 (advisory committee notes).

52.    Further, manageability problems are exacerbated by the fact that this action must be tried to a jury and may involve more than a thousand potential plaintiffs spread across all fifty (50) states. Therefore, in order for this Court to manage this case, it is faced with the likelihood of thousands of bifurcated proceedings before multiple juries increasing the probability that successive juries would pass on issues decided by the prior juries. This probability and potential for overlapping issues that would be decided at thousands of bifurcated proceedings implicate significant Seventh Amendment, efficiency, and manageability problems further deceasing the superiority of the class action device. Thus, Plaintiff fails to appreciate the overwhelming number of individual-specific issues in this case. In fact, the success of each Plaintiff's claim for actual damages will turn on the special circumstance of each individual's case.

53.    Moreover, a class action is not superior to other possible methods of fair and efficient

adjudication because the recovery per class member could be de minimis, once an identifiable class is ascertained, and the administrative costs would be unduly burdensome. *See Lyles v. Rosenfeld Attorney Network,* 2000 WL 798824, at *7 (N.D.Miss. May 17, 2000). By separating the potential plaintiffs into two classes, Plaintiff's proposal multiplies the burden and expense of class management. For instance, under Plaintiff's proposal there would be dual mailings to the same individuals, who then would have dual opt-out procedures and obligations. Not only does Plaintiff's proposal needlessly double the expense of class notification, but the proposal also runs the risk of confusing the very class members she seeks to represent. Those wishing to opt-out of both classes might respond to only one class notification in the mistaken belief that doing so preserves the right to proceed individually against Defendants on all claims. Compounding this problem is the fact that identical claims are brought on behalf of both classes. *See Reed v. Chartwell Financial Services,* Nos. 98 C 6965-66, 1999 WL 181986, *2 (N.D.Ill. Mar. 24, 1999). Therefore, Rule 23(b)(3) class certification should be denied.

## IV.  CONCLUSION

55.    As shown at length herein, Plaintiffs have failed to meet the requirements for class certification. Thus, no class should be certified.

WHEREFORE, Defendant request that this Court deny Plaintiff's Motion for Class Certification and enter judgment in favor of Defendant and against Plaintiff for attorney's fees, litigation costs and expenses.

DAW & RAY,

A Professional Corporation

Keith Wier; TBN: 24008264

Tina Brumbelow; TBN: 24031890

-24-

Coastal Banc Plaza

5718 Westheimer, Suite 1750

Houston, Texas   77057

(713) 266-3121

(713) 266-3188 Facsimile


ATTORNEYS FOR DEFENDANT

**CHECK ALERT SYSTEMS, INC.**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel of record and/or parties pursuant to the Federal Rules of Civil Procedure on this the ~~25th~~ 15th day of ~~February~~ March, 2004.

Stephen Gardner, Esq.; SBN #07660600

Law Office of Stephen Gardner, PC

6060 North Central Expressway, Suite 560

Dallas, TX 75206

(214) 800-2830

(214) 800-2834 Facsimile


John Ventura; SBN #20545700

Conrad Bodden; SBN #00796220

Daniel Whitworth; SBN #24008275

Richard A. Mlynek

Law Offices of John Ventura, P.C.

62 E. Price Road

Brownsville, Texas 78521

Tina Brumbelow

## INDEX OF EXHIBITS

1.    Exhibit A -    May 24, 2002 collection letter

2.    Exhibit B -    Copy of dishonored check

3.    Exhibit C -    Plaintiff's complaint

4.    Exhibit D -    Deposition of William Foster

5.    Exhibit E -    Texas Penal Code

6.    Exhibit F -    Michigan Penal Code

7.    Exhibit G -    Defendant's Response to Interrogatory No. 14

8.    Exhibit H -    Copy of Bankruptcy Petition

9.    Exhibit I -    Discharge from Bankruptcy

# SYSTEMS, INC.

RETURN SERVICE REQUESTED

*Telephone Number (231) 775-3473*

May 24, 2002

CHECK ALERT SYSTEMS INC
PO Box 808
Cadillac MI 49601-0808
|.|..||.|..||..||....||||..|.|..||..|.|.||..|.|.||.|

05/24/2002-D7   170083   23295
William L Foster
PO Box 8713
Brownsville TX 78526-8713
||..||.|.|.|..||..|.||.||..|.|.|..|..||..||...||..||.|.|.|

Debtor ID # 321590
Total Amount Due: $69.62

**Past Due Balance**

***Detach Upper Portion And Return With Payment***

| Merchant(s): | Account #: | Chk Amt: | Ser Charge: | Total Amount: |
|---|---|---|---|---|
| Martin's Supermarket/Wil | 321590 | $34.62 | $35.00 | $69.62 |



Total Due: 69.62

## >>>>> NO OTHER WAY TO CONTACT YOU! <<<<<

Check Alert Systems, Inc. has made several attempts to contact you, telephone, or by written notice.

WE ARE ATTEMPTING TO HELP YOU BEFORE THIS DISHONORED CHECK IS
RECOMMENDED FOR FURTHER COLLECTION EFFORTS."

We have advised you that under State Law, the intentional writing of bad checks can be grounds for
**CRIMINAL CHARGES.**

### AVOID FURTHER ACTION AND PROTECT YOUR CHECKWRITING PRIVILEGES

You can stop any further action being taken by remitting the above amount **IN FULL** to Check Alert
Systems, PO Box 808, Cadillac, MI 49601. MAKE YOUR PAYMENT BY CERTIFIED CASHIER'S
CHECK OR MONEY ORDER. Checks received as payment will be electronically deposited.

This communication is from a collection agency. This is an attempt to collect a debt and all information
obtained will be used for that purpose.

JRDCLRT10D7

EXHIBIT NO. 2
POCKRUS REPORTING SERVICE

EXHIBIT
A

**CHECK ALERT SYSTEMS, INC.** • 7597 S Mackinaw Trail Suite C • Cadillac MI 49601 • (800) 968-2282

Account #: 321590







EXHIBIT NO. 1

POCKRUS REPORTING SERVICE



EXHIBIT

B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 1 1 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| **William Foster,** | § | |
| Individually and on behalf of all | § | |
| others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. **B-02-196** |
| | § | |
| vs. | § | |
| | § | |
| **Check Alert Systems, Inc.** | § | |
| | § | Jury Demanded |
| Defendant. | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff William Foster ("Plaintiff") complains of Check Alert Systems, Inc., ("Defendant"), by way of a class action, and shows the Court the following:

### Introduction

1. This is an individual and class action for damages and injunctive relief for Check Alert Systems, Inc.'s violations of the Fair Debt Collection Practices Act, 15 U.S.C. Sectn. 1692 *et seq.* ("FDCPA") and the Texas Debt Collection Practices Act, Texas Finance Code Chapter 392 ("Texas Act"), both of which prohibit debt collectors from engaging in abusive, deceptive, and unfair practices.

2. William Foster brings this class action on behalf of himself and on behalf of all other consumers who are similarly situated, seeking declaratory relief, money damages, restitution, and a preliminary and permanent injunction forcing Check Alert Systems, Inc. to stop its illegal practices.

### Jurisdiction and Venue

---



EXHIBIT
C

3. Jurisdiction of this Court arises under 15 U.S.C. Section 1692k(d) and 28 U.S.C. Section 1331. Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. Section 1367(a).

4. Venue is proper in the Southern District of Texas, Brownsville Division, under 28 U.S.C. Section 1391(b)(2) and (c) in that a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of Texas. Specifically, Check Alert Systems, Inc. conducted collection efforts in Brownsville, Texas by sending a debt collection letter to William Foster's residence located in Brownsville, Texas.

## Parties

5. William Foster is an individual residing in Brownsville, Cameron County, Texas. William Foster and each of the other members of the class are "consumers" as defined in FDCPA and the Texas Act.

6. Check Alert Systems, Inc. is an out-of-state corporation engaged in the business of collecting debts in this judicial district and elsewhere in the state and nation, and may be served with process by serving its President, Daire Rendon at 7597 Mackinaw Trail, Suite C in Cadillac, Michigan 49601. Check Alert Systems, Inc. is a "debt collector" as defined by FDCPA and the Texas Act.

## Class Action Allegations

7. William Foster sues on his own behalf and, as class representative, sues on behalf of (1) Class 1—all consumers in the United States who have been the victims of the illegal acts of Defendant that violated the FDCPA, beginning one year prior to the date this Complaint is filed, and (2) Class 2—all consumers residing in Texas who have been victims of the illegal acts of Defendant that

---

violated the Texas Act, beginning two years prior to the date this Complaint is filed. Class 2 consumers who were the victims of Defendant's acts beginning one year prior to the date this Complaint is filed are also members of Class 1.

8. William Foster brings this lawsuit as a class action because, on information and belief (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and fact common to the class, (3) his claims are typical of the claims of the class, and (4) he can and will fairly and adequately protect the interests of the class. Questions of whether, and to what extent, Defendant engaged in the practices described herein, whether it did so intentionally or knowingly, and whether it thereby violated the law will be common to all members of the class.

9. The questions of law and fact common to the members of the class predominate over questions affecting only individual members. The prosecution of individual actions by or against class members would create a risk of inconsistent or varying adjudications with respect to individual class members which would establish incompatible standards of conduct for Defendant.

10. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. It is appropriate to maintain this lawsuit as a class action because Defendant acted on grounds generally applicable to the class, thereby making both preliminary and final injunctive and declaratory relief appropriate with respect to the class as a whole.

11. William Foster's claims are typical of the claims of the class as a whole. He can and will fairly and adequately protect the interests of the class, because he has retained experienced counsel to represent the class, he has no conflict of interest with the class, and he brings this lawsuit specifically for the protection of the consumers who have been and will be defrauded by these practices, and not solely to recover his personal damages.

## Acts of Agents

12. Whenever in this Complaint it is alleged that Defendant did any act, it is meant that Defendant performed or participated in the act, or the officers, agents, or employees of Defendant performed or participated in the act on behalf of and under the actual, vicarious, or apparent authority of Defendant.

## Conditions Precedent

13. All conditions precedent to the filing of this case have been performed, have occurred, or have been satisfied.

## Facts

14. In collecting debts, Check Alert Systems, Inc. engaged in a variety of illegal acts and practices in collecting debts, using letters similar to one dated May 24, 2002, that it sent to William Foster. The illegal acts and practices made in that letter included the following:

    a.  Check Alert Systems, Inc. represented that if William Foster did not contact it to resolve the matter, it would take further legal action to collect a debt when, on information and belief, it did not plan to do so and did not in fact do so.

    b.  Check Alert Systems, Inc. represented that under State Law, it could commence criminal charges against the debtor, when on information and belief, it did not plan to do so and did not in fact do so.

## First Cause of Action

## Request for Declaratory Relief

15. Plaintiff seeks a declaratory judgment from this Court pursuant to 28 U.S.C. Sections 2201 and 2202, declaring that Check Alert Systems, Inc. regularly engages in the practices described

---

herein and that these practices violate the FDCPA and the Texas Act.

## Second Cause of Action

### Request for Relief Pursuant to FDCPA for Class 1

16.  By the actions set forth above, Check Alert Systems, Inc. violated the FDCPA as to the members of Class 1.

17.  As a result of its violations of the FDCPA, Check Alert Systems, Inc. is liable to Plaintiff for his actual damages, statutory damages, and costs and reasonable attorneys' fees. The conduct of Check Alert Systems, Inc. described above has made it necessary for Plaintiff to retain the services of the attorneys whose names are subscribed to this petition. Plaintiff is therefore entitled to recover from Check Alert Systems, Inc. additional sums to compensate the Plaintiff for attorneys' services in the preparation and prosecution of this action as well as a reasonable fee for any and all appeals to other courts.

18.  On behalf of himself and each class member, Plaintiff seeks an order of the Court directing Check Alert Systems, Inc. to pay actual damages to all class members consisting of all money obtained by Check Alert Systems, Inc. through the threat of any illegal acts in violation of FDCPA.

19.  In addition, Plaintiff seeks on behalf of all other class members, without regard to minimum individual recovery, an award in the amount of the lesser of $500,000.00 or 1% of the net worth of Check Alert Systems, Inc., and reasonable attorneys' fees.

## Third Cause of Action

### Request Relief Pursuant to the Texas Debt Collection Act and the Texas Deceptive Trade Practices Act for Class 2

20. By the actions set forth above, Check Alert Systems, Inc. violated the Texas Act as to the members of Class 2. A violation of the Texas Act is also a violation of the Texas Deceptive Trade Practices Act, and Plaintiff seeks recovery under that act as well.

21. In addition, Check Alert Systems, Inc. did not maintain a surety bond as required by Section 392.101 of the Texas Finance Code. By this action, Check Alert Systems, Inc. violated the Texas Act as to members of Class 2.

22. As a result of its violations of the Texas Act, Check Alert Systems, Inc. is liable to Plaintiff for his actual damages, disgorgement of any monies paid to Check Alert Systems, Inc., statutory damages, and costs and reasonable attorneys' fees. The conduct of Check Alert Systems, Inc. as described above has made it necessary for Plaintiff to retain the services of the attorneys whose names are subscribed to this petition. Plaintiff is therefore entitled to recover from Check Alert Systems, Inc. additional sums to compensate the Plaintiff for attorneys' services in the preparation and prosecution of this action as well as a reasonable fee for any and all appeals to other courts.

23. On behalf of himself and each class member, Plaintiff seeks an order of the Court directing Check Alert Systems, Inc. to restore to all class members all money obtained by Check Alert Systems, Inc. through the threat of any other illegal acts in violation of the Texas Act and the Texas Deceptive Trade Practices Act.

### Demand for Jury Trial

24. Please take notice that Plaintiff demands trial by jury in this action.

### Prayer

THEREFORE, Plaintiff respectfully prays that this Court:

1. Upon notice and hearing, but at the earliest practicable date, certify this action as a class action.

2. Upon final trial of this cause, enter a Declaratory Judgment declaring that the practices complained of herein are illegal and a Permanent Injunction enjoining Check Alert Systems, Inc. from engaging in the illegal practices set forth herein.

3. Upon final trial of this cause, award Plaintiff and the members of the class judgment for their damages and statutory civil penalties as set forth herein. Plaintiff further prays that these damages be multiplied pursuant to the provisions of the law.

4. Award punitive damages in an amount necessary to punish Check Alert Systems, Inc. for its conduct.

5. Award Plaintiff and the class attorneys' fees and costs of court.

6. Award pre-judgment and post-judgment interest at the maximum rate permitted at law or at equity.

7. Grant Plaintiff and the class all other relief to which they may show themselves and the class entitled.

Respectfully Submitted,
**Law Office of Stephen Gardner, PC**

Stephen Gardner
Federal Id No. 16111
Texas Bar No. 07660600
1845 Woodall Rodgers Freeway, Ste. 1750
Dallas, Texas 75201
Telephone:     (214) 954-0663
Telecopier:    (214) 871-8957

John Ventura
Federal Id No. 1646
Texas State Bar Number 20545700
Conrad Bodden
Federal Id No. 21003
Texas Bar No. 00796220

Daniel Whitworth
Federal Id No. 23119
Texas Bar No. 24008275
Law Offices of John Ventura, P.C.
62 E. Price Road
Brownsville, Texas 78521
Telephone:     (956) 546-9398
Telecopier:     (956) 542-1478
**Counsel for Plaintiffs and the Class**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

WILLIAM FOSTER, Individually )
and on behalf of all others )
similarly situated, )
)
) CIVIL ACTION NO: B-02-196
)
)
CHECK ALERT SYSTEMS, INC. )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

WILLIAM LEE FOSTER

FEBRUARY 26, 2004

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of WILLIAM LEE FOSTER, produced
as a witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause
on the 26th day of February, 2004, from 3:00 p.m. to 4:52
p.m., before JUDITH GARRETT HENNIGH, CSR in and for the
State of Texas, reported by oral stenography, at the
offices of John Ventura, P.C., 62 East Price Road,
Brownsville, Texas, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record
or attached hereto.

---

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:

RICHARD A. MLYNEK
LAW OFFICES OF JOHN VENTURA, P.C.
62 EAST PRICE ROAD
BROWNSVILLE, TEXAS 78521

FOR THE DEFENDANT:

KEITH WIER
DAW & RAY, P.C.
COASTAL BANC PLAZA
5718 WESTHEIMER, SUITE 1750
HOUSTON, TEXAS 77057

ALSO PRESENT:

Ms. Judith Garrett Hennigh, CSR


EXHIBIT

---

Page 3

1        T A B L E   O F   C O N T E N T S

2                                              PAGE

3   Agreements of Counsel . . . . . . . . . . . . . . . 4

4

5   Examination of WILLIAM LEE FOSTER

6       By Mr. Wier  . . . . . . . . . . . . . . . . 6

7

8   REPORTER'S CERTIFICATION . . . . . . . . . . . . . 82

9   FILING CERTIFICATION . . . . . . . . . . . . . . . 84

10  CHANGES AND SIGNATURE . . . . . . . . . . . . . . 87

11  WITNESS' SIGNATURE CERTIFICATE . . . . . . . . . . 88

12

13  OBJECTIONS

14      By Mr. Mlynek   . 44, 45, 59, 62, 68, 70, 76, 77, 78

15

16  EXHIBITS

17

18  NO. DESCRIPTION                     MK'D  ID'D

19  1   Check to Martin's Foods         27

20  2   5/24/02 Letter from Check Alert Systems  27

21  3   Plaintiff's Original Complaint  60

22  4   Bankruptcy Petition             65

23  5   List of creditors               67

24

---

Page 4

1              A G R E E M E N T S

2           It was agreed by and between counsel for the

3   Plaintiff and Defendant that no objections need be made

4   by any party at the time of taking said deposition,

5   except objections as to the form of the question or the

6   responsiveness of the answer, which if not made during

7   the deposition are waived; but if and when said

8   deposition, or any portion thereof, is offered in

9   evidence at the trial of this cause by any party thereto,

10  it shall be subject to any and all legal objections, such

11  objections to be made at the time of tender, the same as

12  though the witness were on the stand personally

13  testifying;

14          It was further agreed that the original

15  deposition transcript was delivered on the 2nd day of

16  March, 2004, to Mr. William Foster, in care of Richard

17  Mlynek, 62 East Price Road, Brownsville, Texas, for

18  examination and signature and is to be returned to

19  Pockrus Reporting Service.  If and when the original

20  deposition transcript is returned with the correction

21  sheet containing the changes made by the witness, if any,

22  a copy of the changes will be forwarded to all counsel of

23  record;

24          It was further agreed that in the event the

25  original deposition is not signed by the witness within

1  thirty (30) days and filed at the time of trial or
2  hearing, that the original or a certified copy of said
3  deposition may be filed in Court and used herein as
4  though the witness had signed original deposition. .
5
6                        -o0o-
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           P R O C E E D I N G S
2                        *
3           WILLIAM LEE FOSTER,
4  having been first duly sworn, testified as follows:
5                        *
6           E X A M I N A T I O N
7  BY MR. WIER:
8      Q. Mr. Foster, my name is Keith Wier.
9          Would you please state your full name for the
10 record?
11     A. William Lee Foster.
12     Q. All right, and Mr. Foster, do you have a father
13 that was named the same thing, do you go by Junior, or
14 III, or anything like that?
15     A. Will.
16     Q. Okay. What is your current address?
17     A. Physical address?
18     Q. Yes, sir.
19     A. 315 North Park Drive in Brownsville, Texas
20 78520.
21     Q. And your date of birth?
22     A. 8/10/77.
23     Q. Okay. And I'm showing that your Social Security
24 number is 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; is that true?
25     A. Yes, sir.

1      Q. And have you ever had a Social Security number
2  issued other than that number?
3      A. No.
4      Q. Do you have a Texas driver's license?
5      A. Yes, sir.
6      Q. Have you ever had that license suspended or
7  revoked for any reason?
8      A. No, sir.
9      Q. All right. Let me ask you a couple of --
10 explain what we're doing here today.
11         Have you ever given a deposition like this
12 before?
13     A. No, sir.
14     Q. Let me take a few minutes to explain now, what
15 we're doing. The court reporter over here is taking down
16 everything that we're saying in this room, all of my
17 questions and all of your answers; do you understand
18 that?
19     A. Yes.
20     Q. If your lawyer decides to speak up and make an
21 objection, she'll take that down as well.
22         And once we finish here today the court reporter
23 will type everything up, all of my questions and all of
24 your answers, into a booklet, and that can be used in the
25 trial of this case; do you understand that?

1      A. Yes.
2      Q. Okay. The reason that I'm explaining all this
3  to you is I want you to be comfortable and understand
4  what we are doing before proceeding today.
5          The questions typed up in the booklet, either
6  your lawyer or I, can choose to read those to the Judge
7  or jury later on if we decide to. So the testimony
8  you're giving here today, even though we're here in your
9  lawyer's office, would have the same force and effect as
10 if you were testifying live in front of the Judge or
11 jury; do you understand that?
12     A. Yes, I understand that.
13     Q. Because of that, even though we're here in
14 informal surroundings in your lawyer's office, you need
15 to be clear that you understand my questions before you
16 attempt to answer them. So if I ask you a question and
17 you do not -- if you do not understand the question,
18 please ask me to repeat or rephrase it, and I'll be happy
19 to do that, okay?
20     A. Okay.
21     Q. And by the same token, if you don't ask me to
22 clarify or rephrase a question I'm going to assume that
23 you understood the question the way that I asked it; is
24 that fair with you?
25     A. Yes, sir.

## Page 9

1  Q. Okay. If you need to take a break, consult with
2  your lawyer at any time, you just let me know and I'll be
3  happy to accommodate you, okay?
4    A. Okay.
5      (Off the record for less than one minute.)
6    Q. (BY MR. WIER) How long have you lived here in
7  the Valley, the Brownsville area?
8    A. About two-and-a-half years now.
9    Q. Where did you reside before that?
10   A. I resided in Southwest Michigan for
11 approximately three years.
12   Q. Okay. What made you move down here to the
13 Brownsville, Texas area?
14   A. This is my hometown.
15   Q. Okay. Okay. Were you born and raised here?
16   A. Yes.
17   Q. Did you go to school here?
18   A. Yes.
19   Q. Did you graduate from high school?
20   A. Yes.
21   Q. Was that here in Brownsville?
22   A. No.
23   Q. What was the name of the high school where you
24 graduated from?
25   A. Dowagiac High School.

## Page 10

1    Q. And where is that located?
2    A. Dowagiac, Michigan.
3    Q. Okay. About what age were you -- strike that.
4      I take it from what you've told me so far that
5  after living here some time as a young child that you
6  moved either to the Michigan area or somewhere else; is
7  that true?
8    A. That's correct.
9    Q. Did you go directly from this area to Michigan?
10   A. Yes.
11   Q. Okay. And about what age were you when that
12 occurred?
13   A. About 15.
14   Q. All right. And then you stayed there long
15 enough to complete high school?
16   A. Yes.
17   Q. After -- what year was it that you graduated
18 from high school?
19   A. 1995.
20   Q. Okay. Have you ever gone to college anywhere?
21   A. Yes.
22   Q. When and where?
23   A. In Dowagiac, Michigan, I attended Southwest
24 Michigan College for, off and on, four years. Also UT-B
25 for approximately half-a-year.

## Page 11

1    Q. UT-B is University of Texas at Brownsville?
2    A. That's correct.
3    Q. And when did you go there?
4    A. The year, you need?
5    Q. Just approximately.
6    A. I would say 1997, approximately.
7    Q. Okay. When did you move back to the Brownsville
8  area after high school?
9    A. I moved first in August 1996.
10   Q. Okay. What made you move from Michigan to
11 Brownsville at that time?
12   A. My mother asked me to.
13   Q. Okay. And then how long did you live in
14 Brownsville before you went back to Michigan?
15   A. Until December 1998.
16   Q. And what caused you to go back to Michigan at
17 that time?
18   A. I wanted to continue schooling.
19   Q. And did you do that for a time?
20   A. Yes.
21   Q. And then you moved back to Brownsville yet
22 again?
23   A. Yes.
24   Q. And when was that?
25   A. March 2002.

## Page 12

1    Q. And have you resided in Brownsville, Texas, or
2  this general area since March of 2002?
3    A. Yes, sir.
4    Q. Okay. Are you married?
5    A. No.
6    Q. Have you ever been married?
7    A. No.
8    Q. Do you have any trade school education or any
9  other education beyond high school other than what we
10 just talked about?
11   A. None at all.
12   Q. Okay. Do you hold any professional titles of
13 any kind?
14   A. No.
15   Q. Do you hold any certifications, certificates,
16 from any trade schools or anything like that?
17   A. No.
18   Q. Okay. After high school -- I don't necessarily
19 need to know each and every job you've had, but just give
20 me an idea of what kind of fields or vocations you've
21 been working in since high school.
22   A. Mostly I've worked in customer service at call
23 centers.
24   Q. When you say "call centers," are you talking
25 about for the collection industry?

## Page 13

1  A. No. I would say customer-service-based jobs.
2  Q. For what types of companies?
3  A. Large organizations. One company was Comcast.
4  Current employer is Dish Network.
5  Q. Okay. What do you do for Dish?
6  A. I do outbound sales and customer service.
7  Q. When you say "outbound sales," do you try to
8  sell satellite tv to customers in their residences?
9  A. That's correct.
10  Q. And how -- you said you also do customer
11  service. What does that involve?
12  A. A customer calls in to the "800" number, I
13  answer the call and help them with any assistance they
14  need on their accounts.
15  Q. Okay. How long have you worked at Dish Network?
16  A. Since -- I'll give you my hire date, June 30th,
17  2003.
18  Q. Okay. The residence you gave me earlier, do you
19  live there alone or with someone?
20  A. With my mother and my brother.
21  Q. Okay, what is your mother's name?
22  A. Yolanda Morales.
23  Q. And your brother's name?
24  A. Jose Morales.
25  Q. Okay. Is your father -- have you had any

## Page 14

1  contact with your father recently?
2  A. No.
3  Q. Is your father deceased, or is he alive?
4  A. I don't know that.
5  Q. Okay. So it's been quite some time since you've
6  had any contact with him?
7  A. Yes.
8  Q. Okay. Who is your current supervisor?
9  A. His name is Carlos Barragan.
10  Q. Okay. And let me ask you a preliminary question
11  about this lawsuit, and I can probably avoid asking you a
12  lot of questions, depending on your answer.
13      Do you know as you sit here today whether you're
14  making any claim for lost income or lost wages in this
15  lawsuit?
16  A. (No response).
17  Q. Do you understand what I'm asking you?
18  A. Yes, I was taking a moment.
19  Q. Okay.
20  A. I'd say in part, yes.
21  Q. Okay. Well, in that case I need to ask you some
22  more questions about your job then, with the Dish
23  Network. You said you've been employed there since 2003?
24  A. Yes.
25  Q. June of 2003? Is that right?

## Page 15

1  A. That is correct.
2  Q. Where were you working back in November of 2001?
3  A. At the Woodwind and Brasswind.
4  Q. I'm sorry?
5  A. The Woodwind.
6  Q. Okay.
7  A. And Brasswind.
8  Q. What kind of company is that?
9  A. They sell musical instruments and accessories
10  through mail-order catalog.
11  Q. What did you do for that company back at that
12  time?
13  A. Customer service and sales as well.
14  Q. Did that involve phone selling or was it
15  in-store contact with customers, or describe that for me?
16  A. They would call me to place their order or to
17  ask questions regarding their account with us and what
18  they had previously ordered. I would also call them back
19  on occasion to also make sales.
20  Q. Okay. And how long did you work for the
21  Woodwind and Brasswind?
22  A. Approximately three years.
23  Q. Okay. When did you start and when did you end,
24  approximately?
25  A. March '99, and I worked until February 2002.

## Page 16

1  Q. And who was your supervisor while you were
2  there?
3  A. Miles Barden, B-a-r-d-e-n.
4  Q. What was your rate of pay while you were there?
5  A. Ending pay was $10 an hour.
6  Q. Do you remember what you started at?
7  A. $7.50, I believe.
8  Q. And did you work a 40-hour work week?
9  A. Yes.
10  Q. Did you ever work any overtime?
11  A. A lot.
12  Q. Okay. Did your hours vary, or did you have a
13  set schedule of hours per week, or did it vary depending
14  on the time of year or anything like that?
15  A. I would say that I had a pretty-much set
16  schedule. Sometimes of the year, mostly Fall is when
17  there was more people calling in, so I would work more
18  hours.
19  Q. How many hours do you think you worked during
20  that busy time, on a weekly basis?
21  A. On a weekly basis?
22  Q. Yes, sir.
23  A. I would say an additional eight to ten hours
24  over the 40.
25  Q. Okay. So would it be fair to say that even

1  during the peak busy season of the year while you were at
2  the Woodwind and Brasswind, the most hours you ever
3  worked would be 50 or less?
4     A. On a weekly basis, yes.
5     Q. Okay. And how many months out of the year do
6  you think you would have been working these extra hours?
7     A. I'd say one, maybe two.
8     Q. Okay. For most of the year you worked a 40-hour
9  week?
10    A. Right.
11    Q. So it was fairly unusual if you worked overtime?
12    A. Right.
13    Q. Okay. Why did you leave your employment with
14 the Woodwind and Brasswind?
15    A. I moved out of state.
16    Q. And when you came back from Michigan, is that
17 when you started working with Dish?
18    A. No.
19    Q. Okay. When you first came back from Michigan,
20 where did you start working then?
21    A. I first started working for an insurance
22 company.
23    Q. What was the name of that company?
24    A. Banker's Life and Casualty.
25    Q. What did you do for them?

1     A. I mostly went through training for sales.
2     Q. What type of sales?
3     A. Insurance policies, Medicaid.
4     Q. Medicaid?
5     A. Medicaid insurance, health insurance.
6     Q. Okay. And you said you went through training,
7  did you actually start selling for them?
8     A. I worked for approximately two weeks in their
9  sales field, but I made no money because it was all
10 commission basis, and I didn't make any sales, so.
11    Q. Did you decide to quit because of that?
12    A. I decided to quit, yes.
13    Q. Okay. And this would have been about what time
14 frame? If you moved -- strike that.
15       If you quite working for the Woodwind and
16 Brasswind in February of 2002 and you moved out of state
17 for a time, when did you come back, approximately?
18    A. I came back in March of 2002, so I worked from
19 then, probably approximately two to three weeks in that
20 position before I quit that.
21    Q. Okay. Because I want to make sure I understand
22 these time frames right. You said March 2002, and I want
23 to make sure you meant that.
24       So when you left Michigan one of these times you
25 were only gone a month, or do we have the wrong year?

1     A. No, I think when I left Michigan after working
2  at the Woodwind and Brasswind, which that would have been
3  February 2002, I moved back from Indiana -- well,
4  Michigan; I'm sorry. I was working in Indiana. I'm
5  sorry. I moved from Michigan back to Brownsville area
6  about a month later in March 2002.
7     Q. Okay. That's what I'm trying to establish. So
8  you were only out of state at that time for about a
9  month?
10    A. Out of what state?
11    Q. Out of Texas.
12    A. No.
13    Q. Okay. And the reason I want to get to this is
14 because some of the claims in this lawsuit involve this
15 time period, apparently.
16       So you were working at the Woodwind from March
17 of '99 to February of 2002?
18    A. Right.
19    Q. And then upon quitting that job, is that when
20 you moved out of state?
21    A. Yes.
22    Q. And so about February 2002 you went to Michigan?
23    A. No, that's where I was residing when I worked at
24 the Woodwind and Brasswind.
25    Q. Okay, all right. That's what I wasn't

1  following. I thought that company was here, but that
2  company was in Michigan?
3     A. That's correct, Indiana.
4     Q. Okay. And so you were living in Michigan but
5  working in Indiana?
6     A. That's correct.
7     Q. Okay. And then the insurance company you went
8  to work for in March of 2002 was located where?
9     A. Well, I guess they were based out of here,
10 central office in San Antonio.
11    Q. But you reported to an office here in
12 Brownsville?
13    A. Right.
14    Q. Sorry for my confusion.
15       All right. And after that didn't work out,
16 where did you go to work next?
17    A. Convergys.
18    Q. What kind of a company is that?
19    A. They're a customer service company, they
20 consider themselves like a vendor of customer service.
21 They have multiple -- they do customer service for other
22 companies.
23    Q. Okay. What were you doing for Convergys?
24    A. I was doing customer service for the Comcast
25 project.

**Page 21**

1   Q. And how long did you work there?
2   A. A year.
3   Q. What were you making while working at Convergys?
4   A. I ended with $7.61 per hour.
5   Q. And what did you start with?
6   A. $7.
7   Q. Did you work a 40-hour work week?
8   A. Yes.
9   Q. Always?
10   A. Pretty regularly.
11   Q. Okay, who was your supervisor there?
12   A. Jose Borjas.
13   Q. How do you spell his last name?
14   A. B-o-r-j-a-s.
15   Q. And how long did you work there?
16   A. One year.
17   Q. That's right, you told me that. So till
18 approximately March of 2003?
19   A. Correct.
20   Q. Okay. Why did you leave there?
21   A. I was terminated.
22   Q. Okay. What was the reason you were terminated?
23   A. Misconduct.
24   Q. What kind of misconduct?
25   A. I emailed a client using personal email.

**Page 22**

1   Q. Okay. And they terminated you for that?
2   A. Yes, sir.
3   Q. Was this a one-time incident or had it happened
4 more than once?
5   A. One time.
6   Q. Did a company charge that you were trying to
7 steal their client away from them or anything like that?
8   A. No, sir. The basis of that was I set the
9 expectations for the client too high, and in doing so he
10 might seek legal action in the future if we do not give
11 him the same level of customer service. Since they would
12 have been liable, they let me go.
13   Q. Okay. And where did you go to work after that?
14   A. Dish Network.
15   Q. And you may have told me but I didn't write it
16 down. What's your current rate of pay for Dish?
17   A. $7.25 per hour.
18   Q. Do you work a 40-hour work week?
19   A. Yes, sir.
20   Q. Okay. Do you have any felony convictions on
21 your record?
22   A. No.
23   Q. Do you have any misdemeanor convictions on your
24 record?
25   A. No.

**Page 23**

1   Q. Have you ever been arrested for anything?
2   A. No.
3   Q. Have you ever filed bankruptcy?
4   A. Yes.
5   Q. When did you file bankruptcy?
6   A. Approximately June 2002.
7   Q. And that was with Mr. Ventura's office here in
8 Brownsville?
9   A. That's correct.
10   Q. Other than that, have you ever filed bankruptcy
11 at any time during your lifetime?
12   A. No, sir.
13   Q. Okay. Is that -- is it your belief that that
14 bankruptcy proceeding is opened or closed?
15   A. Closed.
16   Q. Okay. Other than this lawsuit, and I'm
17 excluding the bankruptcy; you might consider that a
18 lawsuit, but other than that, and this lawsuit, have you
19 ever filed a lawsuit against anyone before?
20   A. You mean under my name?
21   Q. Yeah, I guess let's start with that.
22   A. No.
23   Q. Okay. Have you filed a lawsuit under anybody
24 else's name?
25   A. Maybe perhaps. We had a situation with

**Page 24**

1 recovering damages from an insurance company in an
2 accident that my mother had, but I believe it was under
3 her name.
4   Q. Okay. When you say "we" are you referring to
5 you and your mother, or are you talking about that you
6 had an attorney help you?
7   A. Yes.
8   Q. Okay. Which?
9   A. I helped my mother through an attorney.
10   Q. Okay, and who was that?
11   A. Bill Best, William Best.
12   Q. Where is Mr. Best located?
13   A. He's in Brownsville.
14   Q. And when was that accident?
15   A. Approximately December '96.
16   Q. Okay. Did you make any claims in that case, as
17 well, for you personally?
18   A. Yes.
19   Q. Okay. Just tell me in general about the
20 accident. Was it an automobile accident?
21   A. It was an automobile accident.
22   Q. Okay, just describe it for me, generally.
23   A. I got -- I had a green light, I proceeded
24 forward through the intersection. The car hit me on the
25 passenger side door, on their right-hand lane as I was

Page 25

1  crossing over. So that smashed the car, smashed me
2  against the side, and it was a total loss. I had some
3  injury to myself, so we did some recovery on the car and
4  personal injury as well.
5      Q. And was your mother in that vehicle?
6      A. No.
7      Q. Okay, but she got some money out of it?
8          That's a poor question, let me ask it this way:
9  You mentioned something about your mother, you led me to
10 believe -- I'm not saying you mislead me, but I
11 understood the way you gave your testimony that your
12 mother had a claim out of this.
13     A. The vehicle was hers.
14     Q. Okay. Did she make any personal injury claims?
15     A. No.
16     Q. Okay. Were you the only occupant of your
17 vehicle in that accident?
18     A. I was the only one.
19     Q. Okay. And who was the person that was in the
20 other vehicle?
21     A. I do not know.
22     Q. Was there a lawsuit filed, or was it settled
23 without filing a lawsuit?
24     A. It was -- I believe they filed.
25     Q. Okay.

Page 26

1      A. We ended up filing.
2      Q. Okay. Was that here in Cameron County?
3      A. Yes.
4      Q. And now it's been settled?
5      A. Yes.
6      Q. Any other lawsuits?
7      A. No, sir.
8      Q. Have you ever been sued by anybody?
9      A. No, sir.
10     Q. Have you ever made a claim for disability
11 because of injuries at work or anything like that?
12     A. No, sir.
13     Q. Have you ever made a claim for unemployment
14 benefits?
15     A. Yes.
16     Q. Tell me about that.
17     A. When I left -- I apologize. When I was
18 terminated from Convergys I filed for unemployment.
19     Q. Okay. Other than that have you made any claim
20 for unemployment?
21     A. No, sir.
22     Q. Have you ever received any Social Security
23 benefits for any reason?
24     A. No, sir.
25     Q. Have you ever been in the military?

Page 27

1      A. No.
2      Q. You understand that I represent Check Alert
3  Systems, and you have sued my client on behalf of
4  yourself and others as part of a class action; do you
5  understand that?
6      A. Yes, sir.
7      Q. And you're claiming that you got some
8  communication with my client about a possible bad check
9  and that they employed illegal collection means in trying
10 to collect that. Do you understand that's what you're
11 alleging in this case?
12     A. That's what I understand.
13     Q. Okay.
14         MR. WIER: Let me stop here and mark a
15 couple of exhibits and I think we'll make this go a
16 little faster.
17         (Deposition Exhibits Nos. 1 and 2 marked
18         for identification).
19     Q. Okay. I'm going to hand you -- you've actually
20 got copies in front of you, but just so you have the
21 originals in front of you I'm going to hand you what I've
22 had marked as Exhibits 1 and 2 to your deposition.
23         And let's start with Exhibit 1. That appears to
24 be a copy, front and back, of a check; does it not?
25     A. Yes, sir.

Page 28

1      Q. And it looks like that is a check -- it's
2  hard to make out, but I think it's written to Martin's
3  Food, and it's dated February 18th of '02.
4      A. That's correct.
5      Q. And is that your signature on the check?
6      A. Yes, sir.
7      Q. And that check, there's a printed portion of the
8  check that gives a P.O. box for you up in -- I'm sorry, I
9  can't pronounce the name of that town, in Michigan,
10 what's the?
11     A. Dowagiac.
12     Q. Okay. Dowagiac. You said that, but I couldn't
13 remember that.
14         MR. MLYNEK: Why would they name a town
15 like that?
16         THE WITNESS: It's an Indian name.
17     Q. (BY MR. WIER) And so were you residing in
18 Michigan at that time?
19     A. That's correct.
20     Q. And is that your -- I think you told me that's
21 your signature on the check; is it not?
22     A. Yes, sir.
23     Q. And you had an account with the Notre Dame
24 Federal Credit Union; is that true?
25     A. Yes, sir.

Page 29

1   Q. And do you remember writing a check to Martin's
2 Food?
3   A. Yes.
4   Q. Is that some kind of a grocery store,
5 supermarket or something like that?
6   A. Supermarket.
7   Q. Is that a supermarket where you regularly traded
8 when you were up in the Michigan area?
9   A. Yes.
10   Q. Okay. And if you look at the back part of the
11 check which is reflected on Exhibit 1, it looks like that
12 check was returned for insufficient funds; is that true?
13   A. Yes, sir, that's what I see.
14   Q. Okay. And now I'll turn your attention to
15 Exhibit No. 2, which is a copy of a May 24th, 2002 letter
16 from my client, Check Alert Systems, directed to you. Do
17 you see that?
18   A. Yes.
19   Q. And the letter is dated to William L. Foster,
20 and that's you, right?
21   A. Yes, sir.
22   Q. And then it gives a P.O. box in Brownsville,
23 Texas, P.O. Box 8713.
24   A. Yes, sir.
25   Q. Is that your P.O. box?

Page 30

1   A. Yes.
2   Q. When did you first establish that post office
3 box?
4   A. I would say right around the same time the check
5 was written.
6   Q. Okay. So is it your testimony that soon after
7 this check was written that you moved from Michigan back
8 to Texas?
9   A. Soon, yes.
10   Q. Okay. And by May 24th of 2002, you were
11 residing in Brownsville, Texas?
12   A. Yes, sir.
13   Q. And you see there on Exhibit 2, down below the
14 big black line that says "Past Due Balance," you see
15 under there it says "Martin's Supermarket," and then it
16 gives a bunch of numbers and then it says "Check Amount:
17 $34.62;" do you see that?
18   A. Yes, sir.
19   Q. And that's the same amount that's on the check
20 reflected in Exhibit 1, right?
21   A. That is correct.
22   Q. And then it says "Ser Charge;" I'm assuming that
23 stands for service charge; "$35.00;" do you see that?
24   A. Yes, sir.
25   Q. And then they've got a total amount over there,

Page 31

1 "69.62," do you see that?
2   A. Yes, sir.
3   Q. And on down the letter it says, "Total Due:
4 $69.62." Do you see that?
5   A. Yes, sir.
6   Q. And I'm curious. I've seen this letter
7 throughout, and I think it might have even been attached
8 to your complaint. Do you remember receiving this letter
9 at some point?
10   A. Yes, sir.
11   Q. At the time that you received this letter, would
12 it have been within days, or at least a week or so, from
13 the date on that letter of May 24th of 2002?
14   A. I'm sorry, did you ask me a question?
15   Q. Yeah, it was maybe a poor way to ask it.
16     Do you remember whether you received this letter
17 on or about the time, the date reflected on that letter,
18 within a few days after May 24th of '02?
19   A. Yes, sir, I remember.
20   Q. Other than this letter, do you remember ever
21 receiving any other letters from my client, Check Alert?
22   A. Yes, yes, I do remember.
23   Q. Okay. Do you remember that you might have
24 received letters before this one?
25   A. Yeah, I remember receiving quite a few, yes.

Page 32

1   Q. Okay. Let me back up for a minute, and we'll
2 come back to this letter, Exhibit No. 2, in a second.
3 But Exhibit No. 1, the check that you wrote that bounced,
4 do you remember ever getting contacted by anyone at
5 Martin's about that?
6   A. Only -- by Martin's; I'm sorry?
7   Q. Yes.
8   A. Not by Martin's directly, no, sir.
9   Q. Okay. So before you got contacted by Check
10 Alert you don't remember ever hearing from Martin's
11 directly, either by telephone or in writing, something to
12 the effect of "Hey, you bounced a check and we want you
13 to take care of it"?
14   A. I don't remember that, no, sir.
15   Q. Okay. Was your first communication with anybody
16 about this bounced check by my client, Check Alert? Or
17 do you remember receiving contact from anybody else
18 before hearing from Check Alert?
19   A. Contact to me, I don't recall from anyone
20 besides Check Alert.
21   Q. Okay. If you wrote the check on February 18th
22 of '02, when is the first time you remember being
23 contacted by anybody to inform you that you'd bounced a
24 check?
25   A. I would have to say approximately a week to two

Page 33

1  weeks after that, at my P.O. box in Michigan.
2      Q.  Okay.  I'm sorry, I didn't mean to interrupt
3  you.
4          And who do you remember getting contacted from?
5      A.  Check Alert.
6      Q.  Was that by telephone or by letter?
7      A.  Letter.
8      Q.  And what did you do in response to getting that
9  letter?
10     A.  I read the letter to see what the amount was,
11  and I filed it so I could budget myself to see about
12  paying it off.
13     Q.  Okay.  When you say you "filed it," you mean you
14  just put it in your personal papers somewhere?
15     A.  Personal papers where my bills go and whatnot.
16     Q.  Okay.  And before you -- I'm interested in
17  before you left Michigan and came back to Texas, do you
18  remember getting multiple letters from Check Alert?
19     A.  No, not multiple letters, just one, maybe two,
20  but at the time I was still forwarding the mail and
21  everything and I was receiving a lot of letters similar
22  to this.
23     Q.  Okay.  As we sit here today, and you're under
24  oath, do you ever remember speaking to anybody at Check
25  Alert over the telephone about this?

Page 34

1      A.  No, sir.
2      Q.  Okay.  So the contact that you would have had
3  with my client would have been solely through letters?
4      A.  Yes, sir.
5      Q.  Okay.  These other letters that you might have
6  received, do you have copies of those any longer?
7      A.  I don't know that; I could look.
8      Q.  Do you have a file that you still have at home
9  on this matter?
10     A.  Not a very good one, but I do have one.
11     Q.  Okay.  So would it be fair to say that if the
12  letter still exists you would have those either at home
13  or they might be with your lawyers?
14     A.  That's correct.
15     Q.  Okay.  And since you told me a minute ago that
16  you've never actually talked to anybody at Check Alert
17  over the phone, I take it that even after moving down
18  here to Brownsville you never called Check Alert to make
19  arrangements to pay this off?
20     A.  No, sir.
21     Q.  Did you ever call Martin's to try to pay it off?
22     A.  No, sir.
23     Q.  Let's go to Exhibit No. 2, and go ahead and read
24  the verbiage on that letter, the words on that letter to
25  yourself for a minute, and then I'll have some questions

Page 35

1  about it.
2      A.  (Witness examines document) Okay.
3      Q.  First of all, I'm just curious.  Do you see the
4  check mark on that letter?
5      A.  Yes, sir.
6      Q.  Is that -- do you remember when you got the
7  letter, did it have that check mark on it, or is that
8  something that got placed on there later?
9      A.  It was later.
10     Q.  Okay.  Did you put the check mark on there?
11     A.  No, sir.
12     Q.  Okay.  Who put the check mark on there?
13     A.  I don't know.
14     Q.  Well, I think what I was trying to ask, and I
15  guess I can go back and ask my client the question.  I'm
16  just curious.  When you got the letter in the mail --
17         MR. MLYNEK:  This is the original one.
18     Q.  (BY MR. WIER)  Your lawyer has been kind enough
19  to hand me the original letter.  Do you see that, and
20  it's in blue and it's got a pink check mark?
21     A.  That's right.
22     Q.  When you got it in the mail did it have that
23  pink check mark on it already?
24     A.  No, sir.
25     Q.  Do you know who put the pink check mark on it?

Page 36

1      A.  No, I don't.
2      Q.  Okay.  But that would have happened after you
3  received it?
4      A.  That's right.
5      Q.  Okay.  When you got this letter in the mail, the
6  one that's in front of you dated May 24th of '02, what
7  did you think?
8      A.  My first impression was "I need to pay this as
9  soon as possible, it's one of a couple I've received
10  now."  And I noticed that it was pretty serious, that I
11  needed to take care of this as soon as possible,
12  particularly because of the verbiage on it.
13     Q.  Okay.  And what verbiage are you thinking about
14  when you say it was pretty serious and you needed to take
15  care of it?
16     A.  I would specifically say it's that there was
17  grounds for possible filing criminal charges against me
18  for not making this payment.
19     Q.  Okay.  And because of that, did you do anything
20  in response to receiving this letter?
21     A.  Shortly thereafter I filed bankruptcy.
22     Q.  Okay.  So is it your testimony that upon
23  receiving this letter that shortly thereafter you came
24  and visited with Mr. Ventura's office about filing
25  bankruptcy?

| | |
|---|---|
| **Page 37** | **Page 39** |

**Page 37**

1  A. That's correct.

2  Q. When you came to see Mr. Ventura about this

3  matter and filing bankruptcy, did you owe other creditors

4  money as well?

5  A. Yes, sir.

6  Q. And I guess I could get the bankruptcy schedules

7  out in a minute if we need to, but how many other

8  creditors do you think you had approximately at that time

9  that you owed money to?

10  A. Approximately ten to 15.

11  Q. Okay. And do you have any ballpark figure on

12  how much money that you owed creditors at that time?

13  A. Ballpark, I would say somewhere between 15- and

14  18,000.

15  Q. Okay. Was most of that in unsecured credit card

16  debt?

17  A. Yes, sir.

18  Q. Okay. How many other creditors did you owe for

19  insufficient funds checks other than this one that's

20  reflected on Exhibit 2?

21  A. I don't know that. They don't come to mind.

22  Q. Okay. And I think you've answered this but I

23  just want to make sure, because this will be my chance to

24  ask you questions about this lawsuit.

25  You're not claiming that anyone from Check Alert

**Page 38**

1  harassed or abused you in conversations over the

2  telephone, because you didn't have any telephone calls

3  with anybody, right?

4  A. That's correct.

5  Q. Okay. In reading through that letter -- or

6  strike that. You said something that piqued my curiosity

7  a minute ago. Are you telling me that you filed

8  bankruptcy because of this letter only, or was it because

9  you owed money to a lot of folks and you couldn't pay it?

10  A. To the first part of your question regarding the

11  letter, it was because of letters like this and others

12  like it that, I guess, in a way, you know, painted me

13  into a corner where I needed to take action one way or

14  another. And this was specifically stated that criminal

15  charges could be filed against me for not making payment,

16  so.

17  Q. Okay. And as established by Exhibit 1, you did

18  write this check and you bounced it, right?

19  A. That is correct.

20  Q. You acknowledge that, correct?

21  A. Yes, sir.

22  Q. I mean, you're not claiming that there was any

23  screw up with the bank and it should have cleared, or

24  anything like that, are you?

25  A. No.

**Page 39**

1  Q. Okay. And did you understand at the time that

2  you wrote this check that if you don't have enough money

3  in the bank to pay for something that you can bounce a

4  check?

5  A. I do understand that.

6  Q. Okay. You understand that if you write a check

7  to someone they have the right to demand that you pay for

8  the goods?

9  A. Oh, yeah.

10  Q. And do you understand that not only in Texas,

11  but elsewhere, if you write what we term a "bad" check or

12  a "hot" check that you can be criminally prosecuted for

13  that?

14  A. I don't know that.

15  Q. Okay. You're not aware of that? If you go out

16  today and you write a check somewhere and you don't have

17  the money in the bank to pay for it so you pass what we

18  refer to as a "hot check," do you understand that the

19  district attorney's offices or someone else can come

20  after you criminally for that?

21  A. That I do understand, if I intentionally write a

22  hot check, like you said.

23  Q. Okay. And did you understand that that could

24  happen, back in February of 2002?

25  A. I did understand that.

**Page 40**

1  Q. Okay. With regard to this particular letter,

2  when you first got it and read through it, did you -- did

3  you know that the letter violated either state or federal

4  law in any manner?

5  A. No, I did not.

6  Q. And even reading through it today, other than

7  the criminal charge reference, do you see anything

8  particularly upsetting or offensive about anything in

9  that letter?

10  A. Yes, sir.

11  Q. What is that?

12  A. The portion that says "dishonored check," and

13  also "intentionally writing a bad check," or checks, as

14  it reads.

15  Q. All right. So let me ask you about that. I

16  see -- you're talking about -- let's just, so we're

17  looking at the same place. You see right under that

18  check mark it says, "No other way to contact you"?

19  A. That is correct.

20  Q. And then you skip down and then -- you skip one

21  line and then there's two lines that are in all capital

22  letters where it says "We are attempting to help you

23  before this dishonored check is recommended for further

24  collection efforts;" do you see that?

25  A. Yes, sir.

Page 41

1   Q. Is that what you're talking about when you say
2   "dishonored check"?
3   A. That is correct.
4   Q. What do you find upsetting about that?
5   A. I don't feel that my check was dishonorable. I
6   wrote it in good faith that I had the funds available and
7   that I would be able to -- it would clear. Unfortunately
8   it didn't.
9   Q. Now you said you don't feel the check was
10  "dishonorable." The check actually says "dishonored." I
11  mean, the letter says "dishonored check." Do you
12  understand what that means?
13  A. I understand it to mean that my check was not
14  honorable. In other words, it wasn't any good or I did
15  not have a valid checking account at the time or funds
16  available.
17  Q. Okay. Well, we've already established by
18  looking at Exhibit No. 1 that the check was not any good
19  when you wrote it, was it?
20  A. Yes, it was.
21  Q. Well, if it had been good it would have cleared,
22  wouldn't it?
23  A. That's a possibility. There's a lot of
24  possibilities for that check not to have cleared.
25  Q. Well, let's make sure we're understanding each

Page 42

1   other. When I use the -- use your words that you just
2   used, that the check is not any good, what I mean is you
3   did not have sufficient money in the bank to cover that
4   check at the time you wrote it.
5   A. I did not know that at the time.
6   Q. Okay. But you will acknowledge that's indeed
7   what occurred, by looking at Exhibit 1, true?
8   A. It's a possibility.
9   Q. What other possibility is there?
10  A. Like you mentioned, bank error.
11  Q. Since February of 2002 have you contacted your
12  bank to find out why that check bounced?
13  A. Let me see. No, not on this particular check.
14  Q. And you've already told me, under oath, that
15  when you got this first letter you filed it in a file and
16  you intended to take care of it, right?
17  A. That is correct.
18  Q. I mean, you knew that the check hadn't been paid
19  and you intended to pay it at a later date, right?
20  A. That's correct.
21  Q. But you never did that, did you?
22  A. No, sir.
23  Q. Okay. What else do you find objectionable or
24  offense about the language in the letter?
25  A. "The intentional writing of a bad check." That

Page 43

1   would be on the third paragraph, after the comma.
2   Q. Oh, okay. Third paragraph, "We have advised you
3   that under state law, the intentional writing of bad
4   checks can be grounds for criminal charges," that
5   sentence? Is that the sentence you're talking about?
6   A. That's correct.
7   Q. And you have some problems with the fact that it
8   says "the intentional writing of bad checks"?
9   A. That's correct.
10  Q. And why is that?
11  A. Because they are assuming that I intentionally
12  wrote a bad check.
13  Q. Okay. Now, it says here "We have advised you
14  that under state law the intentional writing of bad
15  checks." Do you know, as you sit here today, whether,
16  indeed, it is a violation of state law to intentionally
17  write a bad check?
18  A. Yes.
19  Q. Okay. So the way that that sentence is phrased,
20  that would be a true statement, wouldn't it?
21  A. The only part of the sentence that I'm not
22  agreeing with is where it says "We have advised." I
23  don't know whether that's true or not.
24  Q. When they say "We have advised," you're not sure
25  whether they told you that before?

Page 44

1   A. That's correct.
2   Q. Okay. But the rest of it where it says "Under
3   state law the intentional writing of bad checks can be
4   grounds for criminal charges," that's true, isn't it?
5       MR. MLYNEK: I'm going to object to the
6   form.
7   A. I --
8   Q. (BY MR. WIER) You can answer. Your lawyer is
9   doing his job, and unless he tells you not to answer,
10  once he objects you can go ahead and answer.
11  A. Are you asking me present date, or?
12  Q. Yes.
13  A. Present date, yes, I do understand that.
14  Q. Okay. So you have a problem with that
15  particular sentence even though it's a correct statement
16  of the law?
17      MR. MLYNEK: I'm going to object to the
18  form.
19  A. Yes.
20  Q. (BY MR. WIER) You're going to sue my client,
21  hold my client accountable for telling you something in a
22  letter that's a correct statement of the law?
23      MR. MLYNEK: Objection to form.
24  A. That's correct.
25  Q. (BY MR. WIER) And you think my client ought to

Page 45

1  pay you and a whole bunch of other people money because
2  they made a correct statement of the law in a letter
3  trying to collect on a bad check from you?
4      MR. MLYNEK: Objection to form.
5  A. I don't know that.
6  Q. (BY MR. WIER) Well, you are asking for money in
7  this lawsuit, aren't you?
8  A. I don't know that.
9  Q. All right. Anything else that you find
10 objectionable about that letter?
11 A. No, sir, that's all.
12 Q. Okay. Now, do you know, in reading through this
13 letter, whether the language of this letter actually
14 violates any Federal Fair Debt Collection laws?
15 A. I would not know.
16 Q. Do you know, in reading through this letter,
17 whether this letter violates any Texas state Fair Debt
18 Collection laws?
19 A. I wouldn't know.
20 Q. Do you see anywhere in that letter where my
21 client, Check Alert, alleges that they would take legal
22 action against you if you didn't pay this check?
23 A. (Witness examines document) I believe where it
24 says "grounds for criminal charges," that would be a
25 legal action.

Page 46

1  Q. Okay. So what further legal action did Check
2  Alert threaten to take against you?
3  A. Well, it's very vague where it says "to avoid
4  further action." I don't know what "further" means; they
5  do not establish that.
6  Q. Okay. So you'll acknowledge, in reading through
7  that letter, they don't ever say "If you don't pay this
8  we're going to sue you or hire a lawyer to sue you," do
9  they?
10 A. I don't know that.
11 Q. Well, you can tell that by reading the letter.
12 It doesn't say that in the letter, does it?
13 A. Specifically what you said, it doesn't say, sir.
14 Q. Okay. And it doesn't threaten to take any legal
15 action with regard to Check Alert either pursuing you in
16 a civil lawsuit or hiring an attorney or anything like
17 that, does it?
18 A. I don't see that, no.
19 Q. Do you know whether Check Alert was authorized
20 by Martin to file a lawsuit against you if you didn't pay
21 this?
22 A. I wouldn't know.
23 Q. Then you haven't done any investigation to find
24 that out, have you?
25 A. Myself?

Page 47

1  Q. Right.
2  A. No.
3  Q. And as we sit here today, do you know whether
4  either Martins or Check Alert has the right to contact
5  the district attorney and recommend that criminal charges
6  be filed against you?
7  A. I wouldn't know.
8  Q. And do you have any information to suggest
9  whether the original creditor, Martin Supermarkets, plan
10 to take any legal action against you if you didn't pay
11 this?
12 A. I don't know that.
13 Q. Are you claiming damages in this lawsuit?
14 A. Yes, sir.
15 Q. Describe those for me.
16 A. I would just say that as a result of this letter
17 is I'd say the stress and whatnot it has put on me led me
18 to bankruptcy and -- because I felt that that was the
19 only way out that I have, because I didn't want to have
20 criminal charges against me, as I said earlier.
21     I don't have any felonies or misdemeanors on my
22 record and I felt this was the only way so that I could
23 keep it that way.
24     And I don't feel that that's right for one
25 agency, as it is, to put that kind of pressure on one or

Page 48

1  any number of individuals.
2  Q. Okay. Because you say that they've caused you
3  stress, are you claiming mental anguish?
4  A. I would say anxiety.
5  Q. Okay. And let me back up and ask you about
6  this, because I'm not clear from what you said earlier:
7  Are you, in this lawsuit, claiming that you missed time
8  from work that you want to be compensated for?
9  A. Time from work, no.
10 Q. Okay. And you're not claiming that you lost any
11 promotions or job opportunities with your work because of
12 receiving this letter, are you?
13 A. No, sir.
14 Q. Are you claiming any out-of-pocket
15 damages, and when I say "out-of-pocket" I mean anything
16 that you actually paid for by check or with cash because
17 of this that you claim that you need to be reimbursed
18 for?
19 A. I would say yes to the cost of the bankruptcy,
20 and the expenditures taking care of that.
21 Q. Okay. And when you say "cost of the
22 bankruptcy," are you talking about your attorneys' fees?
23 A. Yes, sir.
24 Q. How much did you have to pay in attorneys' fees
25 for your bankruptcy?

Page 49

1    A. I believe altogether I paid $1200.
2    Q. When you say "altogether," what did that consist
3 of?
4    A. There was an attorney fee, there was also court
5 fees, that's -- that was what I paid to this particular
6 office. And there was a lot of paperwork that I had to
7 get together and whatnot. I also had to travel in order
8 to make it to the court at a certain time.
9       In that aspect I would have to say, thinking
10 back now on your question, and I apologize for not
11 mentioning this earlier. I did have to take some time
12 off from work in order to meet the court dates and
13 whatnot.
14    Q. Okay. So did you lose time from work that you
15 want to be compensated for?
16    A. I'd have to say yes on that.
17    Q. Okay. How many hours or days do you think you
18 missed?
19    A. I would have to say days, altogether, coming
20 here and having to travel and whatnot, I would say a good
21 five days or so.
22    Q. So about 40 hours, more or less?
23    A. That's correct.
24    Q. And during this time period your rate of pay was
25 what?

Page 50

1    A. At the time of the bankruptcy?
2    Q. Yes, sir.
3    A. $7, I believe, an hour.
4    Q. Okay. With regard to your metal anguish, have
5 you been to see a psychiatrist or a psychologist to help
6 you deal with the stress you've just described?
7    A. No, sir.
8    Q. Have you ever been to see a psychiatrist or a
9 psychologist or other mental health-care doctor at any
10 time during your lifetime for any reason?
11    A. No, sir.
12    Q. Okay. Have you had to seek out the advice or
13 counsel of a doctor because of this stress that you're
14 claiming in this case?
15    A. I have to say -- I'm sorry, can you rephrase?
16    Q. Yeah. I'm trying to figure out if you've had
17 any doctor's visits whereby you've incurred any expense
18 such as medical bills for dealing with ailments that you
19 attribute to the stress.
20    A. With stress, sir, I would have to say yes. I've
21 recently visited my doctor and I've been diagnosed with
22 hypertension now. I have high blood pressure.
23    Q. When were you first diagnosed with high blood
24 pressure?
25    A. Approximately three weeks ago.

Page 51

1    Q. What doctor did you see for that?
2    A. Dr. Martinez.
3    Q. Is Dr. Martinez a man or a woman?
4    A. Female.
5    Q. And what is her first name?
6    A. I can spell it for you.
7    Q. Okay.
8    A. Y-a-n-i-a.
9    Q. Is she located here in Brownsville?
10    A. Yes, sir.
11    Q. What kind of a doctor is she?
12    A. Internal medicine.
13    Q. Okay. Did she put you on any medication?
14    A. Yes.
15    Q. What kind of medication? Do you know the name
16 of it?
17    A. Norvasc is one of them.
18    Q. What else did she put you on?
19    A. Can I borrow a pen. I have to spell it out. I
20 believe it's spelled something like this, I'll spell it
21 to you. L-o-t-e-n-s-i-n. It's some form of water pill
22 that's supposed to bring the blood pressure down.
23    Q. Okay. Anything else she put you on, other than
24 those two?
25    A. Let me think. Regarding to the stress, no, sir,

Page 52

1 or the hypertension, no.
2    Q. Okay. Were you having some other medical issues
3 that she was helping you with?
4    A. Yes.
5    Q. What were those?
6    A. I have sleep apnea.
7    Q. Okay.
8    A. I was diagnosed with that.
9    Q. Anything else she was helping you with besides
10 high blood pressure and sleep apnea?
11    A. I think I had some cold, chest congestion at the
12 time.
13    Q. Okay. So do you have some medical expense from
14 Dr. Martinez that you claim my client should pay for?
15    A. I really don't know, to tell you the truth.
16    Q. Well, let me ask you this: The medical expense
17 you've incurred with Dr. Martinez, do you have insurance
18 to cover that, or have you had to pay that out of your
19 own pocket?
20    A. Partial insurance.
21    Q. Okay. So you've had to pay some of it?
22    A. Yes.
23    Q. How much did you have to pay?
24    A. 30 percent.
25    Q. Do you know about what that was, dollar-wise?

## Page 53

1  A. I had to cover a deductible of $500 just to get
2  started. It was 30 percent of the office visits, the
3  blood work, the medicine, a lot of stuff. I had a CAT
4  scan I had for sinuses for the apnea.
5       Pertaining to the heart, I had an ultrasound
6  done, I still don't know how much that is, they still
7  need to let me know. They're working that out with my
8  insurance.
9  Q. Okay. What kind of physical symptoms were you
10  having that led you to go to the doctor?
11  A. The initial office visit was for my sleep apnea,
12  so she did a complete workup.
13  Q. But I mean, what kind of -- as you were just at
14  home or work or wherever, what kind of problems were you
15  having that led you to believe you should go seek out a
16  doctor? Were you having headaches or heart palpitations
17  or what kind of symptoms were you having?
18  A. I was having some headaches, I'd wake up with
19  headaches. I had a lot of drowsiness at work, numbness,
20  and I finally got health insurance, so I had her do a
21  complete workup.
22  Q. Okay. And I think you said that the bankruptcy
23  was filed in June of '02, correct?
24  A. Approximately.
25  Q. So not too long after you had received Exhibit

## Page 54

1  No. 2; is that true?
2  A. That's true.
3  Q. And then in your mind, when was the bankruptcy
4  completed?
5  A. Approximately two to three months after I filed.
6  Q. Okay. So, say August, September of '02?
7  A. Yes, sir.
8  Q. And had you seen a doctor for any reason from
9  August of 2002 until you went to see Dr. Martinez
10  recently within the last two or three weeks?
11  A. No, sir.
12  Q. Okay.
13       MR. WIER: Do you want to take a break for
14  a minute?
15       MR. MLYNEK: Sure.
16       (Off the record at 4:09 p.m.)
17       (On the record at 4:15 p.m.)
18  Q. (BY MR. WIER) All right, Mr. Foster, we're back
19  on the record. Are you ready and able to continue?
20  A. Yes, sir.
21  Q. And I should have asked you this in the
22  beginning, I usually do, and just forgot.
23       You've already described for me the medications
24  you're talking, but that's not affecting your memory in
25  any way today; is it?

## Page 55

1  A. No.
2  Q. Okay. It's not affecting your ability to
3  testify truthfully?
4  A. No, sir.
5  Q. Okay. Did you have an opportunity to speak with
6  your lawyer before the deposition started today?
7  A. Yes, sir.
8  Q. And did you -- I don't want to know what
9  you-guys talked about because that's privileged, but did
10  you review any documents to get ready for today?
11  A. Yes, sir.
12  Q. What did you look at?
13  A. Exhibit 2, and also the original lawsuit.
14  Q. The Petition?
15  A. Yes.
16  Q. Okay. And I may pull that out in a minute.
17  Anything else?
18  A. No, sir.
19  Q. Okay. All right, let me go back to these
20  damages, and I want to try to be thorough, but not keep
21  us here any longer than we have to.
22       I understand by virtue of the lawsuit that
23  you're claiming damages, and that's what I want to talk
24  to you about. And we've been talking about the medical
25  damages that you might want to claim, so you understand

## Page 56

1  in bring a lawsuit that you have to bring forth evidence
2  and prove your damages, true?
3  A. I understand that.
4  Q. And that's what I'm here to try to get you to
5  articulate or describe for me. And if I understood you
6  correctly right before we took the break, you filed
7  bankruptcy in June of '02, but you hadn't gone to see a
8  medical doctor from that time up until you saw Dr.
9  Martinez two or three weeks ago?
10  A. That's correct.
11  Q. So the only medical expense that you might have
12  that might be attributable to this would be these things
13  that she's done for you in the last two or three weeks?
14  A. That would be correct.
15  Q. Okay. And with regard to any lost wage claims,
16  that would be confined to the 40 hours that you described
17  earlier?
18  A. Approximately.
19  Q. And all of that time that you took off from work
20  was in connection with going to court hearings and
21  assisting your lawyers with your bankruptcy, true?
22  A. That's correct.
23  Q. And I think you said you might have some
24  out-of-pocket for mileage and you're talking about for
25  having to drive the car back and forth to the court

Page 57

1 hearings and all that?
2    A. That's right.
3    Q. About how many trips do you think you took?
4    A. I'd say I visited this office a good three or
5 four times. I had to drive to Hidalgo County Courthouse,
6 which I don't remember where that is. I'm thinking
7 McAllen.
8    Q. McAllen. All right. Now, how far would the
9 round trips be from where you're working or where you're
10 living to this office?
11    A. As far as time frame?
12    Q. No, mileage.
13    A. Oh, mileage. Two and from, two or three miles.
14    Q. One way, or round trip?
15    A. I'd say round trip.
16    Q. Okay. And you say you had maybe three or four
17 of those?
18    A. (Witness indicates by nodding head in the
19 affirmative.)
20    Q. And then the mileage from here to McAllen for a
21 court hearing, and back?
22    A. Right.
23    Q. Was that one time or more than once?
24    A. Once.
25    Q. When you went to McAllen in connection with the

Page 58

1 bankruptcy, was that to meet with the Trustee?
2    A. That's correct.
3    Q. And did any of your creditors show up for that
4 meeting?
5    A. No, sir.
6    Q. Did the Trustee ask you questions?
7    A. Yes, sir.
8    Q. About how long did he question you?
9    A. Ten minutes, tops.
10    Q. Okay. did he tape record it, do you remember?
11    A. I don't remember. It went so fast.
12    Q. Okay. Do you remember who the Trustee was?
13    A. No.
14    Q. Okay. We may get back to that in a minute.
15      And you're claiming mental anguish in this case
16 because of the stress, right?
17    A. Yes.
18    Q. And describe for me how the stress of getting
19 this letter and being threatened with criminal charges
20 affected you.
21    A. As I mentioned, I had multiple creditors. I had
22 quite a list of -- when I was trying to budget out my
23 income, my moving expenses and whatnot, and I prioritized
24 them as best I could. And when I noticed possible
25 criminal charges on this one, that took priority for

Page 59

1 me, and based on my income at the time, help from family
2 and whatnot, this was the only way out. Or the
3 bankruptcy, I should say.
4    Q. Okay. So are you telling me that you filed
5 bankruptcy over a $69-collection attempt?
6    A. No, sir.
7    Q. You had other creditors that -- I think you said
8 $15- to $18,000, true?
9    A. That's correct.
10    Q. And you would not have filed bankruptcy because
11 you couldn't pay an $69-charge as reflected on Exhibit 2,
12 right?
13      MR. MLYNEK: Objection to form.
14    A. Can you rephrase that, I didn't understand it.
15    Q. (BY MR. WIER) I'm just trying to make sure that
16 I understand. You're not telling me and you're not
17 telling this judge and jury that you filed bankruptcy
18 because you could not pay a $69.62-item, are you?
19    A. No.
20    Q. I mean, these other bills totaled up way more
21 than $69, right?
22    A. That's correct.
23    Q. And that's why you filed bankruptcy, isn't it?
24 Because you couldn't pay those multiple creditors?
25    A. Because I couldn't pay the multiple creditors;

Page 60

1 that is correct.
2    Q. I mean, you wouldn't have filed bankruptcy just
3 because you couldn't pay a $69-bill, right?
4    A. That is correct.
5    Q. You had to pay $1200 in court costs; that
6 wouldn't have made much sense, would it?
7    A. Not at all.
8    Q. Do you have -- do you have an agreement with
9 your lawyers as to how you're going to pay attorneys'
10 fees in this case?
11    A. I believe in the Petition it states that damages
12 include expenses.
13    Q. Okay.
14      MR. WIER: Let's go ahead and mark this as
15 the next exhibit.
16      (Deposition Exhibit No. 3 marked for
17      identification).
18    Q. All right. To help you out I've had marked as
19 Exhibit No. 3 Plaintiff's Original Complaint, and that,
20 I'll represent to you -- and feel free to look at it and
21 consult with your lawyer -- but that's the complaint that
22 got this lawsuit started. Is that what that appears to
23 be?
24    A. (Witness examines document) Yes, sir.
25    Q. Okay. And if you flip through the Petition to

Page 61

1  page 7 of 8, and you look down there where it says "Item
2  5," do you see where it says "Award Plaintiff and the
3  Class attorneys' fees and the cost of Court"?
4      A. Uh-huh.
5      Q. Is that what you're talking about? With regard
6  to attorneys' fees?
7      A. That's correct.
8      Q. So, do you have any kind of a written fee
9  arrangement with Mr. Ventura's office on this case?
10     A. Are you asking me for like a receipt, do I have
11 a receipt of any kind?
12     Q. Did you sign a contract with Mr. Ventura's
13 office over how the fees were going to be calculated and
14 handled in connection with this case?
15     A. No, sir.
16     Q. Is it your understanding that the verbal
17 agreement, then, is that attorneys' fees will be awarded
18 by the Court and they will take that as their attorneys'
19 fees, if any fees are awarded?
20     A. That's correct.
21     Q. And you're not going to be obligated or out any
22 attorneys' fees in this case?
23     A. No, sir.
24     Q. And so far in the handling of this case has Mr.
25 Ventura's office asked you for any money to pay for

Page 62

1  attorneys' fees or court costs?
2          MR. MLYNEK: Objection to form.
3      A. No, sir.
4      Q. (BY MR. WIER) Do you know Stephen Gardner?
5      A. How do you mean?
6      Q. Have you ever met him?
7      A. Over the phone.
8      Q. You've never met him in person?
9      A. No, sir.
10     Q. And what is your understanding, in your own
11 words, of the purpose of this lawsuit with regard to the
12 class action allegations?
13     A. Purpose, I would say to collect any damages to
14 myself and others over the improper use of verbiage on a
15 collection letter by Check Alert Systems. And I would
16 say, ultimately to correct their way of business.
17     Q. Okay. Do you know how much your lawyers are
18 claiming their hourly rate is in this case?
19     A. No, sir.
20     Q. And what about Mr. Gardner, do you know what his
21 hourly rate is?
22     A. No, sir.
23     Q. Okay. And you've not received any invoices?
24     A. No.
25     Q. Okay. With regard to Dr. Martinez, are you

Page 63

1  supposed to come back for a follow-up visit?
2      A. Yes.
3      Q. When are you supposed to do that?
4      A. I was scheduled for Tuesday, earlier this week,
5  but I'm going to reschedule till after the 1st of March.
6      Q. Okay. So you missed the appointment on Tuesday?
7      A. That's correct.
8      Q. What caused you to miss that appointment?
9      A. I'm going to change my insurance policy.
10     Q. Okay. Are you getting your insurance changed
11 because of something to do with work?
12     A. No.
13     Q. Okay. Why are you changing insurance policies?
14     A. It's financially better for me.
15     Q. You don't have any medical coverage through
16 work?
17     A. Medical, yes.
18     Q. Okay. So are you just taking out a supplemental
19 insurance policy, is that what you're telling me?
20     A. No, no, it's medical, dental, vision, it's all
21 covered under the same health care plan.
22     Q. Okay. Do you know whether or not this
23 lawsuit -- you might be able to make it out better on
24 your copy. On the first page there's a file date on
25 there. It looks like it was filed sometime in October of

Page 64

1  2002; do you see that?
2      A. Somewhat, I can see the year real clear, it
3  looks like October.
4          MR. MLYNEK: October 11.
5      Q. (BY MR. WIER) Okay. Was that after your
6  bankruptcy was concluded?
7      A. I'm not sure.
8      Q. Okay. When you went and appeared at the
9  Bankruptcy Court and testified before the Bankruptcy
10 Court, did he ask you any questions about any claims that
11 you might have against any other people, lawsuits or
12 claims?
13     A. I don't remember if he did or not.
14     Q. Do you know whether you or your attorneys ever
15 disclosed to the bankruptcy trustee about the fact that
16 this lawsuit was in the works?
17     A. I wouldn't know.
18     Q. Did the Trustee ask you a lot of questions
19 trying to determine whether or not you had any assets to
20 pay any of your creditors?
21     A. Yes, he did.
22     Q. He asked you lots of questions about whether you
23 had a home or whether you had cars and whether you had
24 stocks and bonds and questions of that sort?
25     A. That's correct.

**Page 65**

1   Q. Do you remember during the course of that
2 question whether he asked you whether you had any claims
3 for money contingent claims for money such as lawsuits or
4 anything like that?
5   A. Vaguely. I remember answering "No" to all the
6 questions. I do remember particularly having assets or
7 any money in the bank or houses and whatnot.
8   Q. Okay. So at the time of that meeting you didn't
9 tell the Trustee that you had a lawsuit or you were
10 thinking about a lawsuit that might bring you some money
11 at a later date?
12   A. No, I didn't tell them about that.
13     MR. WIER: I'm going to -- let's get this
14 marked, Ms. Court Reporter. Actually, let's mark this
15 one first; I'm sorry.
16     (Deposition Exhibit No. 4 marked for
17     identification).
18   Q. (BY MR. WIER) I'm going to hand you what I've
19 had marked as Exhibit No. 4 to your deposition, and
20 that's your bankruptcy Petition. Have you ever seen that
21 before?
22   A. (Witness examines document) I don't know, I
23 might have.
24   Q. And just for a point of reference, over on the
25 7th page, do you see where it says "Schedule B. Personal

**Page 66**

1 Property" up at the top?
2   A. "Schedule B"?
3   Q. Yes.
4   A. Okay.
5   Q. And it lists a '96 Dodge Intrepid, do you see
6 that?
7   A. Yes, sir.
8   Q. And did you have that vehicle at the time of
9 your bankruptcy?
10   A. Yes.
11   Q. And that's just by way of example to show you
12 that this was a petition your lawyer compiled on your
13 behalf showing all the property you had and all the debts
14 that you owed; would you agree with that?
15   A. Yes, sir.
16   Q. And if you flip on through and you look at
17 Schedule D., it's showing a creditor there, Notre Dame
18 Federal Credit Union, holding a secured claim on your
19 vehicle; do you see that?
20   A. That's correct.
21   Q. And then you have a Schedule F., going on down
22 showing creditors holding unsecured claims, and you see
23 several folks listed there, such as Amoco and AT&T
24 Wireless. Do you see that?
25   A. Yes, sir.

**Page 67**

1   Q. And that would be a list, and flipping on over
2 the next several pages, of all the folks that you owed
3 money to?
4   A. Yes, sir.
5   Q. And would you say that that was a true and
6 accurate picture of your financial condition at the time
7 that this was filed?
8   A. Yes, sir.
9     (Deposition Exhibit No. 5 marked for
10     identification).
11   Q. Okay. I'm going to hand you Exhibit No. 5, and
12 this is just something that we've gotten from the
13 courthouse that shows a list of all your creditors that
14 you owed money to at the time you filed the bankruptcy.
15   A. (Witness examines document).
16   Q. Do you see that?
17   A. Yes, sir.
18   Q. And that just appears to be just another list of
19 all the folks that you owed money to at the time that you
20 filed, right?
21   A. Yes, sir, that's what I see.
22   Q. And I counted up real quick, it looks like you
23 owe 32 different companies or individuals money; does
24 that sound about right?
25   A. That sounds about right.

**Page 68**

1   Q. Do you know whether any of these folks got paid
2 anything because of your bankruptcy?
3   A. I would not know.
4   Q. You understood the Trustee was trying to gather
5 together all your assets to satisfy these folks; is that
6 true?
7   A. Right.
8   Q. And you understood you owed all these folks
9 money and you understood that they would like to get
10 paid, if possible?
11   A. Yes, sir.
12   Q. Knowing that, if you were awarded money in this
13 case do you think it's fair that you get the money
14 instead of the money being distributed to these
15 creditors?
16     MR. MLYNEK: Objection to form.
17   A. The question of fairness, I have to say -- I
18 have to say there's a lot more involved, I believe, in
19 what we're trying to accomplish here today. And I
20 imagine I'd have to say yes, in the end it would be fair.
21   Q. (BY MR. WIER) Okay. It would be fair to you to
22 benefit from this financially to the expense of your
23 creditors?
24     MR. MLYNEK: Objection to form.
25   A. I think if justice is served, I believe so.

Page 69

1  Q. (BY MR. WIER) With regard to this May 24th,
2  2002 letter, Exhibit No. 2, when did you first take that
3  to your lawyer?
4  A. Shortly after I received it through the mail.
5  Q. And would that be Mr. Ventura? Or did you take
6  it to somebody else?
7  A. I brought it to the law offices here.
8  Q. Had this law firm ever represented you in
9  anything before?
10  A. No.
11  Q. How did you know to come here to help you?
12  A. Advertisement.
13  Q. For bankruptcy?
14  A. Correct.
15  Q. Okay. When you first came to talk to the
16  lawyers about bankruptcy did you bring this letter with
17  you?
18  A. I don't know, I may have.
19  Q. When did you first authorize the John Ventura
20  law firm to file a lawsuit on your behalf against Check
21  Alert?
22  A. Approximately the same time as the rest of the
23  creditors.
24  Q. Okay. So I don't want to know what you were
25  talking about, but you were talking with your lawyers

Page 70

1  about the bankruptcy and also at the same time talking
2  about filing this lawsuit?
3      MR. MLYNEK: I'm going to object to that.
4  A. (Not understood by reporter.)
5      MR. WIER: I'm sorry?
6      MR. MLYNEK: I think that's getting into
7  legal strategy and when we're talking about things, and I
8  don't think that's appropriate.
9      MR. WIER: Okay.
10      THE REPORTER: (To witness) I'm sorry, I
11  didn't hear what your answer.
12      THE WITNESS: I didn't say anything.
13  Q. (BY MR. WIER) But in any event, you've already
14  told me that you were talking to your lawyers about the
15  bankruptcy and also what was in that letter all about the
16  same time, right?
17      MR. MLYNEK: Same objection.
18      MR. WIER: So are you instructing him not
19  to answer?
20      MR. MLYNEK: I'm going to instruct him not
21  to answer that question.
22  Q. (BY MR. WIER) Going back to Exhibit 4, I
23  believe it is, the bankruptcy schedules -- and I'm sorry,
24  I wish these pages were numbered. I'll have to count
25  them for you. The 14th page, turn to the 14th page of

Page 71

1  that exhibit, if you will.
2  A. (Witness complies).
3  Q. And on that page you'll see the second one down,
4  you see that the very debt that was involved and it was
5  referenced in that letter to Martin Supermarket in the
6  amount of $69.62 is listed there; is it not?
7  A. Yes, sir.
8  Q. So that's included in one of the debts that you
9  want to discharge in the bankruptcy, right?
10  A. That is correct.
11  Q. And as far as you understand, now that the
12  bankruptcy has gone through, that the debt has been
13  discharged and you don't have any obligation to pay that
14  any longer, right?
15  A. That is correct.
16  Q. Have you personally told anyone associated with
17  the Bankruptcy Court, including the Trustee, about this
18  lawsuit?
19  A. Can you rephrase that?
20  Q. Yeah. Have you, yourself -- I'm not talking
21  about your attorneys, but have you, yourself, told the
22  bankruptcy trustee or anybody associated with the
23  Bankruptcy Court about this lawsuit?
24  A. No.
25  Q. Do you know if your attorneys have informed

Page 72

1  anybody at the Bankruptcy Court about this lawsuit?
2  A. No.
3  Q. Do you know if your attorneys have informed
4  anybody at the Bankruptcy Court about this lawsuit?
5  A. I wouldn't know.
6  Q. Have you told the Bankruptcy Court about your
7  fee agreement with your attorney in this case?
8  A. No.
9  Q. Do you know if your attorneys have informed the
10  Bankruptcy Court about that?
11  A. I wouldn't know.
12  Q. Would you agree with me that all the debts that
13  are listed on these schedules together made your
14  financial condition such that you felt you needed to seek
15  out bankruptcy protection?
16  A. Yes, sir.
17  Q. Would you agree with me that you retained your
18  attorney in this case to collect on possible future
19  proceeds against this particular debt collector, Check
20  Alert, for alleged illegal collection tactics?
21  A. (No response).
22  Q. That was a poor question. Let me ask you again.
23      You retained your lawyers in this lawsuit, not
24  the bankruptcy, but this lawsuit to help you collect
25  possible future proceeds against Check Alert for alleged

Page 73

1  improprieties in collecting a debt; is that true?
2      A. I believe so, that's right.
3      Q. Now, have you ever been told by anyone other
4  than your lawyers; because I don't want to get into
5  privilege; that the proceeds that you collect in this
6  lawsuit could be required to be delivered to the
7  Bankruptcy Court to satisfy your creditors?
8      A. No.
9      Q. And based on the answer that I heard you say a
10  minute ago about the fairness of proceeding despite the
11  fact that your creditors are owed money, it's your
12  position that you would like to keep any money that you
13  personally collect as your damages in this case; is that
14  true?
15      A. Yes, sir.
16      Q. Would you agree that the debt as reflected on
17  Exhibit 2 to Martin Supermarket that is the subject of
18  this lawsuit is also connected with your bankruptcy
19  proceeding?
20      A. Yes.
21      Q. Would you agree that the debt which you incurred
22  as reflected on Exhibit No. 2 -- let me start over.
23      Would you agree that the debt -- I may have
24  asked you this earlier, but I just want to make sure. The
25  debt that's incurred on Exhibit No. 2, as reflected on

Page 74

1  Exhibit No. 2, is also referenced in your bankruptcy
2  schedules; true?
3      A. Yes, it is.
4      Q. Okay. Now, you're asking this Court to certify
5  you to allow you to serve as a class representative.
6  Have you ever served as a class representative before?
7      A. No, sir.
8      Q. Do you know what a class action representative
9  is?
10      A. I have an understanding.
11      Q. What is that understanding?
12      A. I represent myself and also others in this
13  lawsuit that were or may have been affected by this same
14  "improprietories."
15      Q. Okay. If you're asked to serve as class action
16  representative, do you know what duties and
17  responsibilities are expected of you in serving as a
18  class representative?
19      A. I have an understanding.
20      Q. And what are those?
21      A. To do the deposition today and just follow
22  through with what is asked of me.
23      Q. Okay. Follow through with anything that is
24  asked of you by your lawyers?
25      A. Right.

Page 75

1      Q. So as we sit here today, other than giving your
2  deposition, do you know of anything specifically that you
3  would need to do as a class representative?
4      A. I would say if we progress into court, I may
5  have to go to trial.
6      Q. Okay. Do you know -- I'm sorry, I didn't mean
7  to cut you off.
8      A. And testify.
9      Q. Okay. Do you know anything about the class of
10  people that your lawyer is asking you to represent in
11  this case?
12      A. I have an understanding.
13      Q. And what is that understanding?
14      A. I am representing both state and federal
15  classes.
16      Q. What kinds of people?
17      A. Consumers.
18      Q. Do you know anything else about these folks?
19      A. We share a commonality in that we received
20  letters from Check Alert Systems.
21      Q. Okay. Do you know -- have you gone out and done
22  any investigation on this class of folks, do you know the
23  names of any of them or where they live or anything of
24  that sort?
25      A. No, sir.

Page 76

1      Q. Do you know whether or not any of these folks
2  would want to claim individual damages like you're
3  claiming in this case for medical expenses and lost wages
4  and mileage reimbursement and things of that sort?
5      A. I wouldn't know.
6      Q. And you may have touched on this, but just so I
7  have it clear on the record, why did you decide to serve
8  as a class representative in this case?
9      A. The "improprietories" were told to me by my
10  lawyers.
11      Q. Okay. And that's one of the points I'm getting
12  to. You aren't really aware of any of the improprieties
13  or the illegal conduct until your lawyers told you, were
14  you?
15          MR. MLYNEK: That's not -- I'm going to
16  object to that.
17          MR. WIER: I'm not asking him what you-all
18  talked about, I'm just asking --
19          MR. MLYNEK: Yeah, you are.
20          MR. WIER: No, I'm not. I'm asking him --
21      Q. (BY MR. WIER) Were you aware that -- when you
22  got this letter in the mail and you read it, were you
23  aware that anything was illegal about that letter?
24      A. No.
25      Q. Okay. In your complaint you assert that your

02-cv-00196    Document 22    Filed in TXSD on 03/16/2004

Page 77

1  claims are typical of those in the Class. How are they
2  typical?
3      A. I don't recall saying that.
4      Q. In your complaint you say that your claims are
5  common to those of the Class. How are they common?
6      A. I would say the feelings, the anxiety, the
7  stress, the expenditures thereof.
8      Q. With regard to your anxiety and your stress,
9  isn't that something that's very personal to you?
10     A. To myself, yes.
11     Q. Okay. And in fact you spent a great deal of
12 time describing that for me today; would you agree with
13 that?
14     A. That's right.
15     Q. So with regard to -- let's say I've got Mrs.
16 Smith up in Ohio that got one of these letters and she
17 wants to claim mental anguish, wouldn't you agree that
18 I'm probably going to have to go talk to her and figure
19 out how this letter affected her?
20     A. I wouldn't know.
21     Q. Okay. Do you know what kind of statutory
22 damages that you're entitled to receive if you prevail in
23 this lawsuit?
24        MR. MLYNEK: I'm going to object to the
25 form.

Page 78

1      A. I don't know.
2      Q. (BY MR. WIER) Do you have an understanding that
3  if you serve as class representative and get class
4  certified that you may actually receive less money in
5  damages than if you were just to assert an individual
6  claim?
7      A. I wouldn't know.
8      Q. In other words, federal law gives a penalty of a
9  thousand --
10        MR. MLYNEK: Objection, he already
11 answered.
12     Q. (BY MR. WIER) -- a thousand dollars for
13 statutory damages. Are you aware that you might recover
14 more than a thousand dollars if you didn't represent the
15 class?
16     A. I was not, I don't know.
17     Q. Is it in your best interest to get the most
18 money you can get out of this lawsuit personally?
19     A. Yes, sir.
20     Q. Okay. Have you understood all the questions
21 I've asked you today?
22     A. Most of them.
23     Q. Okay. Anything that you think that you need to
24 go back and clarify for me before we stop?
25     A. I'd say one thing.

Page 79

1      Q. Okay, what's that?
2      A. You stated that when I originally spoke with my
3  lawyers, when I did the bankruptcy I gave them Exhibit 2,
4  the letter, the original letter, but we did not discuss
5  this current lawsuit at the time.
6      Q. In that first meeting?
7      A. That's correct.
8      Q. Do you know when you first started talking -- I
9  don't want to know what you talked about, but can you
10 give me a time frame of when you first started talking to
11 your lawyers about this lawsuit?
12     A. After the -- I believe it's called the decree or
13 dissolution of the bankruptcy.
14     Q. Okay. And I did have a couple of questions that
15 I forgot to ask you, but I think they're going to be
16 quick.
17        In your lawsuit complaint you've made
18 allegations that my client has violated the Texas Finance
19 Code. And I know you're not a lawyer, so I'm just doing
20 my job here and I need to establish some things for the
21 record. But have you ever read the Texas Finance Code?
22     A. No, sir.
23     Q. Is it fair to say that you're relying upon your
24 lawyer in making those kinds of allegations?
25     A. That's correct.

Page 80

1      Q. Same thing with regard to the Federal Fair Debt
2  Collection Practices Act. You're claiming violations
3  under that Act. Have you ever read it?
4      A. No, sir.
5      Q. As we sit here today, can you tell me how my
6  client has violated that Act?
7      A. I wouldn't know.
8      Q. Is it true that you're simply relying on your
9  lawyer to support those allegations?
10     A. Yes, sir.
11     Q. Same thing with regard to the Texas Debt
12 Collection -- actually I'll lump these two together to
13 make it quicker. Texas Debt Collection Practices Act and
14 the Texas Deceptive Trade Practices Act. Have you ever
15 read either one of those Acts before?
16     A. No, sir.
17     Q. Do you know, as we sit here today, how my
18 clients might have violated those Acts?
19     A. No, sir.
20     Q. Are you relying upon your lawyer to support the
21 allegations in that regard?
22     A. That's correct.
23     Q. Okay. Anything else that you think you need to
24 clarify for me?
25     A. No, sir.

Page 81

1   Q.  Okay.  I thank you for your time.
2        MR. WIER:  Pass the witness.
3        MR. MLYNEK:  I'll reserve mine for trial.
4
5        (The proceedings concluded at 4:52 p.m.)
6
7            -o0o-
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

Certified to by me this the 2nd day of March, 2004.

_____

JUDITH GARRETT HENNIGH

CERTIFIED SHORTHAND REPORTER
STATE OF TEXAS
CERT. NO.: 1752   EXP. DATE: 12/31/04

POCKRUS REPORTING SERVICE
P.O. BOX 531786
HARLINGEN, TEXAS  78553
1-800-423-7713 (TOLL FREE)
1-956-350-4940 (PHONE)
1-956-350-3040 (FAX)

Page 82

REPORTER'S CERTIFICATION

I, JUDITH GARRETT HENNIGH, a Certified Shorthand

Reporter in and for the State of Texas, do hereby certify

that the facts stated by me in the caption hereto are

true; that the foregoing deposition transcript of WILLIAM
LEE FOSTER, the witness hereinbefore named, was at the
time mentioned taken by me in stenograph, the said
witness having been by me first duly cautioned and sworn
upon his oath to tell the truth, the whole truth, and
nothing but the truth, and later transcribed from
stenograph.
      I further certify that I am neither attorney or
counsel for, nor related to or employed by any of the
parties to the action in which this deposition is taken,
and further certify that I am not a relative or employee
of any attorney or counsel employed by the parties
hereto, or financially interested in the action.
      I further certify that the above and foregoing
deposition transcript as set forth in typewriting is a
full, true and correct transcript of the proceedings had
at the time of taking said deposition.

Page 84

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
WILLIAM FOSTER, et al      )
                           )
                           ) CIVIL ACTION NO: B-02-196
                           )
                           )
CHECK ALERT SYSTEMS, INC.  )
*******************************************
FILING CERTIFICATE
ORAL DEPOSITION OF
WILLIAM LEE FOSTER
FEBRUARY 26, 2004
*******************************************

I, Judith Garrett Hennigh, Certified Shorthand
Reporter in and for the State of Texas, hereby certify to
the following:
      That the witness, WILLIAM LEE FOSTER, was duly sworn
by the officer and that the transcript of the oral
deposition is a true record of the testimony given by the
witness;
      That the deposition transcript was submitted on
March 2, 2004, to the witness in care of RICHARD A.
MLYNEK, 62 EAST PRICE ROAD, BROWNSVILLE, Texas, for

Page 85

examination, signature and return to me by April 1, 2004.

That the amount of time used by each party at the

deposition is as follows:

Mr. Mlynek - 00:00;

Mr. Wier - 01:46;

That pursuant to information given to the deposition

officer at the time said testimony was taken, the

following includes counsel for all parties of record:

Mr. Richard Mlynek, Law Offices of John Ventura, 62

East Price Road, Brownsville, Texas 78521, appearing for

Plaintiff;

Mr. Keith Wier, Daw & Ray, 5718 Westheimer, Suite

1750, Houston, Texas 77057, appearing for Defendant;

If returned, the original deposition was delivered

to Mr. Keith Wier, Custodial Attorney;

That $_____ is the deposition officer's charges

to the Defendant for preparing the original deposition

transcript and any copies of exhibits;

I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action which this proceeding was taken,

and further that I am not financially or otherwise

interested in the outcome of the action.

Page 86

Certified to me this 2nd day of March, 2004.

_____

JUDITH GARRETT HENNIGH

CERTIFIED SHORTHAND REPORTER

STATE OF TEXAS

CERT. NO.: 1752   EXP. DATE: 12/31/04

POCKRUS REPORTING SERVICE

P.O. BOX 531786

HARLINGEN, TEXAS 78553

1-800-423-7713 (TOLL FREE)

1-956-350-4940 (PHONE)

1-956-350-3040 (FAX)

Page 87

CHANGES AND SIGNATURE

PAGE   LINE   CHANGE        REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

WILLIAM LEE FOSTER

Page 88

I, WILLIAM LEE FOSTER, have read the

foregoing deposition and hereby affix my signature that

same is true and correct, except as noted above.

_____

WILLIAM LEE FOSTER

THE STATE OF _____ )

COUNTY OF _____ )

Before me, _____, on

this day personally appeared, WILLIAM LEE FOSTER, known

to me (or proved to me under oath or through _____

_) (description of identity card or other document) to be

the person whose name is subscribed to the foregoing

instrument and acknowledged to me that they executed the

same for the purposes and consideration therein

expressed.

Given under my hand and seal of office this

_____ day of _____, 2004.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF _____

TX PENAL S 32.41                                                    **Page 7**
V.T.C.A., Penal Code § 32.41
**C**

VERNON'S TEXAS STATUTES AND CODES ANNOTATED
**PENAL CODE**
TITLE 7. OFFENSES AGAINST PROPERTY
CHAPTER 32. FRAUD
SUBCHAPTER D. OTHER DECEPTIVE PRACTICES
§ 32.41. Issuance of Bad Check

(a) A person commits an offense if he issues or passes a check or similar sight order for the payment of money knowing that the issuer does not have sufficient funds in or on deposit with the bank or other drawee for the payment in full of the check or order as well as all other checks or orders outstanding at the time of issuance.

(b) This section does not prevent the prosecution from establishing the required knowledge by direct evidence; however, for purposes of this section, the issuer's knowledge of insufficient funds is presumed (except in the case of a postdated check or order) if:

(1) he had no account with the bank or other drawee at the time he issued the check or order;  or

(2) payment was refused by the bank or other drawee for lack of funds or insufficient funds on presentation within 30 days after issue and the issuer failed to pay the holder in full within 10 days after receiving notice of that refusal.

(c) Notice for purposes of Subsection (b)(2) may be actual notice or notice in writing that:

(1) is sent by registered or certified mail with return receipt requested, by telegram with report of delivery requested, or by first class mail if the letter was returned unopened with markings indicating that the address is incorrect and that there is no current forwarding order;

(2) is addressed to the issuer at his address shown on:

(A) the check or order;

(B) the records of the bank or other drawee;  or

(C) the records of the person to whom the check or order has been issued or passed;  and

(3) contains the following statement:

"This is a demand for payment in full for a check or order not paid because of a lack of funds or insufficient funds.  If you fail to make payment in full within 10 days after the date of receipt of this notice, the failure to pay creates a presumption for committing an offense, and this matter may be referred for criminal prosecution."

(d) If notice is given in accordance with Subsection (c), it is presumed that the notice was received no later than five days after it was sent.

(e) A person charged with an offense under this section may make restitution for the bad checks.  Restitution shall be made through the prosecutor's office if collection and processing were initiated through that office.  In other cases restitution may, with the approval of the court in which the offense is filed, be made through the court.

(f) Except as otherwise provided by this subsection, an offense under this section is a Class C misdemeanor.  If the check or similar sight order that was issued or passed was for a child support payment the obligation for which is established under a court order, the offense is a Class B misdemeanor.

(g) An offense under this section is not a lesser included offense of an offense under Section 31.03 or 31.04.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



TX PENAL S 32.41                                                                              **Page 8**

CREDIT(S)

Acts 1973, 63rd Leg., p. 883, ch. 399, § 1, eff. Jan. 1, 1974. Amended by Acts 1983, 68th Leg., p. 5050, ch. 911, § 1, eff. Aug. 29, 1983; Acts 1987, 70th Leg., ch. 687, § 2, eff. June 18, 1987; Acts 1989, 71st Leg., ch. 1038, § 1, eff. June 16, 1989; Acts 1993, 73rd Leg., ch. 900, § 1.01, eff. Sept. 1, 1994; Acts 1995, 74th Leg., ch. 753, § 2, eff. Sept. 1, 1995; Acts 1997, 75th Leg., ch. 702, § 14, eff. Sept. 1, 1997.

HISTORICAL AND STATUTORY NOTES

2003 Main Volume

The 1983 Amendment inserted a new subsec. (e) and relettered former subsec. (e) as subsec. (f).

The 1987 amendment added subsec. (g).

Section 3 of the 1987 amendatory act provides:

"(a) The change in law made by this Act applies only to the punishment for an offense committed on or after the effective date [June 18, 1987] of this Act. For purposes of this section, an offense is committed before the effective date of this Act if any element of the offense occurs before the effective date.

"(b) An offense committed before the effective date of this Act is covered by the law in effect when the offense was committed, and the former law is continued in effect for this purpose."

The 1989 amendment in subsec. (e) at the end of the third sentence deleted  ", by certified checks, cashiers checks, or money order only, payable to the person that received the bad checks".

The 1993 amendment made only nonsubstantive changes throughout.

The 1995 amendment rewrote subsec. (c) which previously read:

"(c) Notice for purposes of Subsection (b)(2) may be notice in writing, sent by registered or certified mail with return receipt requested or by telegram with report of delivery requested, and addressed to the issuer at his address shown on:

"(1) the check or order;

"(2) the records of the bank or other drawee;  or

"(3) the records of the person to whom the check or order has been issued or passed."

Section 4 of the 1995 amendatory act provides:

"(a) The change in law made by this Act applies only to an offense committed on or after the effective date [Sept. 1, 1995] of this Act.  For purposes of this section, an offense is committed before the effective date of this Act if any element of the offense occurs before that date.

"(b) An offense committed before the effective date of this Act is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose."

Acts 1997, 75th Leg., ch. 702, in subsec. (f), in the first sentence, substituted "Except as otherwise provided by this subsection, an" for "An", and added the second sentence.

Section 15(e) of Acts 1997, 75th Leg., ch. 702 provides:

"The change in law made by this Act to Subsection (f), Section **32.41, Penal** Code, as amended by this Act, applies only

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

TX PENAL S 32.41                                                                                          **Page 9**

to an offense committed on or after the effective date [Sept. 1, 1997] of this Act. For purposes of this subsection, an offense is committed before the effective date of this Act if any element of the offense occurs before that date. An offense committed before the effective date of this Act is governed by the law in effect when the offense was committed, and the former law is continued in effect for that purpose."

Prior Laws:
Acts 1939, 46th Leg., p. 246.
Acts 1951, 52nd Leg., p. 496, ch. 305, § 1.
Acts 1963, 58th Leg., p. 729, ch. 268.
Acts 1965, 59th Leg., p. 1521, ch. 662, §§ 1, 2.
Acts 1969, 61st Leg., p. 1930, ch. 642, § 1.
Vernon's Ann.P.C. (1925) art. 567b.

V. T. C. A., **Penal** Code § 32.41, TX **PENAL** § 32.41

Current through the end of the 2003 Third Called Session

Copyright © 2004 by West, a Thomson business. All rights reserved.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

TX PENAL S 12.22                                                           **Page 10**
V.T.C.A., Penal Code § 12.22
**C**

VERNON'S TEXAS STATUTES AND CODES ANNOTATED
**PENAL** CODE
TITLE 3. PUNISHMENTS
CHAPTER 12. PUNISHMENTS
SUBCHAPTER B. ORDINARY MISDEMEANOR PUNISHMENTS
§ 12.22. **Class B Misdemeanor**

An individual adjudged guilty of a **Class B misdemeanor** shall be punished by:

(1) a **fine** not to exceed $2,000;

(2) confinement in **jail** for a term not to exceed 180 days;  or

(3) both such **fine** and confinement.

CREDIT(S)

Acts 1973, 63rd Leg., p. 883, ch. 399, § 1, eff. Jan. 1, 1974.  Amended by  Acts 1991, 72nd Leg., ch. 108, § 1, eff. Sept. 1, 1991;  Acts 1993, 73rd Leg., ch. 900, § 1.01, eff. Sept. 1, 1994.

HISTORICAL AND STATUTORY NOTES

2003 Main Volume

Acts 1991, 72nd Leg., ch. 108, § 1, in subd. (1) substituted "$1,500" for  "$1,000".

Section 12 of Acts 1991, 72nd Leg., ch. 108 provides:

"(a) The changes in law made by Sections 1, 2, and 11 of this Act apply only to the punishment and court costs for an offense committed on or after the effective date [Sept. 1, 1991] of this Act.  For purposes of this section, an offense is committed before the effective date of this Act if any element of the offense occurs before the effective date.

"(b) An offense committed before the effective date of this Act is covered by the law in effect when the offense was committed, and the former law is continued in effect for this purpose."

Acts 1993, 73rd Leg., ch. 900, § 1.01, in subd. (1), substituted "$2,000" for "$1,500";  and in subd. (3), substituted "confinement" for "imprisonment".

V. T. C. A., **Penal** Code § 12.22, TX **PENAL** § 12.22

Current through the end of the 2003 Third Called Session

Copyright © 2004 by West, a Thomson business. All rights reserved.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

| Citation | Found Document | Rank 1 of 1 | Database |
|---|---|---|---|
| MI ST 750.131 | | | MI-ST-ANN |
| M.C.L.A. 750.131 | | | |
| C | | | |

MICHIGAN COMPILED LAWS ANNOTATED
CHAPTER 750. MICHIGAN PENAL CODE
THE MICHIGAN PENAL CODE
CHAPTER XIX. CHECKS WITHOUT SUFFICIENT FUNDS
750.131. Drawing on insufficient funds; punishment

Sec. 131. (1) A person shall not make, draw, utter, or deliver any check, draft, or order for the payment of money, to apply on account or otherwise, upon any bank or other depository with intent to defraud and knowing at the time of the making, drawing, uttering, or delivering that the maker or drawer does not have sufficient funds in or credit with the bank or other depository to pay the check, draft, or order in full upon its presentation.

(2) A person shall not make, draw, utter, or deliver any check, draft, or order for the payment of money, to apply on account or otherwise, upon any bank or other depository with intent to defraud if the person does not have sufficient funds for the payment of the check, draft, or order when presentation for payment is made to the drawee. This subsection does not apply if the lack of funds is due to garnishment, attachment, levy, or other lawful cause and that fact was not known to the person when the person made, drew, uttered, or delivered the check, draft, or order.

(3) A person who violates this section is guilty of a crime as follows:

(a) If the amount payable in the check, draft, or order is less than $100.00, as follows:

(i) For a first offense, a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $500.00, or both.

(ii) For an offense following 1 or more prior convictions under this section or a local ordinance substantially corresponding to this section, a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00 or both.

(b) If the amount payable in the check, draft, or order is $100.00 or more but less than $500.00, as follows:

(i) For a first or second offense, a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00 or 3 times the amount payable, whichever is greater, or both imprisonment and a fine.

(ii) For an offense following 2 or more prior convictions under this section, a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both. For purposes of this subparagraph, however, a prior conviction does not include a conviction for a violation or attempted violation of subdivision (a).

(c) If the amount payable in the check, draft, or order is $500.00 or more, a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00 or 3 times the amount payable, whichever is greater, or both imprisonment and a fine.

(4) If the prosecuting attorney intends to seek an enhanced sentence based upon the defendant having 1 or more prior convictions, the prosecuting attorney shall include on the complaint and information a statement listing the prior conviction or convictions. The existence of the defendant's prior conviction or convictions shall be determined by the court, without a jury, at sentencing or at a separate hearing for that purpose before sentencing. The existence of a prior conviction may be established by any evidence relevant for that purpose, including, but

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT

F

MI ST 750.131 **Page 2**

not limited to, 1 or more of the following:

(a) A copy of the judgment of conviction.

(b) A transcript of a prior trial, plea-taking, or sentencing.

(c) Information contained in a presentence report.

(d) The defendant's statement.

(5) If the sentence for a conviction under this section is enhanced by 1 or more prior convictions, those prior convictions shall not be used to further enhance the sentence for the conviction pursuant to section 10, 11, or 12 of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.10, 769.11, and 769.12.

CREDIT(S)

Amended by P.A.1984, No. 277, § 1, Eff. March 29, 1985; P.A.1998, No. 312, Eff. Jan. 1, 1999.

<General Materials (GM) - References, Annotations, or Tables>

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

| Citation | Found Document | Rank 1 of 1 | Database |
|---|---|---|---|
| MI ST 750.132 | | | MI-ST-ANN |
| M.C.L.A. 750.132 | | | |
| C | | | |

——————————————— Page 1 ———————————————

TEXT
MICHIGAN COMPILED LAWS ANNOTATED
CHAPTER 750. MICHIGAN PENAL CODE
THE MICHIGAN PENAL CODE
CHAPTER XIX. CHECKS WITHOUT SUFFICIENT FUNDS
750.132. Evidence of intent

TEXT 132

Sec. 132. EVIDENCE OF INTENT TO DEFRAUD, ETC.--As against the maker or drawer thereof, the making, drawing, uttering or delivering of a check, draft or order, payment of which is refused by the drawee, when presented in the usual course of business, shall be prima facie evidence of intent to defraud and of knowledge of insufficient funds in or credit with such bank or other depository, provided such maker or drawer shall not have paid the drawee thereof the amount due thereon, together with all costs and protest fees, within 5 days after receiving notice that such check, draft or order has not been paid by the drawee.

<General Materials (GM) - References, Annotations, or Tables>

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

| Citation | Found Document | Rank 1 of 1 | Database |
|---|---|---|---|
| MI ST 750.133 | | | MI-ST-ANN |
| M.C.L.A. 750.133 | | | |
| C | | | |

───────────────── Page 1 ─────────────────

TEXT
MICHIGAN COMPILED LAWS ANNOTATED
CHAPTER 750. MICHIGAN PENAL CODE
THE MICHIGAN PENAL CODE
CHAPTER XIX. CHECKS WITHOUT SUFFICIENT FUNDS
750.133. Evidence of intent;  notice of protest

TEXT 133

  Sec. 133. NOTICE OF PROTEST AS EVIDENCE OF INTENT TO DEFRAUD, ETC.--Where such check, draft or order is protested, on the ground of insufficiency of funds or credit, the notice of protest thereof shall be admissible as proof of presentation, non-payment and protest, and shall be prima facie evidence of intent to defraud, and of knowledge of insufficient funds or credit with such bank or other depository.

<General Materials (GM) - References, Annotations, or Tables>

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Page 5

| Citation | Found Document | Rank 1 of 1 | Database |
|---|---|---|---|
| MI ST 750.134 | | | MI-ST-ANN |
| M.C.L.A. 750.134 | | | |

**c**

─────────────── Page 1 ───────────────

TEXT
MICHIGAN COMPILED LAWS ANNOTATED
CHAPTER 750. MICHIGAN PENAL CODE
THE MICHIGAN PENAL CODE
CHAPTER XIX. CHECKS WITHOUT SUFFICIENT FUNDS
750.134. Checks without sufficient funds;  credit construed

TEXT 134

  Sec. 134. CREDIT CONSTRUED--The word "credit" as used herein, shall be construed to mean an arrangement or understanding with the bank or depository, for the payment of such check, draft or order, in full, upon the presentation thereof for payment.

< General Materials (GM) - References, Annotations, or Tables >

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM FOSTER,<br>    Individually and on behalf of all<br>    others similarly situated, | §<br>§<br>§<br>§ | |
|         Plaintiffs, | §<br>§ | CIVIL ACTION NO. B-02-196 |
| vs.. | §<br>§ | |
| CHECK ALERT SYSTEMS, INC. | §<br>§ | |
|        Defendant | §<br>§ | |

### DEFENDANT'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

TO:    Plaintiff, William Foster, Individually and on behalf of all others similarly situated, by and through his attorney of record, Stephen Gardner, Law Office of Stephen Gardner, PC 1845 Woodall Rodgers Freeway, Ste. 1750, Dallas, Texas 75201

      **DEFENDANT, CHECK ALERT SYSTEMS, INC.,** and provides the following Answers

to Plaintiff's Interrogatories in accordance with the Federal Rules of Civil Procedure.

                Respectfully submitted,

                DAW & RAY
                A Professional Corporation

                By: _____
                    Keith Wier
                    State Bar No. 21436100
                    Tina Brumbelow
                    State Bar No. 24031890
                    5718 Westheimer, Suite 1750
                    Houston, Texas 77057
                    (713) 266-3121
                    (713) 266-3188 Facsimile

                ATTORNEYS FOR DEFENDANT,
                CHECK ALERT SYSTEMS, INC.



**EXHIBIT**

G

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of May, 2003, a true and correct copy of the above was mailed and/or faxed in accordance with the Federal Rules of Civil Procedure.

Stephen Gardner
Law Office of Stephen Gardner, PC
1845 Woodall Rodgers Freeway, Ste. 1750
Dallas, Texas 75201

John Ventura
Conrad Bodden
Daniel Whitworth
Law Offices of John Ventura, P.C.
62 E. Price Road
Brownsville, Texas 78521

Tina Brumbelow

**INTERROGATORY NO. 12:**

Please identify the terms of the agreement between Check Alert Systems, Inc's and Martin's Supermarket pursuant to which this account was sought to be collected from Plaintiff.

ANSWER:

**Defendant will produce a copy of the agreement between Check Alert Systems, Inc. and Martin's Supermarket upon execution of a confidentiality agreement regarding use and disclosure of same. Defendant will provide a confidentiality agreement upon request by opposing counsel.**

**INTERROGATORY NO. 13:**

If you file or retain attorneys to file lawsuits to collect consumer account:

a)  Please identify your employee(s) who makes or approves the decisions to file suit or to request an attorney to file suit.

b)  At what point in your collection process is the decision to fill suit made.

c)  State what criteria and policies are used in deciding whether to sue (e.g. minimum dollar amount, distance of consumer from your office, contingency of claim, debtor's assets, defenses to claim) and how those criteria or policies have changed since May 24, 2001.

d)  Identify attorneys you retain to file collection suits in Texas.

e)  Identify the Courts in which you have initiated lawsuits over the last two years in Texas.

f)  Identify each document and other method of communication which Martin's Supermarket authorizes Check Alert Systems, Inc. to initiate lawsuits against consumers.

ANSWER:

**Defendant does not file or retain attorneys to file lawsuits to collect consumer accounts.**

**INTERROGATORY NO. 14:**

State the date upon which you began using the type of notice sent to the Plaintiff in Exhibit "1" and if you have ceased using such notice, when that practice ended and why?

ANSWER:

**Defendant began using the type of Notice in Exhibit "1" on or about October 2000. Defendant ceased using such notice in October 2002 due to this lawsuit.**

(Official Form 1) (9/01)

| FORM B1 | United States Bankruptcy Court<br>Southern District of Texas | Voluntary Petition |
|---|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>FOSTER, WILLIAM LEE | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Soc. Sec./Tax I.D. No. (if more than one, state all):<br>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 | Soc. Sec./Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>3695 OLD HIGHWAY 77 #3<br>Brownsville, TX 78520 | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business:   Cameron | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>P.O. BOX 8713<br>Brownsville, TX 78526 | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

**Information Regarding the Debtor (Check the Applicable Boxes)**

**Venue** (Check any applicable box)
- ☐ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | | **Chapter or Section of Bankruptcy Code Under Which the Petition is Filed** (Check one box) |
|---|---|---|
| ■ Individual(s)    ☐ Railroad | | ☐ Chapter 7    ☐ Chapter 11    ☐ Chapter 13 |
| ☐ Corporation    ☐ Stockbroker | | ☐ Chapter 9    ☐ Chapter 12 |
| ☐ Partnership    ☐ Commodity Broker | | ☐ Sec. 304 - Case ancillary to foreign proceeding |
| ☐ Other_____ | | |

| **Nature of Debts** (Check one box) | **Filing Fee** (Check one box) |
|---|---|
| ■ Consumer/Non-Business   ☐ Business | ■ Full Filing Fee attached |
| **Chapter 11 Small Business** (Check all boxes that apply) | ☐ Filing Fee to be paid in installments (Applicable to individuals only.) |
| ☐ Debtor is a small business as defined in 11 U.S.C. § 101 | Must attach signed application for the court's consideration |
| ☐ Debtor is and elects to be considered a small business under | certifying that the debtor is unable to pay fee except in installments. |
| 11 U.S.C. § 1121(e) (Optional) | Rule 1006(b). See Official Form No. 3.<br>*** John Ventura 20545700 *** |

| Statistical/Administrative Information (Estimates only) | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | *Foster*<br>**EXHIBIT NO. 4**<br>POCKRUS REPORTING SERVICE |

Estimated Number of Creditors

| | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | ☐ | ■ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Debts

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**EXHIBIT H**

(Official Form 1) (9/01)                                                                                6/06/02 1:23PM

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>FOSTER, WILLIAM LEE | FORM B1, Page 2 |
|---|---|---|

| Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet) | | |
|---|---|---|
| Location<br>Where Filed:  - None - | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor:<br>- None - | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X ___/s/ WILLIAM LEE FOSTER_____
   Signature of Debtor WILLIAM LEE FOSTER

X _____
   Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

   June  6, 2002
_____
Date

### Signature of Attorney

X ___/s/ John Ventura 20545700_____
   Signature of Attorney for Debtor(s)
   John Ventura 20545700
_____
Printed Name of Attorney for Debtor(s)
   Law Offices of John Ventura, P.C.
_____
Firm Name
   62 E. Price Rd.
   Brownsville Texas 78521
_____
Address
   (956) 546-9398  Fax: (956) 542-1478
_____
Telephone Number
   June  6, 2002
_____
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.
The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
   Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

### Exhibit A

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐ Exhibit A is attached and made a part of this petition.

### Exhibit B

(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X ___/s/ John Ventura 20545700_____   June  6, 2002___
   Signature of Attorney for Debtor(s)          Date
   John Ventura 20545700

### Exhibit C

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

■ No

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
   Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both.  11 U.S.C. § 110; 18 U.S.C. § 156.

# United States Bankruptcy Court
## Southern District of Texas

In re    WILLIAM LEE FOSTER

_____
Debtor

Case No. _____

Chapter _____ 7 _____

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts from Schedules D, E, and F to determine the total amount of the debtor's liabilities.

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A - Real Property | Yes | 1 | 0.00 | | |
| B - Personal Property | Yes | 3 | 10,921.00 | | |
| C - Property Claimed as Exempt | Yes | 2 | | | |
| D - Creditors Holding Secured Claims | Yes | 1 | | 5,499.06 | |
| E - Creditors Holding Unsecured Priority Claims | Yes | 1 | | 0.00 | |
| F - Creditors Holding Unsecured Nonpriority Claims | Yes | 5 | | 22,345.40 | |
| G - Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H - Codebtors | Yes | 1 | | | |
| I - Current Income of Individual Debtor(s) | Yes | 1 | | | 875.20 |
| J - Current Expenditures of Individual Debtor(s) | Yes | 1 | | | 858.40 |
| Total Number of Sheets of ALL Schedules | | 17 | | | |
| Total Assets | | | 10,921.00 | | |
| Total Liabilities | | | | 27,844.46 | |

6/06/02 1:23PM

In re   WILLIAM LEE FOSTER                                                ,                    Case No. _____
_____
                                        Debtor

# SCHEDULE A. REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. (See Schedule D.) If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Market Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| None | | | | |

| | | |
|---|---|---|
| Sub-Total > | 0.00 | (Total of this page) |
| Total > | 0.00 | |

__0__   continuation sheets attached to the Schedule of Real Property

(Report also on Summary of Schedules)

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                    Best Case Bankruptcy

6/06/02 1:23PM

In re    WILLIAM LEE FOSTER                                                    ,    Case No. _____
Debtor

# SCHEDULE B. PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Market Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1. Cash on hand | X | | | |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | X | | | |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | | KITCHEN; SMALL APPLIANCES | - | 40.00 |
| 5. Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | | 100 COMPACT DISK ( MUSIC) | - | 200.00 |
| 6. Wearing apparel. | | CLOTHING; SUIT, 15 SHIRTS, 7 JEANS, 3 PAIRS OF SHOES, 2 COATS | - | 500.00 |
| 7. Furs and jewelry. | | JEWELRY; 2 CHAINS | - | 100.00 |
| 8. Firearms and sports, photographic, and other hobby equipment. | | MUSICAL INSTRUMENT (CLARINET) | - | 200.00 |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |

Sub-Total >        1,040.00
(Total of this page)

  2   continuation sheets attached to the Schedule of Personal Property

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                    Best Case Bankruptcy

6/06/02 1:23PM

In re ____WILLIAM LEE FOSTER_____,    Case No. _____

Debtor

# SCHEDULE B. PERSONAL PROPERTY
## (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Market Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | | 401K (PREVIOS EMPLOYER) | - | 1,881.00 |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 14. Government and corporate bonds and other negotiable and nonnegotiable instruments. | X | | | |
| 15. Accounts receivable. | X | | | |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |

Sub-Total >          1,881.00
(Total of this page)

Sheet __1__ of __2__ continuation sheets attached
to the Schedule of Personal Property

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                                    Best Case Bankruptcy

8/06/02 1:23PM

In re    WILLIAM LEE FOSTER                                              Case No. _____
_____,
                          Debtor

# SCHEDULE B. PERSONAL PROPERTY
## (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Market Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 22. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23. Automobiles, trucks, trailers, and other vehicles and accessories. | | 1996 DODGE INTREPID ES | - | 8,000.00 |
| 24. Boats, motors, and accessories. | X | | | |
| 25. Aircraft and accessories. | X | | | |
| 26. Office equipment, furnishings, and supplies. | X | | | |
| 27. Machinery, fixtures, equipment, and supplies used in business. | X | | | |
| 28. Inventory. | X | | | |
| 29. Animals. | X | | | |
| 30. Crops - growing or harvested. Give particulars. | X | | | |
| 31. Farming equipment and implements. | X | | | |
| 32. Farm supplies, chemicals, and feed. | X | | | |
| 33. Other personal property of any kind not already listed. | X | | | |

|  |  |
|---|---|
| Sub-Total > (Total of this page) | 8,000.00 |
| Total > | 10,921.00 |

Sheet __2__ of __2__ continuation sheets attached
to the Schedule of Personal Property

(Report also on Summary of Schedules)

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                Best Case Bankruptcy

6/06/02 1:23PM

In re    WILLIAM LEE FOSTER
_____,          Case No. _____
                                                    Debtor

# SCHEDULE C. PROPERTY CLAIMED AS EXEMPT

Debtor elects the exemptions to which debtor is entitled under:
*[Check one box]*
☐ 11 U.S.C. §522(b)(1):   Exemptions provided in 11 U.S.C. §522(d). Note: These exemptions are available only in certain states.
■ 11 U.S.C. §522(b)(2):   Exemptions available under applicable nonbankruptcy federal laws, state or local law where the debtor's domicile has
been located for the 180 days immediately preceding the filing of the petition, or for a longer portion of the 180-day
period than in any other place, and the debtor's interest as a tenant by the entirety or joint tenant to the extent the interest
is exempt from process under applicable nonbankruptcy law.

| Description of Property | Specify Law Providing Each Exemption | Value of Claimed Exemption | Current Market Value of Property Without Deducting Exemption |
|---|---|---|---|
| **Household Goods and Furnishings** | | | |
| KITCHEN; SMALL APPLIANCES | Tex. Const. art. XVI, §49; Tex. Prop. Code §§ 42.001(a) (d), 42.001(a) 1, (2), 42.002(a)(3), 42.002(a)(4); 42.002(a)(5), 42.002(a)(6), 42.002(a)(7), 42.002(a)(8), 42.002(a)(9), 42.002(a)(10), 42.002(a)(11) | 40.00 | 40.00 |
| **Books, Pictures and Other Art Objects; Collectibles** | | | |
| 100 COMPACT DISK ( MUSIC) | Tex. Const. art. XVI, §49; Tex. Prop. Code §§ 42.001(a) (d), 42.001(a) 1, (2), 42.002(a)(3), 42.002(a)(4); 42.002(a)(5), 42.002(a)(6), 42.002(a)(7), 42.002(a)(8), 42.002(a)(9), 42.002(a)(10), 42.002(a)(11) | 200.00 | 200.00 |
| **Wearing Apparel** | | | |
| CLOTHING; SUIT, 15 SHIRTS, 7 JEANS, 3 PAIRS OF SHOES, 2 COATS | Tex. Const. art. XVI, §49; Tex. Prop. Code §§ 42.001(a) (d), 42.001(a) 1, (2), 42.002(a)(3), 42.002(a)(4); 42.002(a)(5), 42.002(a)(6), 42.002(a)(7), 42.002(a)(8), 42.002(a)(9), 42.002(a)(10), 42.002(a)(11) | 500.00 | 500.00 |
| **Furs and Jewelry** | | | |
| JEWELRY; 2 CHAINS | Tex. Const. art. XVI, §49; Tex. Prop. Code §§ 42.001(a) (d), 42.001(a) 1, (2), 42.002(a)(3), 42.002(a)(4); 42.002(a)(5), 42.002(a)(6), 42.002(a)(7), 42.002(a)(8), 42.002(a)(9), 42.002(a)(10), 42.002(a)(11) | 100.00 | 100.00 |
| **Firearms and Sports, Photographic and Other Hobby Equipment** | | | |
| MUSICAL INSTRUMENT (CLARINET) | Tex. Const. art. XVI, §49; Tex. Prop. Code §§ 42.001(a) (d), 42.001(a) 1, (2), 42.002(a)(3), 42.002(a)(4); 42.002(a)(5), 42.002(a)(6), 42.002(a)(7), 42.002(a)(8), 42.002(a)(9), 42.002(a)(10), 42.002(a)(11) | 200.00 | 200.00 |
| **Interests in IRA, ERISA, Keogh, or Other Pension or Profit Sharing Plans** | | | |
| 401K (PREVIOS EMPLOYER) | Tex. Prop. Code § 42.0021 | 1,881.00 | 1,881.00 |

___1___ continuation sheets attached to Schedule of Property Claimed as Exempt

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037

`.6/06/02 1:23PM

In re    WILLIAM LEE FOSTER                                                      Case No. _____
_____,
                           Debtor

## SCHEDULE C. PROPERTY CLAIMED AS EXEMPT
### (Continuation Sheet)

| Description of Property | Specify Law Providing Each Exemption | Value of Claimed Exemption | Current Market Value of Property Without Deducting Exemption |
|---|---|---|---|
| Automobiles, Trucks, Trailers, and Other Vehicles | | | |
| 1996 DODGE INTREPID ES | Tex. Const. art. XVI, §49; Tex. Prop. Code §§ 42.001(a) (d), 42.001(a) 1, (2), 42.002(a)(3), 42.002(a)(4); 42.002(a)(5), 42.002(a)(6), 42.002(a)(7), 42.002(a)(8), 42.002(a)(9), 42.002(a)(10), 42.002(a)(11) | 2,500.94 | 8,000.00 |

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037

Best Case Bankruptcy

In re    WILLIAM LEE FOSTER _____,    Case No. _____
                                                    Debtor

## SCHEDULE D. CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding claims secured by property of the debtor as of the date of filing of the petition. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests. List creditors in alphabetical order to the extent practicable. If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND MARKET VALUE OF PROPERTY SUBJECT TO LIEN | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No. 0300019551 LOAN#150 | | | AUTOMOBILE | | | | | |
| NOTRE DAME FEDERAL CREDIT UNION P.O. BOX 7878 Notre Dame, IN 46556-7878 | | | 1996 DODGE INTREPID ES | | | | | |
| | | | Value $            8,000.00 | | | | 5,499.06 | 0.00 |
| Account No. | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | Value $ | | | | | |

|  | Subtotal (Total of this page) | 5,499.06 |
|---|---|---|
| 0   continuation sheets attached | Total (Report on Summary of Schedules) | 5,499.06 |

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                                   Best Case Bankruptcy

In re    WILLIAM LEE FOSTER                   Case No. _____

                                      Debtor

# SCHEDULE E. CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name and mailing address, including zip code, and account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of this petition.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of claims listed on each sheet in the box labeled "Subtotal" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Repeat this total also on the Summary of Schedules.

■ Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

**TYPES OF PRIORITY CLAIMS** (Check the appropriate box(es) below if claims in that category are listed on the attached sheets.)

☐ **Extensions of credit in an involuntary case**

Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(2).

☐ **Wages, salaries, and commissions**

Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $4,650* per person earned within 90 days immediately preceding the filing of the original petition, or the cessation of business, which ever occurred first, to the extent provided in 11 U.S.C. § 507 (a)(3).

☐ **Contributions to employee benefit plans**

Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐ **Certain farmers and fishermen**

Claims of certain farmers and fishermen, up to $4,650* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(5).

☐ **Deposits by individuals**

Claims of individuals up to $2,100* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(6).

☐ **Alimony, Maintenance, or Support**

Claims of a spouse, former spouse, or child of the debtor for alimony, maintenance, or support, to the extent provided in 11 U.S.C. § 507(a)(7).

☐ **Taxes and Certain Other Debts Owed to Governmental Units**

Taxes, customs duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C § 507(a)(8).

☐ **Commitments to Maintain the Capital of an Insured Depository Institution**

Claims based on commitments to the FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507(a)(9).

*Amounts are subject to adjustment on April 1, 2004, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

<u>  0  </u> continuation sheets attached

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                                  Best Case Bankruptcy

In re    WILLIAM LEE FOSTER _____,    Case No. _____
                                          Debtor

# SCHEDULE F. CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. 555-192-992-9 | | | CREDIT CARD PURCHASES | | | | |
| AMOCO P.O. BOX 790001 Houston, TX 77279-0001 | | - | | | | | 515.10 |
| Account No. 859 257 738 161 | | | TELEPHONE SERVICES | | | | |
| AT&T WIRELESS P.O. BOX 8220 Aurora, IL 60572 | | - | | | | | 104.66 |
| Account No. 7001-0621-1204-0336 | | | CREDIT CARD PURCHASES | | | | |
| BEST BUY CO., INC. P.O. BOX 5238 Carol Stream, IL 60197-5238 | | - | | | | | 575.07 |
| Account No. 852 8996 104 | | | CATALOG ORDER | | | | |
| BMG MUSIC SERVICE P. O. BOX 91545 Indianapolis, IN 46291-0545 | | - | | | | | 109.42 |

__4__   continuation sheets attached

Subtotal (Total of this page)    1,304.25

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                    S/N:24552  Best Case Bankruptcy

6/06/02 1:23PM

In re   WILLIAM LEE FOSTER _____,   Case No. _____

Debtor

## SCHEDULE F. CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | C O D E B T O R | Husband, Wife, Joint, or Community | | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
| | | H W | J C | | | | | |
|---|---|---|---|---|---|---|---|---|
| Account No. 914092447<br><br>CERDIT BUREAU ENTERPRISES<br>PAYMENT PROCESSING CENTER<br>RE: SHELL OIL<br>P.O. BOX 3251<br>Milwaukee, WI 53201-3251 | | - | | CREDIT CARD PURCHASES | | | | 861.47 |
| Account No. 5433 6287 1914 6346<br><br>FIRST PREMIER<br>P.O. BOX 5519<br>SIOUX FALLS, SD 57117-5519 | | - | | CREDIT CARD PURCHASES | | | | 506.97 |
| Account No. 06 5020 039842 0<br><br>FRED MEYER<br>P.O. BOX 105981 DEPT.06<br>Atlanta, GA 30353-5981 | | - | | CREDIT CARD PURCHASES | | | | 184.20 |
| Account No. 6035 2530 3023 8381<br><br>GORDON'S<br>P.O. BOX 9025<br>Des Moines, IA 50368-9025 | | - | | DEBTOR BOUGHT RING FOR FIANCE/NO LONGER HAS RINGS | | | | 2,638.18 |
| Account No. 544 045 005 797 1487<br><br>HOUSEHOLD CREDIT SERVICES<br>P.O. BOX 129<br>Thorofare, NJ 08086-0129 | | - | | COLLECTION AGENCY | | | | 1,364.31 |

Sheet no. __1__ of __4__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)   | 5,555.13 |

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                    Best Case Bankruptcy

5/06/02 1:23PM

In re    WILLIAM LEE FOSTER
_____,    Case No. _____
                              Debtor

## SCHEDULE F. CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | Husband, Wife, Joint, or Community | | | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
| | | H | W J | C | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Account No. 290-038-599-4 | | | | | CREDIT CARD PURCHASES | | | | |
| J.C. PENNY P.O. OX 981131 El Paso, TX 79998 | | | - | | | | | | 312.39 |
| Account No. CARD # 5168172 | | | | | RETURNED CHECK TO GROCERY STORE | | | | |
| MARTIN'S SUPERMARKETS 60 W. COTTER STREET P.O. BOX 2709 South Bend, IN 46680 | | | | | | | | | 69.62 |
| Account No. 824 847 79167 | | | | | CREDIT CARD PURCHASES | | | | |
| MOBIL P. O. BOX 22001 Tulsa, OK 74121 | | | - | | | | | | 101.04 |
| Account No. 4621 2050 4088 9236 | | | | | CREDIT CARD PURCHASES | | | | |
| NCO FINANCIAL SYSTEMS P.O. BOX 41457 Philadelphia, PA 19101-1457 | | | - | | | | | | 1,102.69 |
| Account No. 0300019551 LOAN#142 | | | | | ADVANCE FOR CHECK | | | | |
| NOTRE DAME FEDERAL CREDIT UNION P.O. BOX 7878 Notre Dame, IN 46556-7878 | | | - | | | | | | 467.50 |

Sheet no. __2__ of __4__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)    | 2,053.24

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                    Best Case Bankruptcy

6/06/02 1:23PM

In re     WILLIAM LEE FOSTER                                          Case No. _____
                                                    Debtor

## SCHEDULE F. CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | HWJC | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. 0300019551  LOAN#155<br><br>NOTRE DAME FEDERAL CREDIT UNION<br>P.O. BOX 7878<br>Notre Dame, IN 46556-7878 | | - | SIGNATURE LOAN | | | | 1,855.87 |
| Account No. 4465 6927 0066 7185<br><br>PROVIDIAN VISA<br>P.O. BOX 660022<br>Dallas, TX 75266-0022 | | - | CREDIT CARD PURCHASES | | | | 3,566.41 |
| Account No. 67474831030<br><br>RISK MANAGEMENT ALTERNATIVES, INC.<br>RE: THE ASSOCIATES CREDIT CARD<br>P.O. BOX 4024<br>Reynoldsburg, OH 43068 | | - | CREDIT CARD PURCHASES | | | | 1,206.71 |
| Account No. 1150057025431<br><br>SEARS<br>P.O. BOX 182149<br>Columbus, OH 43218-2149 | | - | CREDIT CARD PURCHASES | | | | 461.50 |
| Account No. 57235-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-01<br><br>SOUTHWESTERN MICHIGAN COL.<br>C/O AFSA DATA CORPORATION<br>PO BOX 3295<br>Milwaukee, WI 53201-3295 | | - | STUDENT LOAN( DEBTOR TO PAY DIRECT) | | | | 5,250.00 |

Sheet no. __3__ of __4__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)            12,340.49

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                                          Best Case Bankruptcy

In re    WILLIAM LEE FOSTER                                                    Case No. _____
_____,
                                            Debtor

## SCHEDULE F. CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| **Account No.** 9-174-403-933 <br><br> TARGET <br> RETAILERS NATIONAL BANK <br> P.O. BOX 59231 <br> Minneapolis, MN 55459-0231 | - | | CREDIT CARD PURCHASES | | | | 587.19 |
| **Account No.** 73-042-6824-1 <br><br> TEXACO <br> P. O. BOX 790001 <br> HOUSTON, TX 77279-0001 | - | | CREDIT CARD PURCHASES | | | | 192.74 |
| **Account No.** 6035 2510 1872 4224 <br><br> ZALES <br> P.O. BOX 9025 <br> Des Moines, IA 50368-9025 | - | | CASH ADVANCES | | | | 312.36 |
| **Account No.** <br><br><br><br> | | | | | | | |
| **Account No.** <br><br><br><br> | | | | | | | |

Sheet no. __4__ of __4__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

| | |
|---|---|
| Subtotal (Total of this page) | 1,092.29 |
| Total (Report on Summary of Schedules) | 22,345.40 |

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037            Best Case Bankruptcy

In re   WILLIAM LEE FOSTER

_____ ,
                    Debtor

Case No. _____

# SCHEDULE G. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests.
State nature of debtor's interest in contract, i.e., "Purchaser," "Agent," etc. State whether debtor is the lessor or lessee of a lease.
Provide the names and complete mailing addresses of all other parties to each lease or contract described.

NOTE:   A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate
schedule of creditors.

■ Check this box if debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| | |

____0____ continuation sheets attached to Schedule of Executory Contracts and Unexpired Leases

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037

Best Case Bankruptcy

In re    WILLIAM LEE FOSTER _____,    Case No. _____

Debtor

# SCHEDULE H. CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. In community property states, a married debtor not filing a joint case should report the name and address of the nondebtor spouse on this schedule. Include all names used by the nondebtor spouse during the six years immediately preceding the commencement of this case.

■ Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
| | |

____0____   continuation sheets attached to Schedule of Codebtors

Copyright (c) 1996-2000 - Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037

In re   WILLIAM LEE FOSTER                           Case No. _____

Debtor

# SCHEDULE I. CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by a married debtor in a chapter 12 or 13 case whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.

| Debtor's Marital Status: | DEPENDENTS OF DEBTOR AND SPOUSE | | |
|---|---|---|---|
| | NAMES<br>None. | AGE | RELATIONSHIP |
| Single | | | |

| EMPLOYMENT: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | CUSTOMER SERVICE REP. | |
| Name of Employer | CONVERGYS CUSTOMER MANGEMENT GROUP | |
| How long employed | 3 WEEKS | |
| Address of Employer | 4600 MONTGOMERTY RD.<br>Cincinnati, OH 45212-0000 | |

| INCOME: (Estimate of average monthly income) | | DEBTOR | | SPOUSE |
|---|---|---|---|---|
| Current monthly gross wages, salary, and commissions (pro rate if not paid monthly) | $ | 1,056.81 | $ | N/A |
| Estimated monthly overtime | $ | 0.00 | $ | N/A |
| SUBTOTAL | $ | 1,056.81 | $ | N/A |
| LESS PAYROLL DEDUCTIONS | | | | |
| a. Payroll taxes and social security | $ | 181.61 | $ | N/A |
| b. Insurance | $ | 0.00 | $ | N/A |
| c. Union dues | $ | 0.00 | $ | N/A |
| d. Other (Specify)_____ | $ | 0.00 | $ | N/A |
| | $ | 0.00 | $ | N/A |
| SUBTOTAL OF PAYROLL DEDUCTIONS | $ | 181.61 | $ | N/A |
| TOTAL NET MONTHLY TAKE HOME PAY | $ | 875.20 | $ | N/A |
| Regular income from operation of business or profession or farm (attach detailed statement) | $ | 0.00 | $ | N/A |
| Income from real property | $ | 0.00 | $ | N/A |
| Interest and dividends | $ | 0.00 | $ | N/A |
| Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above | $ | 0.00 | $ | N/A |
| Social security or other government assistance (Specify) _____ | $ | 0.00 | $ | N/A |
| | $ | 0.00 | $ | N/A |
| Pension or retirement income | $ | 0.00 | $ | N/A |
| Other monthly income (Specify) _____ | $ | 0.00 | $ | N/A |
| | $ | 0.00 | $ | N/A |
| TOTAL MONTHLY INCOME | $ | 875.20 | $ | N/A |

TOTAL COMBINED MONTHLY INCOME   $_____ 875.20 _____     (Report also on Summary of Schedules)

Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document:

In re     WILLIAM LEE FOSTER                                                    Case No. _____
_____,
                              Debtor

# SCHEDULE J. CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

Complete this schedule by estimating the average monthly expenses of the debtor and the debtor's family. Pro rate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate.

☐   Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | |
|---|---|
| Rent or home mortgage payment (include lot rented for mobile home) . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
| Are real estate taxes included?          Yes_____    No___X___ | |
| Is property insurance included?          Yes_____    No___X___ | |
| Utilities:  Electricity and heating fuel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
|           Water and sewer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
|           Telephone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
|           Other_____  . . . . . . . | $ 0.00 |
| Home maintenance (repairs and upkeep) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
| Food . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 125.00 |
| Clothing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 27.00 |
| Laundry and dry cleaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 10.00 |
| Medical and dental expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
| Transportation (not including car payments) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 80.00 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. . . . . . . . . . . . . . . . . . . . . . . | $ 60.00 |
| Charitable contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
| Insurance (not deducted from wages or included in home mortgage payments) | |
|           Homeowner's or renter's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
|           Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
|           Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
|           Auto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 123.00 |
|           Other_____ CELLUAR PHONE_____  . . . . . . . | $ 60.00 |
| Taxes (not deducted from wages or included in home mortgage payments) | |
|           (Specify)_____  . . . . . . . | $ 0.00 |
| Installment payments: (In chapter 12 and 13 cases, do not list payments to be included in the plan.) | |
|           Auto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 175.40 |
|           Other_____ STUDEN LOAN/PAYMENTS START IN JULY 2002_____  . . . . . . . | $ 198.00 |
|           Other_____  . . . . . . . | $ 0.00 |
|           Other_____  . . . . . . . | $ 0.00 |
| Alimony, maintenance, and support paid to others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.00 |
| Payments for support of additional dependents not living at your home . . . . . . . . . . . . . . . . . . | $ 0.00 |
| Regular expenses from operation of business, profession, or farm (attach detailed statement)  . . . . . . | $ 0.00 |
| Other_____  . . . . . . . | $ 0.00 |
| Other_____  . . . . . . . | $ 0.00 |
| **TOTAL MONTHLY EXPENSES** (Report also on Summary of Schedules) . . . . . . . . . . . . . . . . . . | $ 858.40 |

[FOR CHAPTER 12 AND 13 DEBTORS ONLY]
Provide the information requested below, including whether plan payments are to be made bi-weekly, monthly, annually, or at some other regular interval.

| | |
|---|---|
| A. Total projected monthly income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ N/A |
| B. Total projected monthly expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ N/A |
| C. Excess income (A minus B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ N/A |
| D. Total amount to be paid into plan each _____  . . . . . . . | $ N/A |
|                        (interval) | |

# United States Bankruptcy Court
## Southern District of Texas

n re    WILLIAM LEE FOSTER

Debtor(s)

Case No.
Chapter    7

# DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of __18__ sheets *[total shown on summary page plus 1]*, and that they are true and correct to the best of my knowledge, information, and belief.

Date  June 6, 2002

Signature    /s/ WILLIAM LEE FOSTER
WILLIAM LEE FOSTER
Debtor

*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

B27 (Official Form 27)
(Rev. 10/87)

# UNITED STATES BANKRUPTCY COURT
### District of Southern District of Texas

In re: William Lee Foster, 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          Bankruptcy Case No.: 02-10393 - rss
                                                Chapter: 7

Debtor*
Social Security No.: 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
Employer Tax ID. No.:

## DISCHARGE OF DEBTOR

It appears that the person named above filed a petition commencing a case under title 11, United StatesCode on 06/06/02 , that an order for relief was entered under chapter 7, and that no complaint objectingto the discharge of the debtor was filed within the time fixed by the court [or that a complaint objecting to dischargeof the debtor was filed and, after due notice and hearing, was not sustained].

**IT IS ORDERED THAT:**

1. The above-named debtor is released from all dischargeable debts.

2. Any judgment heretofore or hereafter obtained in any court other than this court is null and void as a determination of the personal liability of the debtor with respect to any of the following:

   (a) debts dischargeable under 11 U.S.C. § 523;

   (b) unless heretofore or hereafter determined by order of this court to be nondischargeable, debts alleged to be excepted from the discharge under clauses (2), (4), (6) and (15) of 11 U.S.C. § 523 (a);

   (c) debts determined by this court to be discharged.

3. All creditors whose debts are discharged by this order and all creditors whose judgments are declared null and void by paragraph 2 above are enjoined from instituting or continuing any action or employing any process or engaging in any act to collect such debts as personal liabilities of the above named debtor.

|  |  |
|---|---|
| 09/12/02 | Richard S Schmidt |
| Date | Bankruptcy Judge |

*Set forth all names, including trade names, used by the debtor within the last 6 years. (Bankruptcy Rule 1005).*



UNITED STATES DISTRICT COURT
Southern District of Texas

Case No.: 02-10393
Chapter:  7
Judge:   Richard Schmidt

DEBTOR:          William Lee Foster
Social Security No.:    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
Employer Tax I.D. No.:

FINAL DECREE

The estate of the above named debtor has been fully administered.

____   The deposit required by the plan has been distributed.

IT IS ORDERED THAT:

 X    William Romo is discharged as trustee of the estate of the above-named debtor and the bond
is cancelled;

_X_   The chapter 7 case of the above-named debtor is closed; and

____   (other provisions as needed)

_September 12, 2002_
       Date

_____
United States Bankruptcy Judge

