## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 3 0 2004

Michael N. Milby
Clerk of Court

| | |
|---|---|
| William Foster,<br>Individually and on behalf of all<br>others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Check Alert Systems, Inc.,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

Civil Action B-02-196

Jury Demanded

### RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND

### BRIEF IN SUPPORT

William Foster ("Foster" or "Plaintiff") files this response in opposition to the Motion for Summary Judgment ("MSJ") filed by Check Alert Systems, Inc. ("Check Alert" or "Defendant").

### ORDER OF CONSIDERING PENDING MOTIONS

Foster's motion for class certification has been fully briefed and argued to the Court. Check Alert filed its MSJ after the hearing on class certification. Foster requests that the Court consider and rule on the MSJ first, addressing the class certification issues only if it denies the MSJ. Foster believes that efficiency will be best served by proceeding in this order. If the Court denies the MSJ, class certification is a relatively simple matter. In the event the Court grants the MSJ, it will be unnecessary to expend additional Court time in considering the class certification motion, which will then be moot.

### INTRODUCTION

This is an individual and class action seeking damages and injunctive relief from Check Alert for its violations of the Federal Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), and the Texas Debt Collection Practices Act, TEX. FIN. CODE Ch.

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT,**
**AND BRIEF IN SUPPORT**, page 1

392 ("Texas Act"), both of which prohibit debt collectors from engaging in abusive, deceptive, and unfair practices. Foster brought this case as a class action because Check Alert's practices are routine and damage many consumer debtors in addition to himself.

Foster sues on his own behalf and, as class representative, sues on behalf of two classes of consumers:

> **Class 1.**   All consumers in the United States who have been the victims of the illegal acts of Check Alert that violated the FDCPA, beginning October 11, 2001 (one year prior to the date the Complaint was filed) and continuing to the present.

> **Class 2.**   All consumers residing in Texas who have been victims of the illegal acts of Check Alert that violated the Texas Act, beginning October 11, 2000 (two years prior to the date the Complaint was filed) and continuing to the present.. Class 2 consumers who were the victims of Check Alert's acts beginning one year prior to the date this Complaint was filed are also members of Class 1.

Check Alert's MSJ asks the Court to grant summary judgment because:

1.   The form collection letters Check Alert sent to Foster and thousands of other consumer debtors were merely "informational." [MSJ 7-9.]

2.   Check Alert's form collection letters did not threaten further civil or criminal action. [MSJ 8-11.]

3.   Foster and the class are not entitled to seek statutory damages based on the undisputed fact that Check Alert has engaged in debt collection in Texas without obtaining the bond required by Texas law. [MSJ 11.]

Foster will address each point in turn. First, however, he presents the facts and law relevant to consideration of the MSJ.

### SUMMARY JUDGMENT EVIDENCE

Foster incorporates the evidence attached to Check Alert's MSJ as though it were attached hereto. In addition, Foster attaches excerpts from the deposition of Daire L.

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT,**
**AND BRIEF IN SUPPORT, page 2**

Rendon, Check Alert's corporate representative, taken on August 18, 2003, and referred to herein as "Check Alert Depo."

## FACTS

1.    Check Alert is an out-of-state corporation engaged in the business of collecting debts in this judicial district and elsewhere in the state and nation. Check Alert Depo. 11:10-12:17.

2.    Check Alert Systems, Inc. did not maintain a surety bond as required by Section 392.101 of the Texas Finance Code. Check Alert Depo. 87:2-7.

3.    Check Alert sent debt collection letters to Foster's address in Brownsville, Texas, seeking to collect a small ($34.62) insufficient funds check. Check Alert Depo. 13:8-12; Ex. 5.

4.    Check Alert sent the same form letter to thousands of other consumers during the period May 2001-May 2002. Check Alert Depo. 30:21-31:7; Ex. 18.

5.    This form letter threatened criminal prosecution:

**WE ARE ATTEMPTING TO HELP YOU BEFORE THIS DISHONORED CHECK IS RECOMMENDED FOR FURTHER COLLECTION EFFORTS."**

We have advised you that under State Law, the intentional writing of bad checks can be grounds for **CRIMINAL CHARGES.**

Check Alert Depo. Ex. 5.

6.    In the event this form letter did not elicit a response, it was Check Alert's standard practice to send one final form letter. Check Alert Depo. 26:9-24. This letter continued to threaten both a civil lawsuit and criminal prosecution:

You have ignored our previous notices. If payment is not received for this check, Check Alert Systems, Inc. is obligated to advise *The Merchant* of his right to file a civil or criminal complaint in this matter. Your bad check may be reported to multiple nationwide credit reporting systems.

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT, AND BRIEF IN SUPPORT, page 3**

Check Alert Depo. Ex. 17. Check Alert sent this form letter to Foster. Check Alert Depo. 26:9-24.

7.  At deposition, Check Alert admitted that it did not know the law in Texas regarding insufficient funds checks. Check Alert Depo. 24:3-5.

8.  Of the 14,878 checks Check Alert tried to collect during the period May 2001-May 2002, the great majority—10,639—remained unpaid after Check Alert had completed its collection efforts. Check Alert Depo. 79:9-81:14; Ex. 18.

9.  And Check Alert recommended criminal prosecution against the consumer debtors on these 10,639 checks *only 56 times*. Check Alert Depo. 80:17-80:18.

10.  In other words, although Check Alert threatened criminal action on thousands of cases, it only recommended that the merchant *seek criminal prosecution on less than one percent of those checks that remained unpaid*.

11.  As to civil suit, although Check Alert sent over 5,000 the checks to collection law firms, it was able to confirm that a lawsuit was filed *in only five cases*. Check Alert Depo. 81:19-85:1. Thus, as far as Check Alert could say, a threatened civil suit was actually brought *less than one-hundredth of one percent* of the time.

### RELEVANT LAW

As Check Alert's brief at 6 states, the test for analysis of debt collection abuse claims is the least sophisticated consumer standard. "This standard serves the dual purpose of protecting all consumers, including the inexperienced, the untrained and the credulous, from deceptive debt collection practices and protecting debt collectors against liability for bizarre or idiosyncratic consumer interpretations of collection materials." *Taylor v. Perrin Landry, deLaunay and Durand*, 103 F.3d 1232, 1236 (5th Cir. 1997).

The Fifth Circuit recently affirmed this standard. "We must evaluate any potential deception in the letter under an unsophisticated or least sophisticated consumer

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT,**
**AND BRIEF IN SUPPORT, page 4**

standard. *Taylor v. Perrin, Landry deLaunay & Durand*, 103 F.3d 1232, 1236 (5th Cir.1997). That is, in determining whether the defendant's actions are deceptive under the FDCPA we must assume that the plaintiff-debtor is neither shrewd nor experienced in dealing with creditors. This standard serves the purpose of protecting all consumers, 'including the inexperienced, the untrained and the credulous, from deceptive debt collection practices[.]' *Id.* At the same time we do not consider the debtor as tied to the 'very last rung on the [intelligence or] sophistication ladder.' *Id.*" *Goswami v. American Collections Enterprise, Inc.*, 2004 WL 1680409 (5th Cir. July 28, 2004).

Foster has demonstrated that Check Alert engaged in three forms of abusive debt collection.

**First, in its form collection letters, Check Alert represented that if consumers did not contact it to resolve the matter, there would be further legal action to collect a debt when it did not plan to take such action and did not in fact do so.** Check Alert specifically threatened both criminal prosecution and civil litigation. Check Alert Depo. Ex. 5 & 17. This violates the FDCPA, which provides in pertinent part that:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . . (5) The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .

15 U.S.C. § 1692k(3).

> This practice also violates the Texas Act, which provides in pertinent part that:

> Except as otherwise provided by this section, in debt collection or obtaining information concerning a consumer, *a debt collector may not use a fraudulent, deceptive, or misleading representation* that employs the following practices: . . . (8) misrepresenting the character, extent, or amount of a consumer debt, or *misrepresenting the consumer debt's status in a judicial or governmental proceeding.*

Tex. Fin. Code § 392.304(a) [emphases added].

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT, AND BRIEF IN SUPPORT, page 5**

**Second, in those same letters, Check Alert represented that it could commence criminal charges against the debtor, although it did not plan to do so and did not in fact do so.** The Texas Supreme Court has held that because Texas law does not allow such criminal charges, this threat was false.

"Our Constitution has steadfastly adhered to the fundamental principle that a person is innocent until his guilt is established beyond a reasonable doubt. Pursuant to that mandate, an intricate system of procedural protections is maintained to protect the individual against spurious allegations. To allow creditors or their representatives to circumvent proper procedures would make a mockery of that system. We therefore hold that Oaklawn's threats of criminal prosecution violate the Debt Collection Act as a matter of law." *Brown v. Oaklawn Bank*, 718 S.W.2d 678, 680 (Tex. 1986).

This violates the same sections of the FDCPA and the Texas DCPA discussed above.

**Third, Check Alert violated the Texas Act by engaging in debt collection without filing the required bond.** Finance Code § 392.101 provides: "A third-party debt collector or credit bureau may not engage in debt collection unless the third-party debt collector or credit bureau has obtained a surety bond issued by a surety company authorized to do business in this state as prescribed by this section. A copy of the bond must be filed with the secretary of state." Violation of this requirement Finance Code allows Foster and the class to recover "not less than $100 for each violation." Section 392.403(e).

These actions establish liability as a matter of law. "One purpose of statutory damages is to create an incentive to obey the law." *Strange v. Wexler*, 796 F.Supp. 1117, 1120 (N.D.Ill. 1992).

Whether Foster or any other class member was misled is not an element of this cause of action. "The question is not whether the plaintiffs were deceived or misled, but

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT, AND BRIEF IN SUPPORT, page 6**

rather whether an unsophisticated consumer would have been misled." *Beattie v. D.M. Collections, Inc.*, 754 F.Supp. 383, 392 (D.Del. 1991). Similarly, there is no issue of intent, bad faith or negligence. "Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages." *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996).

## ARGUMENT

None of the grounds on which Check Alert bases its MSJ are sustainable.

**1.    The form collection letter Check Alert sent to Foster and thousands of other consumer debtors was an illegal threat, and not just "informational."**

Check Alert claims that its threats of civil and criminal woes if Foster did not pay the $36.00 check were merely "informational." As a court of appeals (in a case cited by Check Alert in its brief at 6) observed, "we do not believe that any consumer could reasonably believe that NFS intended to provide a public service by informing him" about the creditor's rights. *U.S. v. National Financial Services, Inc.*, 98 F.3d 131, 137 (4th Cir. 1996).

Nonetheless, Check Alert tells the Court that other courts "have found *the language utilized in the letter* to be permissible and not in violation of the FDCPA." MSJ at 5, ¶ 16 and 8, ¶ 25 [*emphasis added*]. In support of this assertion, Check Alert cites two cases. *Bingham v. Collection Bureau, Inc.*, 505 F. Supp. 864 (N. Dak. 1981*); Woolfolk v. Van Ru Credit Corp.*, 783 F. Supp. 724 (D. Conn. 1990).

The problem with these two cases is twofold.

First, and foremost, neither case actually considered "the language utilized in the letter." Thus, Check Alert's assertion to the Court is flatly false.

Second, both cases considered much milder language than Check Alert used. In one case, the language at issue was merely "Avoid Further Action." *Bingham v. Collec-*

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT, AND BRIEF IN SUPPORT, page 7**

*tion Bureau, Inc.*, 505 F. Supp. 864, 872 (N. Dak. 1981). As that court observed, "'Action' is a positive, emphatic, word. But its use cannot be completely denied to a collector because others have used it with specific reference to the judicial process." *Id*. Neither criminal charges nor civil action was mentioned.

In the other case, there was no threat of criminal action. The court noted that "the notice clearly states that 'legal action *will be recommended*' and, hence, is not a representation that the debt collector intends to or has the ability to litigate." *Woolfolk v. Van Ru Credit Corp.*, 783 F. Supp. 724, 726 (D. Conn. 1990). Foster believes that *Woolfolk* is wrongly decided, because a threat of litigation is actionable. However, in this case, Check Alert threatened civil action that it knew would occur at most a few times out of thousands of times it made the threat.

**2.   Check Alert's form collection letter clearly threatened further legal action.**

Check Alert's form letter said that it was "obligated to advise The Merchant of his right to file a civil or criminal complaint in this matter." Check Alert Depo. Ex. 17.

This is a threat of both civil and criminal legal action.

In addition to Exhibit 17, Check Alert flatly told Foster and thousands of other class members that "We have advised you that under State Law, the intentional writing of bad checks can be grounds for CRIMINAL CHARGES." Exhibit 5 [CAPITALS in original].

This, too, is a clear threat of criminal action.

**3.   Foster and the class are entitled to statutory damages.**

Texas Finance Code Section 392.101(a) requires that a debt collector obtain and file a surety bond before it engages in debt collection in Texas. Check Alert agrees that it

has engaged in debt collection in Texas without obtaining the bond. Check Alert Depo. 87:2-7.

Texas Finance Code Section 392.403(a) provides that a person such as Foster may sue for: (1) injunctive relief to prevent or restrain a violation of this chapter; and (2) actual damages sustained as a result of a violation of this chapter.

Foster sued under this section of the Texas act for both actual damages and injunctive relief. Complaint, Prayer, at page 7.

Texas Finance Code Section 392.403(e) provides that "A person who successfully maintains an action under this section for violation of Section 392.101, 392.202, or 392.301(a)(3) is entitled *to not less than $100 for each violation of this chapter.*" This is a form of statutory damage, designed to insure that a defendant does not violate the law without fear of financial risk. *See Strange v. Wexler*, 796 F.Supp. 1117, 1120 (N.D.Ill. 1992).

Foster sought an award of $100 in statutory damages for each instance of collection efforts by Check Alert in Texas without the required bond. Complaint, ¶ 21.

Check Alert can't deny that it violated the Texas Act by failing to have the surety bond. Instead, Check Alert relies on a Texas state court of appeals opinion that found that a consumer had to produce evidence of actual damages to obtain statutory damages. *Elston v. Resolution Services, Inc.*, 95 S.W.2d 180, 184 (Tex.App.—Austin 1997, no writ).

Foster believes that *Elston* was wrongly decided. The court of appeals concluded that a consumer had to prove a violation of subsection (a) of Section 392.403 (providing for injunctive relief or actual damages) before he could be eligible to obtain statutory damages under subsection (e). *Id.*, at 184.

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT,
AND BRIEF IN SUPPORT, page 9**

In other words, the court decided that subsection (e) was actually a provision setting a $100 floor for actual damages. This is incorrect, as is made more clear by the history of the section.

As the law was originally written, there was no provision for any form of statutory damages. As of 1993, the civil remedies section was contained in Vernon Revised Civil Statutes Art. 5069-11.10 (since codified as Chapter 392 of the Texas Finance Code). It provided in its entirety that:

> (a) Any person may seek injunctive relief to prevent or restrain a violation of this Act and any person may maintain an action for actual damages sustained as a result of a violation of this Act. A person who successfully maintains such action shall be awarded attorneys' fees reasonable in relation to the amount of work expended and costs. On a finding by the court that an action under this section was brought in bad faith or for purposes of harassment, the court shall award to the defendant attorneys' fees reasonable in relation to the work expended and costs.
> (b) When the attorney general has reason to believe that a person is violating or is about to violate a provision of this Act, the attorney general may bring an action in the name of the state against the person to restrain or enjoin the person from violating this Act.

In 1993, the Texas legislature added the statutory damages section. At that time, the $100 statutory damages applied to any violation of the Act.

In 1995, the Legislature amended this provision again, to provide its current language that the $100 statutory damages were available only for violations of three discrete sections of the Act: (1) failing to comply with the bonding requirement, as Check Alert did in this case, Section 392.101; (2) failing to correct disputed information in a debt collector's or credit bureau's file, Section 392.202; and (3) falsely representing to a third party that the debtor is willfully refusing to pay a nondisputed debt, Section 392.301(a)(3).

These three provisions address clearly harmful actions that may be difficult to quantify in terms of actual damages, but that warrant punishing those who violate the law.

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT,
AND BRIEF IN SUPPORT**, page 10

Thus, the purpose of this section is best carried out without imposing an additional proof requirement on the consumer. This is fully in keeping with the language of the law as it now exists.

In any event, if the Court determines that the *Elston* court got it right, it does not apply in this case for two reasons. First, Foster seeks injunctive relief, which the *Elston* court recognized might support an award of the $100 statutory damage. *Elston v. Resolution Services, Inc.*, 95 S.W.2d at 183. Second, at this point, Check Alert's point is premature because Foster does seek actual damages as well, thus clearly meeting the *Elston* construction.

## PRAYER

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the motion for summary judgment.

Respectfully submitted,

**John Ventura**
Federal ID No. 1646
State Bar No. 20545700
**Moises M. Salas, Jr.**
Federal ID No. 17506
State Bar No. 00786217
**Law Offices of John Ventura, PC**
62 East Price Road
Brownsville, Texas 78521
Telephone: (956) 546-9398
Telecopier: (956) 542-1478

**Stephen Gardner**
Federal ID No. 16111
State Bar No. 07660600
**Law Office of Stephen Gardner, PC**
6060 North Central Expy., Ste. 560
Dallas, Texas 75206
Telephone: (214) 800-2830
Telecopier: (214) 800-2834

Counsel for Plaintiff and the Class

By: _____
Stephen Gardner

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT,
AND BRIEF IN SUPPORT, page 11**

## CERTIFICATE OF SERVICE

On July 29, 2004, a true and correct copy of the foregoing was sent by United States Mail, in compliance with the Rules of Civil Procedure, to:

Keith Wier / Tina Brumbelow
Day & Ray
5718 Westheimer, Ste. 1750
Houston Texas 77057

Stephen Gardner

# ATTACHMENT

## Excerpts from Deposition of

## Check Alert Systems, Inc.

Page 1

[1]       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
[2]           BROWNSVILLE DIVISION
[3] WILLIAM FOSTER, Individually )
  and on behalf of all others        )
[4] similarly situated,              )
[5]      Plaintiffs,                 )
[6] VS.                              )CIVIL ACTION NO. B-02-196
[7] CHECK ALERT SYSTEMS, INC.,       )
[8]      Defendant.                  )
[9]
[10]
[11]        ORAL DEPOSITION OF
[12]        DAIRE L. RENDON
[13]        August 18, 2003
[14]
[15]     ORAL DEPOSITION OF DAIRE L. RENDON,
[16] produced as a witness at the instance of the
[17] Plaintiffs, and duly sworn, was taken in the
[18] above-styled and numbered cause on August 18, 2003,
[19] from 10 08 a m to 12:38 p.m., before Jeannie M. Hance,
[20] CSR in and for the State of Texas, reported by machine
[21] shorthand, at the Law Offices of Stephen Gardner, 6060
[22] North Central Expressway, Suite 560, Dallas, Dallas
[23] County, Texas, pursuant to the Federal Rules of Civil
[24] Procedure and the provisions stated on the record or
[25] attached hereto.

Page 2

[1]        APPEARANCES
[2]
[3] APPEARING FOR PLAINTIFF:
[4]   Mr. Stephen Gardner
      LAW OFFICE OF STEPHEN GARDNER, P.C.
[5]   6060 North Central Expressway, Suite 560
      Dallas, Texas 75206
[6]   214-800-2380 (office)
      214-800-2834 (fax)
[7]
[8]       -AND-

      Mr Richard A  Mlynek
[9]   LAW OFFICES OF JOHN VENTURA, P.C.
      62 E. Price Road
[10]  Brownsville, Texas 78521
      956-546-9398 (office)
[11]  956-542-1478 (fax)
[12] APPEARING FOR DEFENDANT:
[13]  Mr  Keith Wier
      DAW & RAY, P.C.
[14]  5718 Westheimer, Suite 1750
      Houston, Texas 77057
[15]  713-266-3121 (office)
      713-266-3188 (fax)
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1] DAIRE L. RENDON,
[2] having been first duly sworn, testified as follows:
[3]            EXAMINATION
[4]         BY MR. GARDNER:
[5]    Q: Tell us your name.
[6]    A: Daire Rendon.
[7]    Q: Ms. Rendon, have you ever given a deposition
[8] or testified in court before?
[9]    A: No.
[10]   Q: I am sure Mr. Wier has mentioned a couple of
[11] operating precepts, but in case he didn't and just, in
[12] any event, to underscore them, I would have two
[13] requests to make of you.
[14]    First is that if you are responding in
[15] the affirmative or the negative, you give — call it an
[16] audible. You give me a "yes" or a "no," rather than
[17] merely nodding or shaking your head, or even "uh-huh"
[18] or "huh-uh," because it doesn't always show up on the
[19] transcript well in the latter case, and it never shows
[20] up if you just nod, although a good court reporter
[21] always says "witness nods."
[22]    But to be clear, so that your testimony
[23] is clear, I'd ask that you would say "yes" or "no."
[24] You may also nod or shake your head, but if you would,
[25] do that also.

Page

[1]    As I just illustrated, lawyers tend to go
[2] on and on with questions, and sometimes we have to come
[3] up for air in the middle of a question, and you're not
[4] quite sure where it's going to end, but you know what
[5] we're asking. Please let me finish my question and
[6] shut up before you answer it, also, so that the record
[7] is clear, and, frankly, so that I don't do an about
[8] turn at the end and you've answered the wrong question.
[9] Okay?
[10]   A: Okay.
[11]   Q: Have you ever been either a defendant in a
[12] lawsuit or a plaintiff in a lawsuit before?
[13]   MR. WIER: Object to form. I'm not
[14] trying to be nitpicking. When you say "you," are you
[15] talking about her personally or the company?
[16]   MR. GARDNER: Well, I object to form, as
[17] well.
[18]   Q: (BY MR. GARDNER) Ms. Rendon, you are produced
[19] as the representative for your company. You understand
[20] that?
[21]   A: Yes.
[22]   Q: And when I say "you," unless it's clear that I
[23] just mean you individually, I'm really referring to the
[24] corporation. So let me rephrase that.
[25]   MR. WIER: Okay.

**Page 9**

[1] Q: Okay. And, for the record, being a mom is
[2] real job. That was within my question, so thank you.
[3] Okay.
[4]    Does the corporation have any
[5] disagreement with our allegation that William Foster
[6] lives in Brownsville, Cameron County, Texas?
[7] A: I have no reason to believe otherwise.
[8] Q: I'll put it that way then.
[9]    Does the corporation have any reason to
[10] believe that Mr. Foster and each of the other members
[11] of the alleged class are consumers as defined in the
[12] Fair Debt Collection Practices Act and the Texas Act?
[13] MR. WIER: Object to form.
[14] MR. GARDNER: What's wrong with the form?
[15] MR. WIER: "Consumer" is defined by the
[16] act, so that calls for a legal conclusion.
[17] MR. GARDNER: Okay.
[18] A: In general, I guess we could consider them
[19] consumers.
[20] Q: (BY MR. GARDNER) But you don't have any facts,
[21] is all I'm really trying to explore, that says
[22] Mr. Foster is not a consumer, other class members are
[23] not consumers?
[24] A: Yes, I do.
[25] Q: Okay. What is that?

**Page 10**

[1] A: And, in fact, my company handles a fair amount
[2] of checks that are stolen and forged and counterfeited,
[3] and those checks are not passed by consumers. They are
[4] passed by people who intentionally intend to defraud my
[5] clients, who are retailers.
[6] Q: Do you think Mr. Foster is one of those?
[7] A: I would have no reason to know Mr. Foster's
[8] character.
[9] Q: Okay. You weren't saying they're not
[10] consumers, as Mr. Foster. You're saying that some
[11] people that we've defined in the class might not be
[12] consumers because they did it intentionally?
[13] A: Correct.
[14] Q: Do you dispute that to the degree anybody did
[15] pass an insufficient funds check it was to acquire
[16] consumer type goods or services?
[17] MR. WIER: Objection, form, but you can
[18] answer.
[19] A: I really have no way of knowing what a
[20] person's intention is when they pass a nonsufficient
[21] funds checks.
[22]    A lot of my clients are grocery stores
[23] who cash two-party checks, and when I say "two-party
[24] checks," it doesn't even have to be a payroll check.
[25] It can be a check from Sam to Joe, for that type of

**Page 11**

[1] thing.
[2]    The majority of time it probably is for
[3] goods and services, but, again, I have no way of
[4] knowing that.
[5] Q: (BY MR. GARDNER) Well, do you have any way to
[6] dispute that the class members here passed checks,
[7] whether on insufficient funds or not, for personal,
[8] family, or household purposes?
[9] A: I would assume that they do.
[10] Q: And you would agree with me that Check Alert
[11] does do debt collection in the state of Texas, correct?
[12] A: No. I would not agree with that. I would
[13] agree that the collection — any collection that we do
[14] is a collection of checks, and we collect for Michigan
[15] retailers primarily.
[16] Q: But you do contact people residing in Texas
[17] and other states, in addition to Michigan, correct?
[18] A: We do contact people in other states. We do
[19] not any longer contact people in Michigan — I'm
[20] sorry — in Texas.
[21]    Since being served with this lawsuit, we
[22] now route — any bad check writers that move to Texas
[23] we send directly to attorneys.
[24] Q: Prior to being served, you did attempt to
[25] collect on NSF checks from people with Texas

**Page 1?**

[1] residences, correct?
[2] MR. WIER: Object to form, but you can
[3] answer.
[4] A: What we did was we sent a letter to wherever
[5] the check writer may have moved to to let them know
[6] that we have the check. Again, the checks were written
[7] in Michigan to Michigan retailers.
[8] MR. GARDNER: I'll object to
[9] responsiveness.
[10] Q: (BY MR. GARDNER) The question I'm asking is:
[11] You'll agree with me that y'all wrote to people at
[12] addresses in Texas?
[13] A: Yes. If you want to go back and look at the
[14] history of my company, yes, we have sent letters.
[15] Q: And you did at the time immediately preceding
[16] the filing of this lawsuit, correct?
[17] A: Correct.
[18] Q: Just for the record, I'm going to hand you
[19] Exhibit 1. This is the notice of deposition pursuant
[20] to which you are appearing here, correct?
[21] A: Yes.
[22] Q: And just to get you to identify these, Exhibit
[23] 2 is Check Alert's answers to the interrogatories we
[24] served on Check Alert, correct?
[25] A: Correct.

**Page 13**

[1]  Q: Exhibit 3 is Check Alert's responses to our
[2] requests for admission, correct?

[3]  A: Correct.

[4]  Q: Exhibit 4 are — is the wrong document. I
[5] made a copy of our responses to your request for
[6] production by accident. We don't have an Exhibit 4 at
[7] the moment.

[8]  Exhibit 5, that is a letter that Check
[9] Alert sent to the plaintiff, William Foster, correct —

[10]  A: That's correct.

[11]  Q: — at his address in Brownsville, Texas?

[12]  A: That's correct.

[13]  Q: I will tell you there is in this copy a
[14] grayish large check mark in the middle of Exhibit 5
[15] that looks to be kind of a highlighter mark. Do you
[16] see that?

[17]  A: Yes, I do.

[18]  Q: We don't know where it came from, but is that
[19] something that appears on the original of these?

[20]  A: No, it isn't.

[21]  Q: Otherwise, Exhibit 5 is a copy of the letter
[22] as it went from Check Alert to Mr. Foster, correct?

[23]  A: Correct.

[24]  Q: Now we're getting to the nitty-gritty. Those
[25] were procedural.

**Page 14**

[1]  Who drafted this letter?

[2]  A: I did.

[3]  Q: How did you decide what to put into this
[4] letter, what to say in it?

[5]  A: This is a letter that follows a first
[6] notification and, generally, is mailed out if we are
[7] unable to reach the individual by phone.

[8]  We are attempting to find out, first of
[9] all, if they received the first letter, and we're also
[10] attempting to find out if there was a mistake made, if
[11] this was an intentional writing of the bad check,
[12] because that letter, the response to that letter, may
[13] indicate whether or not the check itself is referred
[14] back to the merchant for criminal prosecution, or if it
[15] goes on to an attorney for long-term — or for
[16] long-term collection in the event that it is not paid.

[17]  Q: But why did you decide on the various
[18] components, various statements you made in this letter,
[19] as opposed to other form letters?

[20]  A: Why did I decide?

[21]  Q: Yes. Well, just to start, right in the middle
[22] under that check it says, "No other way to contact
[23] you." Do you see that?

[24]  A: Correct.

[25]  Q: Why is that?

**Page 15**

[1]  A: Typically it's because we don't have a phone
[2] number to reach the individual.

[3]  Q: Now, that statement is in bold and fairly
[4] large font, correct, relative to —

[5]  A: That's correct.

[6]  Q: I'm sorry. Let me reask it.

[7]  That statement, "No other way to contact
[8] you," is in fairly large and bold font compared to
[9] other sentences in the letter, correct?

[10]  A: That's correct.

[11]  Q: And why did you choose to have that in large,
[12] bold font?

[13]  A: Because it's kind of the name of the letter.
[14] That's our "no other way to contact you" letter. It's
[15] not a first notice. It's a notice that we send because
[16] we've been unable to contact the check writer.

[17]  Q: And that's the point — or a point you want to
[18] make to the recipient, correct?

[19]  A: Correct. In other words, if you have a phone
[20] number and you prefer for us to call you that way,
[21] we're hoping that you'll respond to this letter.

[22]  Q: And this is a second letter after one letter
[23] has gone out, correct?

[24]  A: Correct.

[25]  Q: And you said if you've been unable to reach

**Page 16**

[1] them by telephone, correct?

[2]  A: Correct.

[3]  Q: How many attempts do you make to reach them by
[4] telephone before you send Exhibit 5?

[5]  A: If we have a working phone that hasn't been
[6] disconnected, we make several attempts at different
[7] times of the day. But if we have a disconnected phone
[8] and we've attempted to find a phone and we can't locate
[9] one, then this letter may go out.

[10]  There's no standard because people are
[11] moving. Collecting bad checks is a very fluid
[12] business. People are writing them constantly, and they
[13] move around while they're doing that.

[14]  Q: When you say "bad checks," what do you mean?

[15]  A: I mean checks that are nonsufficient funds,
[16] account closed, no account, stolen, forged,
[17] counterfeit, refer to maker.

[18]  Q: All of those categories, correct?

[19]  A: All of those.

[20]  Q: And some of those categories, as you'd already
[21] said, include people who are knowingly passing an
[22] insufficient funds check knowing they don't have money
[23] in their account, correct?

[24]  A: Correct.

[25]  Q: And some of those are people who don't know

Page 21

[1]    Exhibit 16 is a form D-1, correct — I
[2]  mean —
[3]    A: Correct.
[4]    Q: And Exhibit 16 was sent to Mr. Foster,
[5]  correct?
[6]    A: I believe so.
[7]    Q: And it was the first letter that was sent to
[8]  Mr. Foster; is that correct?
[9]    A: Correct.
[10]    Q: Mr. Foster, you say, did not respond to the
[11]  letter that's exemplified by Exhibit 16, correct?
[12]    A: I believe that's correct, or he would never
[13]  have received this letter.
[14]    Q: Okay. I know y'all do a lot of business, but
[15]  one of the things we did ask you to be ready to testify
[16]  on was the details of Mr. Foster's account, and I'm
[17]  hearing you say you believe things are so.
[18]    A: Uh-huh.
[19]    Q: And if that's the best you can do, I'm happy
[20]  with it. I just need to make sure that — is there
[21]  anyone else who would know better than you what went on
[22]  with respect to Mr. Foster's account?
[23]    A: No. I believe that's the series — according
[24]  to our files, that's what it shows, the letters that he
[25]  was sent.

Page 22

[1]    Q: Oh, okay. So he got Exhibit 16 —
[2]    A: But, again, we have no reason to know if he
[3]  actually received the letters.
[4]    Q: Well, y'all mailed Exhibit 16 —
[5]    A: Yes, we did.
[6]    Q: — to Mr. Foster?
[7]    A: That's correct.
[8]    Q: You're interrupting me.
[9]    A: I'm sorry.
[10]    Q: Well, you're interrupting me, and you know
[11]  where I'm going, but it does make it really hard on the
[12]  court reporter.
[13]    A: Okay.
[14]    Q: She will nod and confirm that maybe.
[15]    How long do you wait — or how long did
[16]  you wait with Mr. Foster's case between sending Exhibit
[17]  16 before you sent Exhibit 5?
[18]    A: Typically we send that notice first and allow
[19]  ten days. It will come in a collector queue to work.
[20]  The collector will determine whether or not there is a
[21]  phone number.
[22]    If there is a phone number that works,
[23]  the collector will attempt to make a phone call to the
[24]  check writer. Because there was no phone and we were
[25]  unable to find a phone, the check — the collector

Page 23

[1]  instead generated the second notice, this one, "No
[2]  other way to contact you."
[3]    In other words, you didn't respond to the
[4]  first notice; we haven't been able to contact you by
[5]  phone; we have no other way to contact you except by
[6]  this letter.
[7]    Typically this letter is not sent until
[8]  30 days after the first one.
[9]    Q: When you say "this letter," you're pointing to
[10]  Exhibit 5 —
[11]    A: Correct.
[12]    Q: — which is your form D-7?
[13]    A: That's correct.
[14]    Q: And this is — you've told us what typically
[15]  happens. That's what happened with respect to Mr.
[16]  Foster, as far as you know?
[17]    A: Yes.
[18]    Q: So let me direct your attention to Exhibit 16,
[19]  your form D-1. The second paragraph says, "You are
[20]  hereby given notice." Do you see that?
[21]    A: Yes, I do.
[22]    Q: Now, halfway through the second line it says,
[23]  "According to Public Law, the intentional writing of
[24]  bad checks can be grounds for criminal charges or
[25]  damages paid to the merchant as high as double the face

Page 24

[1]  value of the check." Do you see that?
[2]    A: Yes.
[3]    Q: Do you know what the law in Texas is for
[4]  insufficient funds checks?
[5]    A: No.
[6]    Q: Is Michigan law what you are citing here?
[7]    A: Yes.
[8]    Q: Precisely what does Michigan law provide for
[9]  criminal charges for an insufficient fund check?
[10]    A: For criminal charges?
[11]    Q: Yes.
[12]    A: For criminal charges it depends on the court.
[13]  A lot of the courts will ask them to pay the face
[14]  amount of the check and service fees as provided by the
[15]  state law.
[16]    If the retailer takes action after 30
[17]  days, if the individual does not respond after 30 days,
[18]  they can bring an action in civil court and charge
[19]  double the face value of the check and damages in the
[20]  amounts of $250 per check.
[21]    Q: Flipping back to Exhibit 5, you've got a
[22]  service charge of $35 stated. Do you see that?
[23]    A: Yes.
[24]    Q: You referred a moment ago to the ability of
[25]  the merchant to assess a service charge, correct?

**Page 25**

[1] A: Correct.

[2] Q: Is it that to which you were referring?

[3] A: Yes. Michigan law that became effective

[4] January 1st of 1999 allows for a state service charge

[5] of $25.

[6]    If the consumer or check writer pays this

[7] amount within seven working days, the amount of the bad

[8] check and $25, he's off the hook, but if it takes him

[9] longer than that, the fee automatically goes up to $35.

[10]    And then, again, if it takes longer than

[11] 30 days, the merchant or his representative can bring

[12] an action against him for double the face value of the

[13] check, the service fee of $35 and $250 in damages.

[14]    Q: And we don't actually have Mr. Foster's D-1

[15] initial letter —

[16] A: Uh-huh.

[17]    Q: — but in Exhibit 16, is it your testimony

[18] that the service charge would there have been $35, $25,

[19] or something else?

[20] A: It would have been $35, because his — this

[21] supermarket sends him two or three letters before they

[22] even send it to us. So he received his initial letters

[23] directly from Martin's.

[24]    Q: And do y'all have copies of those initial

[25] communications?

**Page 26**

[1] A: No, we don't. I don't believe that we do.

[2]    Q: How do you know they sent them?

[3] A: That's their standard practice. They're one

[4] of the few clients I have that don't have the checks

[5] come to me directly from the bank.

[6]    They believe it's customer friendly to

[7] send a letter to them — their customers first, and

[8] give their customers an opportunity to pay.

[9]    Q: Okay. Still looking at Exhibit 5 — I just

[10] want to make sure I'm clear — if the consumer does not

[11] respond to Exhibit 5, the next step is to send Exhibit

[12] 17?

[13] A: Yes.

[14]    Q: And that is what happened to Mr. Foster; is

[15] that correct?

[16] A: That is correct.

[17]    Q: He did not respond to Exhibit 5, and Check

[18] Alert then sent a letter in the form exemplified by

[19] Exhibit 17, which you said is your form D-17, correct?

[20] A: That is correct.

[21]    Q: Is that typically what Check Alert does if

[22] there's no response to form D-7, Exhibit 5?

[23] A: That's what we have done in the past, that's

[24] correct.

[25]    Q: Are there instances where Check Alert takes a

**Page 27**

[1] different step if there is no response to the D-7

[2] letter here, Exhibit 5?

[3] A: Currently, we are no longer using this letter

[4] because of this lawsuit, and we haven't. So now we are

[5] only using this letter and this letter (indicating).

[6]    Q: Okay. For pointing purposes, when you said

[7] you're not using this letter, you were pointing at

[8] Exhibit 5, correct?

[9] A: That is correct.

[10]    Q: And you say now you just go from Exhibit 16 to

[11] Exhibit 17, correct?

[12] A: That is correct.

[13]    Q: Okay. Then let me ask it again. I appreciate

[14] the clarification.

[15]    What I should have said is: At the time

[16] you sent this letter to Mr. Foster, did Check Alert

[17] ever take any step if the consumer did not respond,

[18] other than sending Exhibit 17?

[19] A: Yes.

[20]    Q: What step or steps were those?

[21] A: Occasionally we had additional skiptracing

[22] efforts that located a phone number and allowed us to

[23] talk to the consumer.

[24]    Q: How often as a percentage did that occur?

[25] A: I probably can't give you a good answer on

**Page 28**

[1] that. I don't do the actual collections myself. I

[2] just know that it's common practice for our collectors.

[3]    Our collectors are paid commission, and

[4] the only way they get commission is if a check is paid

[5] with the service fee, and sending a letter to someone

[6] who very likely isn't going to respond is nonproductive

[7] to them. They skiptrace every account between the

[8] letters.

[9]    Q: But other than making that effort, is there

[10] any action taken with respect to this — any individual

[11] account if there is no response to Exhibit 5?

[12] A: Occasionally we refer them on for criminal

[13] prosecution, because by the time they've got this

[14] notification, a particular check writer has several bad

[15] checks, and we have determined that there is criminal

[16] activity, and we take the whole batch and send them on

[17] to all of the retailers who need to file criminal

[18] complaints.

[19]    Q: In May of 2002, approximately how many letters

[20] in the form of Exhibit 5, your form D-7, did Check

[21] Alert send?

[22] A: In one month's time?

[23]    Q: In May 2002, the year, or whatever your

[24] comfortable with. I just need a number, and it may

[25] well be in your stuff here.

**Page 29**

[1]    A: It would be because —

[2]    Q: Okay.

[3]    A: I don't have — I know I don't have numbers

[4]  for just one month, though.

[5]    Q: Well, just the year, a quarter. I don't care.

[6]    A: Okay.

[7]    MR. WIER: Are you talking about folks

[8]  just in Texas or nationwide?

[9]    MR. GARDNER: Nationwide.

[10]    A: That would be in with that. Okay. For the

[11]  period of May 25th, 2001 through May 24th, 2002, we had

[12]  14,878 accounts.

[13]    Now, again, those represent checks, so

[14]  that doesn't represent the number of check writers

[15]  necessarily. That was the total number that were sent

[16]  in that period of time —

[17]    Q: (BY MR. GARDNER) Okay. Let me —

[18]    A: — for every check.

[19]    Q: You have pulled Keith's copy of Exhibit 18,

[20]  and that's what you're referring to, I believe,

[21]  correct?

[22]    A: Yes.

[23]    Q: Okay. And at the top it says "Total accounts

[24]  sent, 14,878"?

[25]    A: Yes.

**Page 30**

[1]    Q: Does that mean that there were 14,878 letters

[2]  went out, or if you had 30 checks written by the same

[3]  person, did you just send one letter, or what?

[4]    A: It means there were 14,878 checks, and if

[5]  there were 14 checks sent to the same consumer, it was

[6]  the same letter.

[7]    Q: Contained within the one letter?

[8]    A: Yes, yes.

[9]    Q: Okay. Do you have any way to determine how

[10]  many individuals received letter 7 in that time period?

[11]    A: No, we don't.

[12]    Q: In your experience, what would you say? How

[13]  many people do you think this reflects?

[14]    A: Can I refer to this Exhibit 17? This is a

[15]  different letter, but you can see they listed all of

[16]  the merchants and all of the bad checks that this

[17]  particular check writer had.

[18]    And on this instance, this particular

[19]  example, there were eight bad checks listed on one

[20]  example.

[21]    Q: I understand. My question is: As the

[22]  operator of this company and, in your experience, doing

[23]  so, approximately what percentage — or how many people

[24]  got letter 7 out of these 14,878 accounts?

[25]    MR. WIER: Object to form, but you may

**Page 31**

[1]  answer.

[2]    A: I'm going to guess. In the area — this may

[3]  actually represent half of the number of consumers, so

[4]  it may actually represent — this says 14,878, so

[5]  perhaps only 7,500 consumers are actually represented.

[6]  But, again, it's only a guess. My software system

[7]  isn't — there isn't any way I could extract that data.

[8]    Q: (BY MR. GARDNER) I'm just asking you based on

[9]  what you have seen.

[10]    A: Yes.

[11]    Q: It's about half, give or take?

[12]    A: I'm guessing, and, again, that's a

[13]  supposition. I'm not sure.

[14]    Q: Well, it's an informed one. I mean, you pay

[15]  attention to these things, I presume, right?

[16]    A: Generally.

[17]    MR. WIER: Objection, form, but you can

[18]  answer.

[19]    Q: (BY MR. GARDNER) Of these 14,878 accounts sent

[20]  in this one-year time period, how many of them were

[21]  referred to a lawyer or for criminal prosecution

[22]  without sending any follow-up letter?

[23]    MR. WIER: Object to form. Do you

[24]  understand the question?

[25]    A: I do understand, but I really didn't — don't

**Page 32**

[1]  have knowledge of that.

[2]    What we did was respond to anyone who

[3]  received a number 7, and these are the results of that

[4]  response. Whether they received a letter 12 or didn't

[5]  receive a letter 12, this is what happened.

[6]    Out of those accounts, those that

[7]  remained unpaid, there were a number that were not

[8]  eligible for attorney referral for particular reasons,

[9]  no address skips. In other words, the 7 determined

[10]  that they were not good addresses, and without a valid

[11]  place to contact the check writer, we can't refer that

[12]  on to anyone.

[13]    There were some because a client

[14]  canceled, so we pulled the letters, pulled the

[15]  accounts. There were bankruptcies, stop payments,

[16]  return requests. There's a number, and you can see

[17]  them all there.

[18]    Those that were eligible for attorney or

[19]  legal referral out of the original number of bad checks

[20]  were 56 percent. Out of that 56 percent, 96 percent

[21]  were referred on to attorney firms, or they were stolen

[22]  or forged and referred back to the clients to send on

[23]  for criminal complaints.

[24]    Q: (BY MR. GARDNER) Okay. Let me start to make

[25]  sure that the record is clear. On Exhibit 18, the top

Page 77

[1] I don't know for what period. Can you tell us?

[2] **A:** For that same period of time.

[3] **Q:** The October 11, 2001 —

[4] **A:** Yes.

[5] **Q:** — October 10, 2002?

[6] **A:** Yes.

[7] **Q:** If we may, I would like to take a break.

[8] **A:** Okay.

[9] **Q:** I think — I'm going to confer. I've got some

[10] more questions. I want to see if Rich has any I've

[11] missed. I think we can finish within about half an

[12] hour. If you want, we can take lunch and come back. I

[13] would hardly recommend we finish up.

[14] **A:** Okay.

[15] **Q:** But I'll leave that to y'all.

[16] (Recess taken.)

[17] **Q:** (BY MR. GARDNER) A question I should have

[18] asked you earlier, looking at Exhibit 18, down at the

[19] bottom, there's a relatively small number of folks that

[20] are, what, four percent, eligible, are not pursued. Do

[21] you see that?

[22] **A:** Yes.

[23] **Q:** What is that, and why were they not pursued?

[24] **A:** They probably would have been referred for

[25] long-term collection, and basically what we do is — if

Page 78

[1] they go to long-term collection, they basically get a

[2] letter saying at this point it affects your credit

[3] record, and that's it. We just list it in the

[4] databases.

[5] **Q:** Is that what long-term collection is?

[6] **A:** Yes. Can I digress on this just a moment?

[7] **Q:** Sure.

[8] **A:** Simply because — to understand what makes a

[9] company work, our income is derived from the service

[10] fees only. Our merchants get paid 100 percent of every

[11] check we collect.

[12] So at some point in time you have to

[13] throw in the towel and say, This is not worth

[14] collecting anymore. We've already spent much more than

[15] we're ever going to recoup from this check writer.

[16] **Q:** Looking still at Exhibit 18, can you tell

[17] us — I think I asked this before, but I want to make

[18] sure — how many of the consumers whose checks are

[19] reflected in Exhibit 18 were referred by Check Alert

[20] for criminal prosecution?

[21] **A:** Those that are listed as stolen and forged or

[22] those that were returned for other reasons due to

[23] criminal complaint.

[24] There is 109 that were stolen and forged.

[25] Those are automatically referred, others returned for

Page 79

[1] criminal complaint, there were 56 accounts. And,

[2] again, those are as a result of other activities in the

[3] computer system that lead us to believe that there's

[4] criminal activity going on.

[5] In other words, we know the account is

[6] closed and yet we see that it's still being used in the

[7] verification system, there are checks popping up on a

[8] daily basis on that account.

[9] **Q:** So of the 14,878 checks, 109 were forwarded

[10] because they were stolen or forged, and 56 were

[11] referred for some other form of criminal activity?

[12] **A:** That's correct.

[13] **Q:** Now, the stolen or forged, are those accounts

[14] where the consumer to whom you write says, "This is not

[15] mine, they were forged, somebody forged my name," or

[16] whatever, or are you saying that the consumer to whom

[17] you wrote stole or forged the check?

[18] **A:** We can't make any assumptions. Sometimes,

[19] even though the check will be stamped insufficient

[20] funds, there will be a police report filed by a

[21] consumer subsequent to that that says this is not me.

[22] That happens afterwards. Or they will file an

[23] affidavit with the bank.

[24] Sometimes — and — but that number is

[25] not reflected here — in the first notice — there's a

Page 80

[1] number we never even send letters to. They come to us

[2] directly from the bank stamped "stolen" or "forged."

[3] We don't send letters on those.

[4] **Q:** But in the 109 that were sent as stolen or

[5] forged, those were not sent for criminal activity

[6] against the consumer?

[7] **A:** Correct.

[8] **Q:** Okay. Now, the 56 other returned for criminal

[9] complaint, do some of those — or were some of those

[10] sent for criminal complaint against the consumer?

[11] **A:** Yes.

[12] **Q:** All of those?

[13] **A:** I assume that they were. They were returned

[14] to our — to our retailer clients with that activity in

[15] mind, that they were going to file a criminal

[16] complaint.

[17] **Q:** So of this — for this sampling, the only

[18] checks where y'all recommended a criminal complaint

[19] against the consumer whose name was on the check was

[20] this 56 number, correct?

[21] **A:** No —

[22] **Q:** Okay.

[23] **A:** — not necessarily correct. Our client may

[24] have called us and said, "This is my employee. We

[25] suspect they've been embezzling money in other ways,

Page 81

[1] but we need these checks back, as well, because we're
[2] building a case."
[3] **Q:** Okay. So either y'all recommended it or they
[4] requested —
[5] **A:** Yes.
[6] **Q:** — the checks back?
[7] **A:** Yes.
[8] **Q:** Let me reask that in a slightly different way.
[9] Of this group in Exhibit 18, only 56 checks were
[10] returned for a criminal complaint against the drafter,
[11] the consumer?
[12] **MR. WIER:** Objection, form, but you can
[13] answer.
[14] **A:** I believe that's the case, yes.
[15] **Q:** (BY MR. GARDNER) Do you know of those 56 how
[16] many were — actually resulted in a criminal complaint
[17] being filed?
[18] **A:** No, I don't.
[19] **Q:** Now, moving back up that same row. You have
[20] three different law firms to which you forward the —
[21] forwarded these checks for some form of activity,
[22] correct?
[23] **A:** Correct.
[24] **Q:** Now, you had said this, and I just didn't get
[25] it written down, Rephen & Associates is located where?

Page 82

[1] **A:** In New York.
[2] **Q:** And Bennett & Deloney?
[3] **A:** Salt Lake City.
[4] **Q:** And then Pottelli is in Michigan?
[5] **A:** Postelli & Nottage.
[6] **Q:** Oh.
[7] **A:** Yeah. It's misspelled. It's supposed to be
[8] Postelli, P-o-s-t-e-l-l-i.
[9] **Q:** Okay. And they're where?
[10] **A:** In Michigan, in Lansing.
[11] **Q:** Okay. First, if you're mostly collecting in
[12] Michigan, why do you have New York and Salt Lake City
[13] lawyers doing the almost entire bulk of the collection
[14] work?
[15] **A:** Because they're licensed in all 50 states, and
[16] because if we have — they can pursue anything anywhere
[17] anyhow.
[18] **Q:** And does your agreement with your merchant
[19] clients allow you, if you can't collect it, to forward
[20] it to these folks for collection — further
[21] collections?
[22] **A:** Our initial agreement does not. Basically it
[23] says we can use any means to collect their checks, but
[24] since, you know, because — since we formulated
[25] relationships with them, most of our — almost all of

Page 83

[1] our clients say, yes, we want you to do whatever it
[2] takes, and if these firms are reliable — they provide
[3] a tertiary collection effort.
[4] **Q:** Primary is the merchant; secondary is y'all?
[5] **A:** No. We are primary.
[6] **Q:** You're primary.
[7] **A:** We are primary.
[8] **Q:** Who's secondary?
[9] **A:** Secondary collection effort, we might keep a
[10] few in our Collect II Division for long-term. That
[11] would be secondary. They provide a tertiary. They
[12] provide a final destination.
[13] **Q:** It doesn't go anywhere after it hits the law
[14] firms?
[15] **A:** Pretty much not.
[16] **Q:** Of the 5,380 Rephen & Associates got,
[17] what did they do with these?
[18] **A:** What do they do?
[19] **Q:** Do they file suit, or do they send a demand
[20] letter?
[21] **A:** From what I understand, they make collection
[22] calls.
[23] **Q:** Do they file suit?
[24] **A:** Yes. They do file suit too, but I don't know
[25] if they filed that many suits, and I don't keep track.

Page 8

[1] We simply keep track of what gets paid so we can take
[2] it out of the database.
[3] **Q:** Of the 5,380 that were forwarded to Rephen &
[4] Associates, can you tell us of one instance where
[5] Rephen & Associates did file a civil lawsuit on behalf
[6] of the merchant against the consumer?
[7] **A:** I can't tell you, no.
[8] **Q:** Can anyone at Check Alert tell me?
[9] **A:** I don't believe so, because we don't track
[10] them after that.
[11] **Q:** Once you send them, you don't know what
[12] happens?
[13] **A:** Right.
[14] **Q:** Okay. Same as to the other law firms?
[15] **A:** No. Postelli & Nottage — we have one client
[16] that typically has large balance checks. Their average
[17] bad check is in the neighborhood of $5,500, and those
[18] generally go to Postelli & Nottage, and she litigates
[19] immediately.
[20] **Q:** So you don't know, but probably in all five of
[21] these —
[22] **A:** Yes.
[23] **Q:** — instances —
[24] **A:** Yes.
[25] **Q:** — Postelli did file a civil lawsuit?

**Page 85**

[1] A: Yes.

[2] Q: You have told us about collection letters

[3] numbered 1, 7, 12, 51, and perhaps one other number.

[4] A: 66.

[5] Q: 66. Why the gaps? Is there a reason that —

[6] where is number 2, where is number 3?

[7] A: We never — we just numbered them that way.

[8] We've never had a sequence of 1, 2, 3, 4, 5.

[9] Q: Is there a logical relation between — one is

[10] the 1, the first one, correct?

[11] A: Uh-huh.

[12] Q: Why is it 6 and not 2? Is there any reason?

[13] A: No. No particular reason.

[14] Q: Well, with all the letters, the ones that

[15] Mr. Foster got, 1, 7, and 12, I think you told me that

[16] you had been the drafter of number 7. Were you also

[17] the drafter —

[18] A: Yes.

[19] Q: — of the others?

[20] A: Yes.

[21] Q: And it is your intent when you send them for

[22] the recipient to read it and respond, correct?

[23] A: Correct.

[24] Q: What is the Bloodhound System?

[25] A: That is a debt collection software that we

**Page 86**

[1] use, owned and operated by Roydan Associates in

[2] Manitowoc, Wisconsin, and it's used by agencies all

[3] over the country.

[4] Q: Is it a system that we've been looking at —

[5] A: Yes.

[6] Q: — the screen prints that you talked about?

[7] A: That's correct.

[8] Q: I have a lawsuit in Manitowoc.

[9] A: You did?

[10] Q: I have no idea where it is. No. It's

[11] pending. I'm just —

[12] A: It's right on Lake Michigan.

[13] Q: Oh, my, lovely. Is it?

[14] A: Yes.

[15] Q: Do you know why they call it "Bloodhound"?

[16] A: "Bloodhound" because — I know they hired a

[17] marketing firm to develop a whole thing, and it has to

[18] do with the bloodhound, and actually their marketing

[19] material has pictures of the hound sniffing around and

[20] leaving tracks, and that's — actually, I thought it

[21] was pretty ingenious, but it's distinctively different

[22] software

[23] Q: I'm not going to mark your portfolio, but

[24] you've been holding up a portfolio you brought with you

[25] with the nice Bloodhound logo on it, correct?

**Page 87**

[1] A: Yes.

[2] Q: At the time you sent the communications to

[3] Mr. Foster, Check Alert Systems did not have a surety

[4] bond in the state of Texas, correct?

[5] A: That's correct.

[6] Q: Does Check Alert have one now?

[7] A: No, we do not.

[8] Q: Because you're not doing collections in Texas?

[9] A: That's correct.

[10] Q: Does Check Alert contend that at the time it

[11] was doing collections in Texas it did not have to have

[12] a surety bond?

[13] MR. WIER: Objection, form.

[14] A: I contend that at the time the letter was sent

[15] to Mr. Foster we were not aware that we needed a surety

[16] bond in the state of Texas.

[17] We have a surety bond in the state of

[18] Michigan. It is the highest bond required in the

[19] country, and we assumed that since we were sending the

[20] letter on behalf of a Michigan retailer and the check

[21] was written in the state of Michigan, that we did not

[22] have to have a bond to send a letter to wherever he

[23] lived.

[24] Q: (BY MR. GARDNER) Let me ask you to look at

[25] Exhibit 21, 22 and 23, which y'all produced earlier

**Page 88**

[1] today.

[2] A: Yes.

[3] Q: I frankly have not had the chance to look

[4] through them, or at least I haven't looked through.

[5] Would you just describe one at a time what Exhibits 21,

[6] 22 and 23 are, starting with 21, please.

[7] A: This is our most current financial statement

[8] for Check Alert Systems as of June 30th, 2003.

[9] Q: This is not an audited statement, is it?

[10] A: No. It was prepared by my CPA.

[11] Q: At the bottom it says, "We are not independent

[12] with respect to Check Alert Systems." Do you see that?

[13] A: Yes. That's her standard form on —

[14] Q: I don't know what that means. Do you?

[15] A: I don't either. I assumed it was CPA language

[16] so that they don't have to be liable for anything that

[17] people don't like.

[18] Q: Well, they're not an outside auditor, correct?

[19] A: Correct.

[20] Q: She does your accounting work?

[21] A: Yes, yes.

[22] Q: I say "she" because there are two shes.

[23] A: Yes.

[24] Q: Do they do your tax work?

[25] A: Yes.

# Check Alert
## S Y S T E M S ,  I N C.
*Telephone Number (231) 775-3473*

PO Box 808
Cadillac MI 49601-0808
RETURN SERVICE REQUESTED

May 24, 2002

05/24/2002-D7   170083   23295
William L Foster
PO Box 8713
Brownsville TX 78526-8713

CHECK ALERT SYSTEMS INC
PO Box 808
Cadillac MI 49601-0808

Debtor ID # 321590
Total Amount Due: $69.62

| Past Due Balance |
|---|

***Detach Upper Portion And Return With Payment***

| Merchant(s): | Account #: | Chk Amt: | Ser Charge: | Total Amount: |
|---|---|---|---|---|
| Martin's Supermarket/Nil | 321590 | $34.62 | $35.00 | $69.62 |

Total Due: 69.62

## >>>>> NO OTHER WAY TO CONTACT YOU! <<<<<

Check Alert Systems, Inc. has made several attempts to contact you, telephone, or by written notice.

WE ARE ATTEMPTING TO HELP YOU BEFORE THIS DISHONORED CHECK IS RECOMMENDED FOR FURTHER COLLECTION EFFORTS."

We have advised you that under State Law, the intentional writing of bad checks can be grounds for **CRIMINAL CHARGES.**

### AVOID FURTHER ACTION AND PROTECT YOUR CHECKWRITING PRIVILEGES

You can stop any further action being taken by remitting the above amount **IN FULL** to Check Alert Systems, PO Box 808, Cadillac, MI 49601. MAKE YOUR PAYMENT BY CERTIFIED CASHIER'S CHECK OR MONEY ORDER. Checks received as payment will be electronically deposited.

This communication is from a collection agency. This is an attempt to collect a debt and all information obtained will be used for that purpose.

1RDCLRT10D7

**CHECK ALERT SYSTEMS, INC.** • 7597 S Mackinaw Trail Suite C • Cadillac MI 49601 • (800) 968-2282

# EXHIBIT 5

PO Box 808
Cadillac MI 49601-0808
RETURN SERVICE REQUESTED

# Check Alert

*Telephone Number (231) 775-3473*

CHECK ALERT SYSTEMS INC
PO Box 808
Cadillac MI 49601-0808

Debtor ID#:
Total Amount Due:

**Past Due Balance**

***Detach Upper Portion And Return With Payment***

| Merchant(s): | Account #: | Chk Amt: | Ser Charge: | Total Amount: |
|---|---|---|---|---|
| | | | | |

Total Due:

## >>>>> IT IS TIME TO SAY NO MORE <<<<<

You have ignored our previous notices. If payment is not received for this check, Check Alert Systems, Inc. is obligated to advise *The Merchant* of his right to file a civil or criminal complaint in this matter. Your bad check may be reported to multiple nationwide credit reporting systems.

IF REPORTED, THIS COULD AFFECT YOUR CREDIT RATING AND REMAIN ON YOUR CREDIT REPORT FOR SEVEN YEARS!!!

All unpaid checks continue to be reported to a nationwide check verification database as well.

Protect your check writing privileges by paying the FULL AMOUNT of the check and the merchant's service fee today by money order or by certified cashier's check. Checks received as payment will be electronically deposited.

This communication is from a collection agency. This is an attempt to collect a debt and all information obtained will be used for that purpose.

CHECK ALERT SYSTEMS, INC. • 7597 S Mackinaw Trail Suite C • Cadillac MI 49601 • (800) 968-2282

**EXHIBIT 17**

DAIRE L. RENDON

94

## CHANGES AND SIGNATURE (Cont'd)

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 56 | 13 | *Weir gave the seminar, NOT the defendant* | |

I, **DAIRE L. RENDON**, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

*Daire L Rendon*
**DAIRE L. RENDON**

THE STATE OF *Michigan*     )

COUNTY OF *Wexford*     )

Before me, *DAIRE L. RENDON*, on this day personally appeared **DAIRE L. RENDON**, known to me (or proved to me under oath or through _____ (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this *22nd* day of *September*, 2003.

*Vicki R Flax  2-17-05*
NOTARY PUBLIC IN AND FOR
THE STATE OF *Michigan*